UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 02-769(DSD/SRN)

Miken Composites, L.L.C.,

Plaintiff,

v. **ORDER**

Wilson Sporting Goods Co.,

Defendant.

Michael H. Streater, Esq., Kurt J. Niederluecke, Esq. and Briggs and Morgan, 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, counsel for plaintiff.

Matthew A. Doscotch, Esq. and Merchant & Gould, 3200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402 and Jeffery A. Key, Suite 1115, 150 North Michigan Avenue, Chicago, IL 60601, counsel for defendant.

This matter is before the court for construction of claims in United States Patent No. 5,415,398 ("the '398 patent"). Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court construes the relevant terms of the '398 patent as follows:

1. As to claim 1, the term "gap" means a space or void between the inner surface of the frame and the outer surface of the insert.

2. As to claim 15, the term "gap" means a space or void between the inside wall of the impact portion and the outer surface of the insert.

3. The term "annular" means ring-like.

4. The phrase "at least part of an annular shape" does not require construction.

5. The term "insert" does not require construction.

6. The phrase "outer diameter less than the inner diameter of the frame" means that the diameter between outer surfaces of the insert is not as large as the diameter between inner surfaces of the frame.

7. The term "adjoining" means "touching."

8. The phrase "the insert being held within the impact portion" means that the insert is constrained to remain within the impact portion during use.

9. The phrase "elastically deflectable across the gap to operably engage the insert" does not require construction.

10. The phrase "elastically deflectable to close a portion of the annular gap and operably engage the insert" does not require construction.

**BACKGROUND**

Plaintiff Miken Composites, L.L.C. ("Miken"), and defendant Wilson Sporting Goods Co. ("Wilson") are both engaged in the business of manufacturing and selling bats. Miken brought this civil action seeking declarations of invalidity, non-infringement and unenforceability of the '398 patent, which Wilson owns. Wilson

counterclaims for a declaration that Miken has infringed the ’398 patent. In the present proceeding, the parties call upon the court to interpret disputed elements of Claims 1, 15 and 18 of the patent.

## DISCUSSION

### I. The Claim Construction Process

“Claim construction begins with the language of the claims.” Housey Pharms., Inc. v. Astrazeneca UK Ltd., 366 F.3d 1348, 1351-52 (Fed. Cir. 2004); see also Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1360 (Fed. Cir. 2004); W.E. Hall Co. v. Atlanta Corrugating, LLC, 370 F.3d 1343, 1350 (Fed. Cir. 2004). The court construes claim language according to its usage and context from the perspective of one having ordinary skill in the relevant art at the time of the invention. See Metabolite Labs., 370 F.3d at 1360; Housey Pharms., 366 F.3d at 1352. There is a “‘heavy presumption’ that the claim terms carry their ordinary meaning.” W.E. Hall Co., 370 F.3d at 1350 (quoting Johnson Worldwide Assocs. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999)); see also Metabolite Labs., 370 F.3d at 1360; Housey Pharms., 366 F.3d at 1352. “Dictionaries and treatises may provide insight into a term’s ordinary meaning thus defined.” Housey Pharms., 366 F.3d at 1352 (citing Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202-03 (Fed. Cir. 2002)).

"If there is a discernable plain and ordinary meaning of the claim language, then this meaning usually defines the scope of the claims unless the patentee has explicitly disclaimed or clearly disavowed this meaning in the specification or prosecution history." Id. at 1352 (citing Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342-43 (Fed. Cir. 2001)). "In other words, a patent applicant may define a term differently from its general usage in the relevant community, and thus expand or limit the scope of the term in the context of the patent claims." Metabolite Labs., 370 F.3d at 1360 (citing Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1347 (Fed. Cir. 2003)).

If the plain and ordinary meaning of a claim term is ambiguous or otherwise not apparent, the court turns to the intrinsic record, including the specification and prosecution history, for guidance. See W.E. Hall Co., 370 F.3d at 1350. Furthermore, even where a claim term seemingly has a plain meaning, its meaning can be overridden in the specification or prosecution history. See id. at 1350 (intrinsic record, where clear, may trump inconsistent dictionary definitions); Middleton, Inc. v. Minn. Mining & Mfg. Co., 311 F.3d 1384, 1388 (Fed. Cir. 2002) (patent applicant may "clearly and unambiguously" disavow claim scope during prosecution).

## II. Disputed Claim Terms

### A. "Gap"

#### 1. Claim 1

The parties' principal dispute concerns the meaning of the term "gap." In claim 1 of the '398 patent, the inventor, Michael Eggiman, claims:

> 1. A bat, comprising:
>
> a hollow tubular bat frame having a circular cross-section; and
>
> an insert positioned within the frame, the insert having a circular cross-section, the insert having first and second ends adjoining the tubular frame, the insert being separated from the tubular frame by a gap forming at least part of an annular shape along a central portion between said first and second ends, the frame elastically deflectable across the gap to operably engage the insert along a portion of the insert between the insert first and second ends.

(Doscotch Decl. Ex. 1 at col. 5, *ll*. 54-65.) Wilson argues that "gap" means an "interruption of continuity" such as would necessarily exist as long as the "frame and insert are not bonded, adhered, welded, braised, riveted, or otherwise attached so as to prevent a sliding interface." (Def.'s Markman Hr'g Mem. at 10.) Wilson asserts that the "gap" limitation of claim 1 does not preclude constant physical contact between the frame and the central portion of the insert. Rather, Wilson contends that the limitation is satisfied by an interruption in continuity between

the frame and insert sufficient to permit independent relative movement of the two parts while the structure is under load, such as the moment when a batter connects with the ball. Wilson's "gap" therefore requires only two dimensions. The "gap" has a circumference around what might be called the longitudinal axis of the bat, and it has a length along that axis.

Miken, on the other hand, argues that the "gap" limitation precludes physical contact between the frame and the central portion of the insert while the bat is not under load. (Miken Composites' Markman Hr'g Mem. at 14.) Miken's "gap" thus has three dimensions: circumference, length and width. The width of Miken's "gap" is a distance along what may be called a latitudinal axis[1] of the bat between the inner surface of the frame and the outer surface of the insert. This added dimension, of course, gives the "gap" a volume, a feature absent from Wilson's conception of the term.

In plain and ordinary usage, a "gap" can, but does not necessarily, refer to a three-dimensional space. A "gap" can mean either "a separation in space" or "a break in continuity." Merriam-Webster's Collegiate Dictionary 480 (10th ed. 1998). "Gap"

[1] By "longitudinal axis," the court refers to a single imaginary line running through the center of the bat from the tip of the handle out through the end of the portion of the bat used to strike a ball. By "latitudinal axis," the court refers to any one of an infinite number of imaginary lines dissecting the longitudinal axis and perpendicular to it.

is not expressly defined in the claim language. The court therefore closely examines the context in which the claim discusses the "gap."

Claim 1 discloses that the frame must be "elastically deflectable across the gap...." (Doscotch Decl. Ex. 1 at col. 5, *ll*. 63-64.) Having been deflected across the gap, the frame must be able to "operably engage the insert along a portion of the insert between the first and second ends." (Doscotch Decl. Ex. 1 at col. 5, *ll*. 64-65.) "Deflect[ion]" connotes movement. "Across" indicates that some distance is traversed. The patent therefore teaches that the frame possesses a capability of movement within the confines of the gap. Specifically, the frame is capable of "deflect[ion] across" the gap. This movement must necessarily occur in one or more dimensions: up or down the length of the bat, around the circumference of the bat, or laterally through the width of the bat.

Bearing in mind the configuration of the frame and insert, only inward movement along a latitudinal axis of the bat would allow the frame to "operably engage the insert." Because the movement occurs "across the gap," the "gap" necessarily features a width or distance along any latitudinal axis of the bat. The gap therefore has three, not two, dimensions, and Miken's conception is presumptively correct.

The court next turns to the specification and prosecution history to confirm that "gap" should be accorded its plain and ordinary meaning within the context of claim 1. The specification does not expressly define "gap." Nevertheless, Wilson points to the specification's teaching that the "gap" need not necessarily be filled with lubricant for the invention to function properly. From this teaching, Wilson argues that the "gap" is not a space or void.

Wilson's argument, however, lacks merit. The fact that a particular embodiment of the invention may lack matter within the "gap" does not prove that the "gap" is not a space or void. If Wilson's logic is valid, the fact that a container is empty proves that it has no volume. This, of course, is absurd and is not the sort of evidence that will overcome the heavy presumption in favor of the claim's plain meaning. See W.E. Hall Co., 370 F.3d at 1350.

Nor does Wilson's definition find support in the prosecution history. Eggiman amended claim 1 three times before it was allowed by the patent examiner. (See Niederluecke Decl. Exs. 6, 8 & 12.) The patent examiner rejected claim 1 the first two times because it was anticipated by U.S. Patent No. 5,219,164 ("Peng '164"). (Id. Exs. 5 & 7.) As Eggiman attempted to distinguish his invention from Peng's, he emphasized the motion of the frame "across" and "through" the gap. (Id. Ex. 6 at 3 (emphasis in original).) After amending claim 1 the second time, Eggiman explained that his "bat frame is elastically deflectable to cross the gap and engage the

insert." (Id. Ex. 8 at 2.) Eggiman asserted that this feature distinguished his invention from Peng '164 because "[t]he gap between the Peng '164 frame 30 and insert 20 is far too wide for the frame to elastically deflect across the gap to engage the insert." (Id. Ex. 8 at 3.)

Eggiman's explanation suggests two conclusions. First, it demonstrates that Eggiman understood "gap" to possess a measurable physical dimension. Notably, Eggiman did not distinguish his "gap" from Peng's "gap" by asserting that his "gap" was an interruption in continuity while Peng's was a space or void. Rather, Eggiman observed that Peng's "gap" was simply "too wide," implying that Eggiman's "gap" would be more narrow so as to allow "for the frame to elastically deflect across the gap to engage the insert." (Id. Ex. 8 at 3.) If the "gap," then, is something Eggiman believed would be amenable to measurement, it cannot not be a mere absence of connection or "interruption in continuity" as Wilson claims.

Second, beyond revealing his own understanding, Eggiman's explanation to the examiner is evidence of how one skilled in the art of bat-making would define "gap" at the time of the '398 patent. To Eggiman, one presumably skilled in the art, the "gap" contained in prior art was "too wide." For the reasons already discussed, if artisans would regard the "gap" as having width, the "gap" must be a space or void, not a lack of continuity or connection. Therefore, the court finds nothing in the intrinsic

record to overcome the plain and ordinary meaning of "gap" within the context of claim 1. Accordingly, the court construes the term to mean a space or void between the inner surface of the frame and the outer surface of the insert.

**2. Claim 15**

Claim 15 also contains the term "gap." In claim 15, Eggiman claims:

> 15. In a hollow bat having a small-diameter handle portion and a large-diameter impact portion, an improvement comprising an internal structural insert defining an annular gap with an inside wall of the impact portion of the bat and the impact portion elastically deflectable to close a portion of the annular gap and operably engage the insert .

(Doscotch Decl. Ex. 1 at col. 6, *ll*. 37-43.) Neither party has argued that "gap" means something different in the context of claim 15 than it does in claim 1. Because claim 15 discusses how the impact portion "close[s] a portion of the annular gap," it, like claim 1, implies that the gap has width, foreclosing Wilson's "interruption in continuity" theory. Further, nothing in the specification or prosecution history tends to show that claim 15's "gap" differs from claim 1's "gap." Thus, within the context of claim 15, the court construes "gap" to mean a space or void between the inside wall of the impact portion and the outer surface of the insert.[2]

---

[2] The court has substituted "impact portion" in its claim 15 (continued...)

**B. "Annular" and "At least part of an annular shape"**

The parties agree that "annular" is an adjective that describes a ring-like shape. (See Def.'s Markman Hr'g Mem. at 2; Miken Composites' Reply at 10.) The court agrees and finds that such a construction would be consistent with the plain and ordinary meaning of the term.

Wilson, however, would have the court expand its definition of "annular" to point out that an "annular shape" is not "perfectly ring shaped, nor must the shape complete a circle." (Def.'s Markman Hr'g Mem. at 2.) The court concludes, however, that the modifier "like" in the compound word "ring-like" sufficiently conveys that an "annular" shape need not be perfectly circular. Accordingly, the court construes the term "annular," as used in claims 1 and 15, to mean "ring-like."

Wilson has also requested that the court construe the phrase "at least part of an annular shape" as used in claim 1. Substituting the court's definition of "annular" in the claim language, the phrase reads: "at least part of a ring-like shape." The court concludes that this phrase speaks for itself and requires no further construction. See United States Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim

[2](...continued) "gap" definition for "frame" in its claim 1 "gap" definition because claim 15 does not contain the term "frame."

construction only required where meaning or scope of terms is unclear or in dispute).

**C. "Insert"**

Miken asks the court to construe "insert" as that term is used in claims 1, 15 and 18. Miken proposes that "insert" means "a structural component that is inserted into the bat frame." (Miken Composites' Markman Hr'g Mem. at 12.) Wilson does not oppose Miken's definition, and the court finds that the term's meaning is clear. Therefore the court does not construe it. See id. at 1568.

**D. "Outer diameter less than the inner diameter of the frame"**

Wilson has asked the court to construe the phrase "outer diameter less than the inner diameter of the frame," hereinafter the "diameter phrase," as it appears in claim 18.[3] Wilson makes its request in response to Miken's assertion that the specification

[3] In claim 18, Eggiman claims:

18. A bat, comprising:
a hollow tubular bat frame having a small-diameter handle portion and a large-diameter impact portion having a circular cross-section with an inner and outer diameter;
at least one insert having a substantially circular cross-section with an outer diameter less than the inner diameter of the frame impact portion, the insert being held within the impact portion; and
the impact portion being inwardly elastically deflectable such to establish a tight interference fit between the insert and the impact portion.

(Doscotch Decl. Ex. 1 at cols. 6-8, *ll.* 66-68 & 1-6.)

"expressly define[s]" the diameter phrase synonymously with "gap." (Miken Composites' Reply at 11.) Wilson argues that the diameter phrase "means simply [that] the outer diameter of the insert is 'not as large as' the inner diameter of the frame." (Def.'s Markman Hr'g Mem. at 2.)

Again the court begins with the plain and ordinary meaning of the claim language from the perspective of one having ordinary skill in the relevant art. The court determines that, consistent with Wilson's interpretation, the plain and ordinary meaning of the diameter phrase is that the diameter between outer surfaces of the insert is not as large as the diameter between inner surfaces of the frame. The court next turns to the specification and prosecution history to determine if the plain meaning has been displaced.

Miken contends that the description section of the specification redefines the diameter phrase.[4] Indeed, Miken argues

---

[4] Referring to a preferred embodiment of the invention, the description states that:

> [b]ecause the outer diameter of the insert 18 is slightly less than the inner diameter of the tubular frame impact portion 12, the suspended insert 18 contacts the tubular frame only at the interference fits of the first and second insert ends 20, 22. A narrow, uniform gap 26 exists between the insert 18 and the inner wall of the impact portion 12. The gap extends uniformly around the insert (see FIG. 3) and along the length of the insert between the first and second ends 20, 22 thereof.

(continued...)

that "the lesser diameter language of claim 18 is expressly defined in the patent specification to have the same meaning as 'gap.'" (Miken Composites' Reply at 11.)

Miken's argument must fail. First, taken on its face, the language quoted by Miken does not purport to define the diameter phrase. Rather, it describes one preferred embodiment of the invention that features both a "gap" and an insert with an outer diameter less than the frame inner diameter. However, that a particular embodiment of the invention possesses both these attributes does not mean that all embodiments according to claim 18 must include both. Indeed, the United States Court of Appeals for the Federal Circuit has repeatedly warned against reading limitations from preferred embodiments into claims. See Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 345 F.3d 1318, 1327 (Fed. Cir. 2003); Resonate, Inc. v. Alteon Websystems, Inc., 338 F.3d 1360, 1364-65 (Fed. Cir. 2003); Abbott Labs. v. Baxter Pharm. Prods., Inc., 334 F.3d 1274, 1280 (Fed. Cir. 2003); Storage Tech. Corp. v. Cisco Sys., Inc., 329 F.3d 823, 831 (Fed. Cir. 2003).

Second, it is not clear that the particular embodiment discussed in the quoted description language relates to claim 18. The description refers to a "suspended" insert. Claim 18 does not. The description refers to permanent "interference fits" at the

[4] (...continued)
(Doscotch Decl. Ex. 1 at cols. 2-3, *ll*. 62-68 & 1-2.)

insert first and second ends. Claim 18 does not. The description refers to a "gap" and teaches that it is "narrow" and "uniform." Claim 18 does not refer to a gap, narrow, uniform or otherwise. Independent claim 17, on the other hand, includes nearly all of these elements. (See Doscotch Decl. Ex. 1 at col. 6, *ll*. 46-65.)

Further, as Wilson points out, another embodiment of the invention is described later in the specification in which "positive attachments of the insert within the frame may be dispensed with" and "interference attachments for the insert" exist only "during impact." (Doscotch Decl. Ex. 1 at col. 5, *ll*. 32-37.) This separate embodiment is consistent with the limitations of claim 18 and is not described as having a "gap" or its equivalent. The court therefore concludes that the plain and ordinary meaning of the diameter phrase is not displaced by the specification or prosecution history. The court therefore construes the phrase "outer diameter less than the inner diameter of the frame," as it appears in claim 18, to mean that the diameter between outer surfaces of the insert is not as large as the diameter between inner surfaces of the frame.

**E. "Adjoining" and "Held"**

The parties ask the court to construe the term "adjoining," which appears in claim 1, and the term "held," which appears in claim 18. Miken argues that both terms are defined synonymously in the specification to require, as to both claims 1 and 18, that

interference fits exist at the insert first and second ends. (Miken Composites' Markman Hr'g Mem. at 22.) Wilson does not propose a construction of "held," but argues that "adjoining" means "next to" or "close contact." (Def.'s Markman Hr'g Mem. at 26.)

**1. "Adjoining"**

The court begins with the term "adjoining" in claim 1. Claim 1 distinguishes the insert first and second ends, which "adjoi[n]" the frame, from the central portion of the insert which is "separated" from the frame by a "gap" or, consistent with the court's construction, "space." Therefore, while there is space between the insert center and the frame, none exists between the frame and the insert ends. Therefore, the insert ends "touch" the frame. This construction is consistent with the dictionary definition of "adjoining." Merriam-Webster's Collegiate Dictionary 15 (10th ed. 1998) (defined as "touching or bounding at a point or line"). The court therefore concludes that the plain and ordinary meaning of "adjoining," as used in the context of claim 1, is "touching."

Turning to the specification and prosecution history, the court finds no merit in Miken's arguments. The court agrees with Wilson that Miken's construction would inappropriately read preferred embodiment and dependent claim limitations into claim 1. See Arlington Indus., 345 F.3d at 1327; Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004) (court must apply

rebuttable presumption that limitation imposed by dependent claim is not present in independent claim). The court's review of the intrinsic evidence reveals no reason to displace the plain and ordinary meaning of "adjoining." Accordingly, the court construes "adjoining," as it appears in claim 1, to mean "touching."

**2. "Held"**

Miken also argues that the term "held," which appears in claim 18, should be construed to require permanent interference fits between the frame and insert. Wilson, on the other hand, contends that "held" is used in claim 18 to express the idea that the insert is constrained so as to remain within the impact portion of the bat during use.

To understand properly the use of "held" in claim 18, the court must consider its context. See Metabolite Labs., 370 F.3d at 1360. The relevant portion of claim 18 describes an "insert," "the insert being held within the impact portion." (Doscotch Decl. Ex. 1 at col. 8, *ll.* 1-2.) "Held" is the past participle form of "hold." Merriam-Webster's Collegiate Dictionary 538 (10th ed. 1998). "Hold," in turn, has several meanings. It can mean "to avoid emitting or letting out," as Wilson urges. Id. at 552. "Hold" can also mean "to support in a particular position or keep from ... moving," consistent with Miken's proposed construction. Id. at 552. Therefore, when the court limits its analysis to the claim language, "held" is seemingly ambiguous.

The court therefore turns to the intrinsic record. See W.E. Hall Co., 370 F.3d at 1350 (specification and prosecution history may be employed to resolve ambiguities in claim terms). The specification does not expressly define "held," but does describe several embodiments of the invention that may be of value in understanding the limitations of claim 18. In the first described embodiment, the insert is "suspended" within the frame impact portion by permanent interference fits at each end of the insert. (See Doscotch Decl. Ex. 1 at col. 2.) In another embodiment, "positive attachments of the insert 18 within the frame 11 may be dispensed with altogether." In that embodiment, the insert "float[s]" within the impact portion of the bat, and interference attachments exist only while the frame is deflected during impact. (See id. Ex. 1 at col. 5.) Centrifugal force created by a batter's swing also "may tend to lodge the insert 18 in the end of the frame, contributing to an attachment." (Id. Ex. 1 at col. 8, *ll.* 1-2.)

The court agrees with Wilson that the second of these two embodiments provides better guidance regarding the meaning of "held." The first described embodiment features several elements that are not suggested by claim 18. For instance, claim 18 makes no reference to permanent interference fits between the frame and the insert ends. Rather, consistent with the features of the second embodiment, claim 18 requires only that the impact portion

to be capable of inward deflection to create an interference fit between the impact portion and insert. Therefore, contrary to Miken's wishes, the court will not import a permanent-interference-fit limitation into claim 18.

The court determines that Wilson's construction is correct. Wilson's definition is consistent with the obvious need to keep the "float[ing]" insert of the second embodiment from flying out the end of the bat during use while still permitting longitudinal movement within the frame. Accordingly, the court construes claim 18's phrase "the insert being held within the impact portion" to mean that the insert is constrained to remain within the impact portion during use.

### 3. "Elastically deflectable" and "Operably engage the insert"

Wilson asks the court to construe the phrase "elastically deflectable across the gap to operably engage the insert," as it appears in claim 1, and the phrase "elastically deflectable to close a portion of the annular gap and operably engage the insert" from claim 15. Miken, however, does not dispute Wilson's understanding of these phrases. Further, the court has already construed "gap," which appears in both phrases, and "annular," which appears in one of them. The court determines that further construction is unnecessary. See United States Surgical Corp., 103 F.3d at 1568.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that the court construes the relevant terms of the '398 patent as follows:

1. As to claim 1, the term "gap" means a space or void between the inner surface of the frame and the outer surface of the insert.

2. As to claim 15, the term "gap" means a space or void between the inside wall of the impact portion and the outer surface of the insert.

3. The term "annular" means ring-like.

4. The phrase "at least part of an annular shape" does not require construction.

5. The term "insert" does not require construction.

6. The phrase "outer diameter less than the inner diameter of the frame" means that the diameter between outer surfaces of the insert is not as large as the diameter between inner surfaces of the frame.

7. The term "adjoining" means "touching."

8. The phrase "the insert being held within the impact portion" means that the insert is constrained to remain within the impact portion during use.

9. The phrase "elastically deflectable across the gap to operably engage the insert" does not require construction.

10. The phrase "elastically deflectable to close a portion of the annular gap and operably engage the insert" does not require construction.

Dated: July 26, 2004

s/David S. Doty
David S. Doty, Judge
United States District Court