UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

---

Miken Composites, L.L.C.,

Plaintiff,

v.

Wilson Sporting Goods Co.,

Defendant.

---

Court File No. 02-CV-769 DSD/SRN

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# I. INTRODUCTION

Defendant Wilson Sporting Goods Co. ("Wilson") has accused Miken Composites, L.L.C. ("Miken") of infringement of United States Patent No. 5,415,398 ("the '398 Patent") relating to "double wall" bats. Wilson has identified nine separate bat models manufactured by Miken that it contends infringe Claims 1,15, and 18 of the '398 Patent.

This Court recently construed certain of the Claims contained in the '398 Patent. With respect to Claims 1 and 15, the Court determined that the term "gap", as used in each of these Claims, requires a space or void between the outer surface of the insert and the inner surface of the bat frame throughout the impact portion of the bat while the bat is not under load. In other words, the "gap" limitation in Claims 1 and 15 precludes physical contact between the frame and the central portion of the insert before the bat impacts a ball. As shown below, however, in each of the nine claimed infringing Miken bat models, the outer surface of the "insert"[1] and the inner surface of the bat frame are in intimate contact with each other throughout the central portion of the "insert" while the bat is not under load. As such, none of the nine bat models infringes Claim 1 or 15 of the '398 Patent.

The Court also interpreted certain terms of Claim 18, including the limitation that the insert have "an outer diameter less than the inner diameter of the frame impact portion." The Court interpreted Claim 18 as not precluding contact between the insert and frame impact

---

[1] As discussed in detail below, only four of the accused Miken bat models have an "insert" in the sense of having a structural member capable of being “inserted” into a bat frame. The other five Miken bat models are manufactured by rolling carbon fiber layers on top of a mandrel, curing the rolled layers at an elevated temperature, and then overlaying the cured carbon fiber layers with a number of successive woven carbon fiber layers that are infused with resin in a closed mold. These carbon fiber layers cannot constitute an “insert” since they are incapable of being “inserted” into a frame. *See* Section III.E., *infra*. For discussion purposes, however, Miken will address herein the interface between the rolled carbon layers (called an “insert” for this limited purpose) and the woven carbon layers (called a “frame” for this limited purpose).

portion. So interpreted, Claim 18 reads directly on United States Patent No. 3,861,682 ("the '682 Patent"), a prior art patent issued more than one year prior to the effective date of the application for the '398 Patent. The '682 Patent discloses and claims a bat having an insert and frame portion, with the insert in contact with the frame portion and capable of creating a "tight interference fit" upon hitting a ball. Thus, Claim 18 must be declared invalid in light of the '682 Patent.

Assuming, *arguendo*, that Claim 18 is not declared invalid by the Court, that Claim requires, among other things, that the impact portion of the bat frame be inwardly elastically deflectable such to establish a "tight interference fit" between the insert and the impact portion of the bat frame. By its terms, Claim 18 precludes a tight interference fit between the insert and the impact portion of the bat frame ***prior*** to impact with the ball. As shown below, however, the "inserts" and "frames" in all but one model of the claimed infringing Miken bats are in a tight interference fit while the bats are not under load, and thus none of these models infringe Claim 18.

Finally, in order to avoid the '398 Patent "reading" on prior art, the '398 Patent must be deemed to exclude from its coverage bats that include an insert that is "tightly abutted" or in a "tight engaging relationship" with the frame. All but one model of the claimed infringing Miken bats have inserts that tightly abut their frames. As such, none of the models with inserts that tightly abut their frames infringe the '398 Patent.

## II. FACTUAL BACKGROUND

### A. The Parties.

Miken is a Wisconsin limited liability company, having its principal place of business in Caledonia, Minnesota. (Wilson's Counterclaim at ¶ 2.) Miken designs, manufactures, and sells softball and baseball bats. (*Id.* at ¶ 5.)

Wilson is a Delaware corporation, with its principal place of business in Chicago, Illinois. (Wilson's Counterclaim, at ¶ 1). Wilson also designs, manufactures, and sells bats. Wilson claims to be the owner by assignment of the '398 Patent.[2] (Wilson Counterclaim, at ¶ 4.)

**B. The Claims of the '398 Patent Allegedly Infringed by Miken.**

Wilson asserts that Miken's bats infringe Claims 1,15, and 18 of the '398 Patent. Those Claims provide as follows:

> 1. A bat, comprising:
>
> a hollow tubular bat frame having a circular cross-section; and
>
> an insert positioned within the frame, the insert having a circular cross-section, the insert having first and second ends adjoining the tubular frame, the insert being separated from the tubular frame by a gap forming at least part of an annular shape along a central portion between said first and second ends, the frame elastically deflectable across the gap to operably engage the insert along a portion of the insert between the insert first and second ends.
>
> 15. In a hollow bat having a small-diameter handle portion and a large-diameter impact portion, an improvement comprising an internal structural insert defining an annular gap with an inside wall of the impact portion of the bat and the impact portion elastically deflectable to close a portion of the annular gap and operably engage the insert.
>
> 18. A bat, comprising:
>
> a hollow tubular bat frame having a small-diameter handle portion and a large-diameter impact portion having a circular cross-section with an inner and outer diameter; at least one insert having a substantially circular cross-section with an outer diameter less than the inner diameter of the frame

[2] The '398 Patent is attached as Ex. 1 to the Declaration of Michael H. Streater (hereinafter "Streater Decl.")

> impact portion, the insert being held within the impact portion; and the impact portion being inwardly elastically deflectable such to establish a tight interference fit between the insert and the impact portion.

('398 Patent, col. 5, line 54 to col. 8, line 5.)

### C. <u>**The Court's Construction of the Claim Term "Gap"**</u>.

By Order dated July 26, 2004, this Court construed certain of the terms of Claims 1,15, and 18 of the '398 Patent. As reflected in the Order, the parties' principal dispute concerned the meaning of the term "gap" as used in Claims 1 and 15. Wilson argued that the "gap" limitation did not preclude constant physical contact between the inner-surface of the bat frame and the central portion of the insert, while Miken argued that the "gap" limitation precludes physical contact between the frame and the central portion of the insert while the bat is not under load. (*See* July 26, 2004 Order at pp. 5-6.) Focusing first on the express language in Claim 1, the Court concluded:

> Because the movement occurs "across the gap," the "gap" necessarily features a width or distance along ***any*** latitudinal axis[3] of the bat. The "gap" therefore has three, not two, dimensions, and Miken's conception is presumptively correct.

(*Id*. at p. 7) (emphasis added).

The Court found nothing in the specification or prosecution history of the '398 Patent to overcome the plain and ordinary meaning of "gap" as determined above. (*Id*. at pp. 8-10.) The

---

[3] The Court defined "longitudinal axis" as referring to a single, imaginary line running through the center of the bat from the tip of the handle out to the end of the portion of the bat used to strike a ball. The Court defined "latitudinal axis" as referring to any one of an infinite number of imaginary lines dissecting the longitudinal access and perpendicular to it. (July 26, 2004 Order at p.6 n. 1.)

Court thus concluded that the term "gap" "mean[s] a space or void between the inner surface of the frame and the outer surface of the insert." (*Id.* at p. 10.)

Certain of the other terms construed in the Court's July 26, 2004 Order are discussed herein.

**D. <u>The Claimed Infringing Bat Models</u>.**

Wilson asserts that the following Miken bat models infringe Claims 1,15, and 18 of the '398 Patent: Viper, hhd, Intensit-E, Velocit-E, Ultra, Ultra II, Velocit-E II, Edge, and M-Pulse.[4] (*See* Wilson Sporting Goods Co.'s First Amended Answers to Miken Composites, L.L.C.'s Interrogatories to Wilson Sporting Goods Co., at p. 4, attached as Ex. 9 to Streater Decl.) Each of these bats is discussed below.

**1. <u>Intensit-E and Velocit-E Bat Models</u>.**

(i) <u>Manufacturing Process</u>.

The processes used to manufacture the Intensit-E and Velocit-E bats are, for the most part, identical. For both bats, the insert is made separately from the frame and then, in a secondary process, it is pressed into the frame using a hydraulic press. (Dr. Dennehy Report, dated October 15, 2003, p. 4, attached as Ex. 4 to Streater Decl.) The inserts are fabricated by table rolling. Three layers of preimpregnated (with resin) glass fiber reinforced/epoxy tape are rolled onto a heated mandrel, wrapped with shrink tape, and cured at elevated temperature. The shrink tape is removed and the insert pulled from the mandrel. The inserts are then run through a grinder to achieve an outside diameter of 2.004 inches to 2.008 inches. (*Id*. at p.4.)[5]

---

[4] Miken no longer manufactures the hhd, Viper, Intensit-E or Velocit-E models. (Declaration of Matthew Vacek (hereafter "Vacek Decl.") at ¶5.)

[5] The only significant difference between the Intensit-E and Velocit-E bats is in the thickness of the insert wall, with the insert in the Velocit-E bat being a little thicker than the insert in the Intensit-E bat. (Dr. Dennehy's Report of October 15, 2003, at pp. 4-5.)

The frames for both bats are manufactured using a resin infusion process. Dry carbon fabric weaves are tightly drawn over a mandrel specified to have an outside diameter of 2.000 inches, placed in a closed mold, and infused with resin. The outside diameter of the mandrel , 2.000 inches, is the inside diameter of the bat frame. (*Id.* at p. 5.)

A basic bat is produced by pressing the insert into the bat frame using a hydraulic press. The force necessary to press the inserts (with an outside diameter specified to be 2.004 to 2.008 inches) into the frames (with inside diameters specified to be equal to or under 2.000 inches) typically exceeded 1000 pounds. (Vacek Decl. at ¶ 6.)

(ii) Interface Between Insert and Bat Frame.

The processes used in the manufacture of the Intensit-E bat and the Velocit-E bat do not introduce or maintain spatial separation of the insert from the frame. Rather, the design of these bats results in an interference fit between the insert and the frame. (Dr. Dennehy's Report of October 15, 2003, at p. 9.) The interference fit between the insert and the frame is demonstrated by the force needed to dislodge the insert from the frame. (Dr. Dennehy's Report of December 1, 2003, at p. 6, attached as Ex. 5 to Streater Decl.) Testing establishes that it takes in excess of 1,000 pounds of force to move the insert inside the frame of a 10-inch long section, the approximate length of the insert within the bat frame in a Velocit-E. (*Id.* at p. 6.)

Optical stereomicroscopy evidence, reproduced below, shows that the insert and frame of the Intensit-E is in intimate contact with each other throughout the impact portion of the bats.[6,7] (Dr. Dennehy's Report of October 15, 2003, at pp. 8-9.)

---

[6] Figure 5.4 of the October 15, 2003 Report of Dr. Dennehy illustrates the intimate contact between the insert and frame in the Velocit-E.

[7] Miken has submitted to the Court samples from the impact portions of each of the bats at issue, along with two samples of fully intact bats with a portion of the impact portion removed. (*See* Exhibits A-J of Declaration of Keith Dennehy (hereafter "Dennehy Decl.")). (Because the Ultra



(Dr. Dennehy 10/15/03 Report, Fig. 5.3)

**2. Ultra and Ultra II Bat Models.**

(i) Manufacturing Process.

The manufacturing process for the Ultra and Ultra II bat models are identical. (Vacek Decl. at ¶ 4.) The process consists of the following major steps: overlaying composite wraps on a mandrel; curing the composite layers; drawing dry fabric weaves over the composite layers; infusing the assembly with resin; and curing and finishing the assembly.

To manufacture the Ultra and Ultra II bats, two layers of carbon fiber material are rolled onto a bat mandrel. The mandrel, with the first two layers on it, is cured at elevated temperature, and then dipped in a release agent. Dry carbon fabric weaves are then tightly drawn over the mandrel (with the first two layers on it) to form the bat. The bat assembly is placed in a closed mold, infused with resin under 750 pounds per square inch of pressure, and cured.

---

and Ultra II are identical, except for weighting (Vacek Decl. at ¶ 4), only the Ultra II was sampled for the Court). An examination of each bat sample demonstrates the intimate contact between the inserts and frames.

Following curing, the mandrel is removed and the basic multi-layer bat produced. (Dr. Dennehy's Report of October 15, 2003, at p. 4.)

(ii) Interface Between Carbon Rolled Layers and Fabric Weave Layers.

The process used in the manufacture of the Ultra and Ultra II bat does not introduce or maintain spatial separation of the "insert" from the "frame."[8] The manufacturing process does not allow for variation in the construction of the wall along the length of or circumferentially around the impact portion of the Ultra II bat. (Dr. Dennehy's Report of October 15, 2003, at p. 8.) In each bat, the outer surface of the "insert" and the inner surface of the "frame" remain in intimate contact with each other along the interface. (*Id*. at p. 8.) This intimate contact is demonstrated by the force necessary to dislodge the "insert" from the "frame." Testing establishes that it takes in excess of 1,200 pounds of force to move the "insert" inside the "frame" of a 10-inch long section. (Dr. Dennehy's Report of December 1, 2003, at p. 5.)

Microscopy evidence, reproduced below, demonstrates that the "insert" and "frame" are in intimate contact with each other throughout the impact portion of the bat. Any discrete separation between the layers is intermittent and imperceptible, measuring less than 0.0009 inches. (Dr. Dennehy's Report of October 15, 2003, at p. 8.)

[8] Given the manufacturing method of overlaying each successive carbon fiber layer on top of the mandrel and the previous layers, the Ultra and Ultra II bats do not have an "insert" because the various carbon layers are incapable of being "inserted" into a bat frame. *See* Section III.E., *infra*. Again, however, to demonstrate that these bats also lack the required interface between the "insert" and the "frame," Miken addresses herein the interface between the carbon rolled layers (called "insert" for this limited purpose) and the woven carbon layers (called "frame" for this limited purpose).




(Dr. Dennehy 10/15/03 Report, Fig. 3.5.)




(Dr. Dennehy 10/15/03 Report, Fig. 3.8.)

**3. M-Pulse, Velocit-E II and Edge Bat Models**.

(i) Manufacturing Process.

The design and manufacture of the M-Pulse, Velocit-E II, and Edge bats are similar to each other and closely resemble the design and manufacture of the Ultra and Ultra II bat models described above. The process consists of the following major steps: overlaying composite wraps on a mandrel; curing the composite layers; drawing dry fabric weaves over the composite layers; infusing the assembly with resin; and curing and finishing the assembly. (Dr. Dennehy's Report of January 15, 2004, at. p. 3, attached as Ex. 6 to Streater Decl.)

To manufacture the M-Pulse, Velocit-E II and Edge bats, two layers of carbon fiber material are rolled onto a bat mandrel. The mandrel (with the first two layers on it) is cured at elevated temperature, and then dipped in a release agent. Dry carbon fabric weaves are tightly drawn over the mandrel (with the first two layers on it) to form the bat. The bat assembly is placed in a closed mold, infused with resin under 750 pounds per square inch of pressure, and cured. Following curing, the mandrel is removed and the basic multi-layer bat produced. (*Id*. at p. 3.)

(ii) Interface Between Carbon Rolled Layers and Fabric Weave Layers.

The processes used to manufacture the M-Pulse, Velocit-E II, and Edge bats do not introduce or maintain spatial separation between the "insert" and the "frame."[9] The outer layer of the "insert" and the inner layer of the "frame" remain in intimate contact with each other along the interface. (Dr. Dennehy's Report of January 15, 2004, at p. 6.) Given the similarities in design and manufacture between these bat models and the Ultra II, Miken's engineering expert opines that it would take forces comparable to those represented for the Ultra II (that is, in excess of 1200 pounds) to move the "inserts" in their "frames" of these models. (Dennehy Decl. at ¶ 4.)

The magnified cross-sections of the walls of a Velocit-E bat, shown below, is illustrative of the intimate contact between the insert and frame in all three bat models.[10,11] (January 15, 2004 Report, p. 6.)

[9] As discussed, *supra*, while the M-Pulse, Velocit-E II, and Edge bats do not have an "insert," for the purposes of demonstrating the lack of the required interface between the "insert" and the "frame," Miken addresses herein the interface between the carbon rolled layers (called "insert" for this limited purpose) and the woven carbon layers (called "frame" for this limited purpose).

[10] Figures 1.3 and 1.5 from Dr. Dennehy's Report of January 15, 2004 depict the intimate contact between the inserts and frames in the M-Pulse and Edge bats, respectively.

[11] For the M-Pulse and Velocit-E II bats, the intimate contact between the "insert" and the "frame" is maintained throughout the entire sectioned impact portions. (Dr. Dennehy's Report of January 15, 2004, p. 6). In the particular Edge bat that was examined under microscope, there is some separation between the "insert" and the "frame" at the location where the insert/frame wall construction transitions to the frame only wall construction (i.e. the lower approximate 3 inches of the impact portion of the bat). This separation may simply be a manufacturing flaw unique to the particular Edge bat evaluated. (*Id*. at p. 7.) In any event, beyond the lower approximate 3 inches of the impact portion of the Edge bat and continuing through the remainder of the length and circumference of the "insert" (approximately 6 inches in length), the "insert" and the "frame" are in intimate contact. (*Id*. at pp. 6-7.)




(Dr. Dennehy 1/15/04 Report, Fig. 1.4.)

**4. <u>hhd and Viper Bat Models</u>.**

(i) <u>Manufacturing Process</u>.

The processes used to manufacture the hhd and Viper bats are, for the most part, identical. Both bats used an aluminum tube insert. The frames for the two bats were fabricated similar to frames for the Intensit-E and Velocit-E bats, described *supra*, using dry prewoven fabrics and a resin infusion process.

The outside diameter of the aluminum inserts for the hhd and Viper were specified to be 2.00 inches, and the outside diameter of the mandrels used to produce the frames for the bats were specified to be 2.00 inches (i.e. the inside diameter of the hhd and Viper bat frames). The aluminum inserts were manually pushed into the cured frames of the hhd and Viper bats. The force needed to push the inserts into the frames varied: "…some of them (aluminum inserts) fell in and some were pounded on the floor to get them in." (Dr. Dennehy's Report of January 15, 2004, at pp. 3-4.)

(ii) Interface Between Insert and Bat Frame.

Specifying the outside diameter of the aluminum inserts of the hhd and Viper bats to be 2.00 inches and the inside diameter of the frames to be 2.00 inches (i.e. the outside diameter of the mandrels used to manufacture the frames) ideally produced bats where the insert was in direct contact with and tightly abutted to the frame. However, given bilateral tolerances on these two dimensions (i.e. allowing variation in both directions from the basic size of 2.00 inches)[12] there would have been occasions where the inserts had to be forced into the frames (an oversized aluminum insert and/or an undersized frame), and occasions where the inserts slid into the frames (an undersized aluminum insert and/or an oversized frame). (Dr. Dennehy's Report of January 15, 2004, at p. 7.) Intimate contact between the insert and the frame throughout the impact portion of the bat would occur in the hhd and Viper bats where the inserts were forced into the frames. (Dr. Dennehy's Report of January 15, 2004, at p. 7.) As reflected in the microscopy image below, even where there is measurable separation between the insert and the frame due to manufacturing tolerances, it is intermittent, and significant surface areas of the inserts and frames remain in contact.

[12] According to the supplier of the aluminum inserts used in the hhd and Viper bats, the expected tolerance on a 2.00 inch specified diameter aluminum tube was ± 0.005 inches, meaning that tube diameter could be as large as 2.005 inches, or as small as 1.995 inches. (Vacek Decl. at ¶ 7.)



(Dr. Dennehy 1/15/04 Report, Fig. 1.9.)

Due to the manufacturing tolerances, Miken could not ensure intimate contact between the insert and frame on the hdd bats. If a bat lacked intimate contact, the insert would not necessarily be held within the bat, and could "fly" out the end of the bat. To remedy this problem, Miken modified its manufacturing process, bonding the insert into to frame of the hdd to ensure intimate contact. Ultimately, approximately 85% of the hdd bats sold had inserts bonded to the frames. (Vacek Dep. at pp. 31-32, attached as Ex. 10 to Streater Decl.).

## III. ARGUMENT

### A. Standard for Summary Judgment.

A motion for summary judgment must be granted if the evidence and affidavits submitted to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). See also *Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 834 (8th Cir. 2000)

("Summary judgment is an appropriate remedy despite factual discrepancies unless genuine issues of *material* fact remain.") (emphasis in original.) A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Anderson*, 477 U.S. at 252.

To avoid summary judgment, the non-moving party cannot rely on mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof. *Mayard v. Hopwood*, 105 F.3d 1226, 1228 (8th Cir. 1997) (citing *Celotex*, 477 U.S. at 322). "[A] complete failure of proof regarding an essential element renders all other facts immaterial." *Dominium Mgmt. Servs. v. Nationwide Housing Group*, 986 F. Supp. 578, 581 (D.Minn. 1997) (citing *Celotex*, 477 U.S. at 322-23).

A claim of literal patent infringement involves a two-step analysis: (1) the proper construction of the asserted claims; and (2) a determination as to whether the accused product infringes the asserted claims as construed by the court. *Markman vs. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995, *aff'd.*, 116 S.Ct. 1384, 1393 (1996)); *Vitronics Corp. vs. Conceptronic, Inc.*, 90 F.3d 1576, 1581-82 (Fed. Cir. 1996). To establish literal infringement, Wilson must establish that each and every claim limitation is present in the allegedly infringing product. *See, e.g.*, *Dolly, Inc. vs. Spalding & Evenflo Co.s., Inc.*, 16 F.3d 394, 397 (Fed. Cir.

1994). "If even one limitation is missing or not met as claimed, there is no literal infringement." *Mas-Hamilton Group vs. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998).[13]

Applying these standards to the undisputed facts in this case, summary judgment should be granted in favor of Miken.

**B. <u>None of the Miken Bat Models Infringe Claim 1 or 15 Because There Is No Gap Between the Insert and Frame in the Impact Portion in Each Bat Prior to Loading</u>.**

Claims 1 and 15 of the '398 Patent require, among other things, that the inner surface of the frame be separated from the outer surface of the insert by a "gap":

> 1. …the insert being separated from the tubular frame by a ***gap*** forming at least part of an annular shape along a central portion between said first and second ends [of the insert]…" (emphasis added)
>
> 15. …an improvement comprising an internal structural insert defining an annular ***gap*** with an inside wall of the impact portion of the bat…" (emphasis added)

The Court's July 26, 2004 Order construed "gap" to preclude physical contact between the frame and the central portion of the insert before the bat impacts a ball. In the Intensit-E, Velocit-E, Ultra, Ultra II, M-Pulse, Velocit-E II and Edge models, however, there is intimate contact between the inner surface of the bat frame and the outer surface of the "insert" throughout the impact portion of the bat, longitudinally and circumferentially. With respect to the Viper and hhd models, there is a possibility, due to manufacturing tolerances, that some of the manufactured bats have areas of separation between the inner surface of the bat frame and the outer surface of the inserts. Even in those particular models, however, there are significant areas of contact between the insert and bat frame surfaces. Indeed, Douglas Guenther, one of Wilson's

---

[13] Wilson has not alleged infringement under the doctrine of equivalents. (*See* Wilson Sporting Goods Co.'s First Amended Answers to Miken Composites, L.L.C.'s Interrogatories to Wilson Sporting Goods Co., at pp. 4-6, attached as Ex. 9 to Streater Decl.)

engineering experts, admits that there is contact between the inserts and frames in each of the nine Miken bat models alleged to have infringed. (Guenther Dep. at pp. 149-150, attached as Ex. 8 to Streater Decl.)

Because the "gap" limitation of Claims 1 and 15 is missing in each of the bat models alleged to infringe the '398 Patent, there is no literal infringement.[14]

**C. <u>The Fujii '682 Patent Invalidates Claim 18</u>.**

**1. <u>Legal Standards</u>.**

A patent is presumed valid. 35 U.S.C. § 282. However, where a prior art patent anticipates claims of the patent-in-suit, those claims will be declared invalid. *Schering Corp. v. Geneva Pharmaceuticals, Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003); 35 U.S.C. § 102(b) ("a person shall be entitled to a patent unless the invention was patented or described in a printed publication . . . more than one year prior to the date of the application").

A prior art patent anticipates when it discloses and enables[15] every element of the claimed invention such that a person of ordinary skill in the art could practice the invention without undue experimentation. *See Schering Corp.*, 339 F.3d at 1377; *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1282 (Fed. Cir. 2000); *PPG Indus. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996). In addition to explicit disclosures, features inherent

---

[14] There is an additional basis for a finding of non-infringement of Claims 1 and 15 with the respect to the hhd bat. According to Wilson's other engineering expert, a "gap" will exist if the "bat frame and insert are not bonded, adhered, welded, brazed, riveted, or otherwise attached so as to prevent a sliding interface." (Expert Report of David M. Parks, p. 22, attached as Ex. 7 to Streater Decl.). As indicated *supra*, however, shortly after Miken began manufacturing the hhd, it began gluing the insert to bond it the frame. Accordingly, even under Wilson's interpretation of the term "gap", the "bonded" hhd bats do not have a "gap", and they cannot infringe Claims 1 or 15 of the '398 Patent.

[15] Both the claimed and unclaimed disclosures in a prior art patent are presumed to be enabling. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003) (patentee holds burden of proving non-enablement of prior art).

in a prior art patent can also invalidate challenged claims. *Schering Corp.*, 339 F.3d at 1379; *EMI Group N. Am., Inc. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1350 (Fed. Cir. 2001). Inherent features or benefits do not need to be recognized by ones skilled in the art to anticipate the patent. *Shering Corp.*, 339 F.3d at 1377; *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1366 (Fed. Cir. 1999); *Atlas Powder Co. v. E.I. du pont De Nemours & Co.*, 750 F.2d 1569, 1348-49 (Fed. Cir. 1984). Materials incorporated by reference into a patent can also anticipate the claimed invention. *Advanced Display Systems*, 212 F.3d at 1282.

Though anticipation is generally a question of fact, *Advanced Display Systems*, 212 F.3d at 1281, summary judgment is proper where no genuine dispute exists whether the limitations of the claimed invention are disclosed by the prior art patent. *See Hazani v. United States Int'l Trade Comm'n*, 126 F.3d 1473, 1477 (Fed. Cir. 1997) (summary judgment appropriate where prior art patent disclosed each and every feature recited in claim); *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561-62 (Fed. Cir. 1988).

**2. <u>The Fujii '682 Patent Discloses Every Element of Claim 18</u>.**

The '398 Patent was filed on June 10, 1994, claiming priority to a prior application filed on May 14, 1993. Accordingly, the critical date for the claimed invention can be no earlier than May 14, 1992, and any patent that issued prior to that date is prior art under both the "patented" and "printed publication" clauses of Section 102(b).

Seventeen years prior to the 1992 critical date, U.S. Patent No. 3,861,682 ("the '682 Patent")[16] issued to Hirokaru Fujii claiming a particular construction of a baseball bat. The '682 Patent discloses a "bat comprising a bat body made of a metallic tube material . . . also includ[ing] a metallic repellent member disposed therein." ('682 Patent, Abstract.) The

[16] A copy of the '682 Patent is attached as Ex. 3 to Streater Decl.

arrangement of Fujii's bat body and repelling insert "increases the repellency of the bat portion for hitting the ball." (*Id.*) Figure 3 of the '682 Patent is "an elevation showing a second embodiment of the present invention, with parts broken away" and discloses the configuration of the repelling insert (20) and the bat body (11):




FIG. 3

> In FIG. 3 is illustrated a second embodiment carried out in accordance with the present invention in which a repelling insertion member 20 is provided in the inner periphery of the metallic cylinder portion 11 corresponding to the batting portion of bat 10 where a batter usually strikes a ball. This takes advantage of the most resilient portion of the bat 10.

('682 Patent, col. 4, lines 1-7.) The second embodiment also incorporates sound arresting member 17 in contact with either end of the repelling insertion member 20 to hold it in place. (*Id.*, col. 4, lines 13-24.)

The '398 Patent shows the same configuration:

FIG. 1




Both the '398 Patent and the '682 Patent disclose a bat 10, a cylindrical aluminum frame 11, and an insert (Figure 1, #18; Figure 3, #20).

Breaking Claim 18 into its constituent elements demonstrates that each element thereof is described in the '682 Patent:

a. "*a hollow tubular bat frame having a small-diameter handle portion and a large-diameter impact portion having a circular cross-section with an inner and outer diameter*"

Figure 3 and Claim 1[17] of the '682 Patent both disclose a "hollow" and "cylindrical" bat frame 11. Claim 1 recites, and Figure 3 illustrates, that the impact (barrel) portion is larger in diameter than the handle portion. As Figure 3 illustrates, and as the "cylinder" description necessitates, the impact (barrel) portion has a circular cross-section. Thus, the '682 Patent fully discloses and claims the first element of Claim 18.

*b. "at least one insert having a substantially circular cross-section with an outer diameter less than the inner diameter of the frame impact portion"*

Figure 3 of the '682 Patent illustrates and discloses a "repelling insertion member 20" provided within the impact portion of the bat. Claim 1 of the '682 Patent similarly discloses and claims a "metallic cylindrical repelling member" disposed within the periphery of the barrel portion of the bat. The Patent discloses that "repelling insertion member 20 is provided in the inner periphery of the metallic cylinder portion 11 corresponding to the batting portion of bat 10 where a batter usually strikes a ball." (col. 4, lines 3-6.) It is a physical necessity that to fit within the impact portion of the bat, the outer diameter of the repelling member *must* be less than the inner diameter of the frame impact portion. Thus, the '682 Patent fully discloses and claims the second element of Claim 18.

*c. "the insert being held within the impact portion"*

---

[17] Claim 1 of the '682 Patent provides: A substantially hollow metallic ball bat comprising a generally cylindrical barrel portion and a generally cylindrical handle portion, said barrel portion being larger in diameter than said handle portion said barrel portion terminating in an open end, a cap element inseparably mounted on and extending into said open end two, spaced apart metallic-sound arresting ring members centrally disposed in the barrel portion of the ball bat and a metallic cylindrical repelling member disposed between said sound arresting ring members, said repelling member being contiguous with said ring members and the inner periphery of the barrel portion of the bat.

Figure 3 and Claim 1 of the '682 Patent both disclose the insert being "held" within the impact portion of the bat. As claimed, the '682 patented bat includes "two, spaced apart sound arresting members" (17) "disposed in the barrel portion of the bat" (11) and "contiguous with"[18] the insert (20). The Patent discloses that "it is necessary to provide a pair of metallic sound arresting members 17, 17 at the upper and lower ends of said member 20 and in contacted relationship therewith." (col. 4, lines 15-18.) The '692 Patent fully discloses the insert being "held" within the impact portion by the sound arresting members, and thus fully discloses the third element of Claim 18.

d. *"the impact portion being inwardly elastically deflectable such to establish a tight interference fit between the insert and the impact portion"*

The '682 Patent discloses and claims a hollow, cylindrical bat frame with an impact portion. (S*ee supra* at *a*.) The "cylindrical repelling insertion member 20" is provided in the impact portion to "take advantage of the most resilient portion of the bat 10." (col. 4, lines 3-7.) Prior to ball impact, the "insert" is merely in "contact" with the inner periphery of the impact portion. (*See supra* at *b*.) While the bat impact portion is described as "resilient,"[19] the insert is described as "repelling."[20] The '682 Patent thus discloses a bat frame that upon impact with a ball deforms, causing the insert to deflect and then "repel" or "drive" back the frame. This is precisely how the "interference fit" of Claim 18 is described in the '398 Patent: "When the bat strikes the ball on the impact portion 12, the impact portion 12 wall deflects inwardly . . . to load and inwardly deflect the underlying insert wall." ('398 patent, col. 2, lines 19-22.) The

[18] “Contiguous” is defined as “being in actual contact”. *Webster’s New Collegiate Dictionary (1980)*.

[19] “Resilience” is defined as “the capability of a strained body to recover its size and shape after deformation caused esp. by compressive stress.” *Webster’s New Collegiate Dictionary (1980).*

[20] “Repel” is defined as “to drive back”. *Webster’s New Collegiate Dictionary (1980).*

momentary loading of the insert by the impact portion creates a temporary interference fit.[21] Accordingly, the '682 Patent fully discloses and claims the fourth and final element of Claim 18.

Because every element of Claim 18 is explicitly or inherently disclosed and claimed by the '682 Patent, Claim 18 is invalid as a matter of law. *See Hazani v. United States Int'l Trade Comm'n*, 126 F.3d 1473, 1477 (Fed. Cir. 1997); *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561-62 (Fed. Cir. 1988).

### D. Alternatively, If Claim 18 is Not Invalid In Light of the '682 Patent, None of the Miken Bat Models Infringe Said Claim.

#### 1. Claim 18 Requires the Absence of an Interference Fit Pre Loading; Each of the Miken Bats has an Interference Fit Pre-Loading and Therefore do Not Infringe the Claim.

Claim 18 requires, among other things, that "the impact portion be[ ] inwardly elastically deflectable such to ***establish*** a tight interference fit between the insert and the impact portion." (Emphasis added.) By its terms, Claim 18 precludes the existence of a tight interference fit prior to loading. *See, e.g.*, Report of David M. Parks, where he states that the interference fit of Claim 18 is a "transient" or "temporary" fit that occurs only during impact between the bat and the ball. (David M. Parks Report, at pp. 25-26.)

"Interference fit" is defined as "a fit wherein one of the mating parts of an assembly is forced into a space provided by the other part in such a way that the condition of maximum metal

[21] Referencing Claim 18, Dr. David M. Parks, Wilson's engineering expert, states, "[b]ased on the disclosure in the '398 Patent specification, one of ordinary skill in the art would readily recognize that the inward elastic deformation of both the impact portion of the frame and of the insert that occurs during impact tends to create forces between the two bodies which, during the time of impact, tend to lock the insert in place and restrain global relative motion of the insert and bat frame, and/or increase the tightness of the attachment already existing." (David M. Parks Report, at p. 25). Inventor Michael Eggiman similarly testified that the bat of Claim 18 allowed the insert to rotate freely within the frame prior to ball impact. (Eggiman Transcript, pp. 79-83 attached as Ex. 11. to Streater Decl.) No interference fit is created until the ball deflects the frame impact portion inwardly, creating a temporary interference fit. (*Id.* at 81.)

overlap is achieved." *McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003)*.[22]

With the possible exception of the Viper and the non-bonded hhd models, each of the other Miken bat models at issue are constructed so as to establish a tight interference fit between the "insert" and "frame" pre-loading. In the Intensit-E and Velocit-E bats, the outer diameter of the insert is actually larger than the inner diameter of the bat frame, and the inserts are hydraulically forced into the frames. Testing of these bats establishes that it takes an excess of 1,000 pounds of force to move the inserts within the bat frames. As such, a tight interference fit is created in each of these models. (*See* Dr. Dennehy Report of October 15, 2003, p. 9, where he states "... the design of these two bats results in an interference fit between the insert and the frame. The interference fit introduces tensile stresses in the frame and compressive stresses in the insert.")[23]

Although Miken's Ultra and Ultra II are manufactured differently than the Velocit-E and Intensit-E bats, the same force required to move the inserts within the frames in the Intensit-E and Velocit-E bats is required to move the "insert" in the "frames" of these models. Indeed, testing establishes that it takes in excess of 1,200 pounds of force to move the insert inside the frame of a 10-inch long section cut from an Ultra II bat. (Dr. Dennehy's Report of December 1, 2003, at p. 5). Given the similarities in design and manufacture between the M-Pulse, Velocit-E II and Edge bats, and the Ultra and Ultra II, a force comparable to that reported for the Ultra II

---

[22] According to Douglas Guenther, one of Wilson's engineering experts, interference fit means "the two parts are put together in such a way that there are stresses applied to each part due to the fit of the joint." (Guenther Dep. at p. 160.)

[23] Douglas Guenther, Wilson's engineering expert, agreed that if the outer diameter of the insert in the Velocit-E or the Intensit-E was 2.004 inches greater, and the insert was forced into a bat barrel with an inner diameter no greater than 2.000 inches, an interference fit would be created. (Guenther Dep. at pp. 159 - 160.)

bat (1,200 pounds) would be expected to move the "insert" within the "frame" in the M-Pulse, Velocit-E II and Edge bats. (Dennehy Decl., ¶. 4.)

Accordingly, since the admitted interference fits of the Velocit-E and Intensit-E require 1,000 pounds of force to move the inserts in their frames, then the Ultra, Ultra II, Velocit-E II, M-Pulse, and Edge bats, which also require in excess of 1,000 pounds of force to move the inserts within the frames, must also be deemed to have "interference fits" pre-loading. Because each of these bats includes an interference fit between the "insert" and "frame" prior to impact with a ball, Claim 18 is not infringed by any of these models.[24]

### 2. **<u>If Claim 18 is Construed to Cover Miken's Bats, the Claim is Invalid Because it Would Improperly Ensnare Anticipatory Prior Art</u>**.

The specification in the '398 Patent attempts to distinguish United States Patent No. 3,963,239 (the "Fujii '239 Patent") [25]as follows:

> The prior art also includes tubular bats using inserts. While most often inserts are used for vibration deadening purposes, U.S. Pat. No. 3,963,239 of Fujii discloses a metallic bat frame with a large diameter impact portion receiving an insert to adjust the weight and improve the "repelling action" of the bat. Fujii teaches an insert in tight abutment with the tubular frame, so that the insert is fixed relative to the frame. The engagement is improved by forcing the insert into the tapered intermediate portion of the bat and/or by gluing the insert within the frame. The tightly-fitted

---

[24] The hhd bats that had their inserts bonded to the frames (85% of all of those manufactured) must also be deemed to have an interference fit pre-loading. According to one of Wilson’s engineering experts, no independent movement of the insert and frame will occur if the frame and insert are bonded. (David M. Parks’s Report, at p. 22.) An interference fit, as defined by Dr. Parks (that is, the insert is locked in place and global relative motion of the insert and frame are restrained), is thus present in the bonded hhd bats. The remaining hhd bats, and all of the Viper bats, would have to be individually examined in order to determine whether, as a result of aluminum manufacturing tolerances, they had an “over-sized” insert and thus would have an interference fit, or whether they had an “under-sized” insert, in which case an interference fit may not be present.

[25] The ‘239 Patent is attached as Ex. 2 to Streater Decl.

> Fujii insert simply acts to thicken the wall of the impact portion of the bat.

'398 Patent, col. 1, lines 57-68.

The Fujii '239 Patent does not require that the insert be bonded to the bat frame, as suggested by the specification in the '398 Patent. Rather, bonding of the insert to the frame is simply an option:

> If any of the reinforcing members 16a to 16f is inserted into the inner cavity of the metallic tubular body 11 with the use of a suitable adhesive applied to the outer surface of said reinforcing member, the engaging relationship of said reinforcing member with the inner periphery of the body 11 is firmly established and cannot be loosened by the repeated contact of a pitched ball against the batting portion 14 of the bat.

'239 Patent, col. 3, lines 43-50.

Indeed, Fujii '239 expressly describes a bat and insert combination in which the insert is "removable", "removably disposed", and "replaceable with a different reinforcing member." ('239 Patent, Abstract and col. 4, lines 42-43.)

As discussed *supra*, the "inserts" and the "frames" in Miken's Velocit-E, Intensit-E, Ultra, Ultra II, M-Pulse, Velocit-E II, and Edge are in intimate contact, requiring an excess of 1,000 pounds of force to move the "inserts" within the "frames" in each bat. Given this, no serious argument can be made that the "inserts" in these bat models are "removable", "removably disposed", or are "replaceable with a different reinforcing member." As such, the "inserts" in each of these models must be deemed to be in "tight abutment" or in a "tight engaging relationship" with their respective "frames", as taught by the Fujii '239 Patent.

It is axiomatic that the claims of a patent "should be read in a way that avoids ensnaring prior art if it is possible to do so." *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1154 (Fed. Cir. 1997); *Amhil Ent. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996). Where a patentee's proposed construction would "read on" prior art – particularly art that was cited during

prosecution and distinguished on the face of the patent itself – that interpretation must be rejected. *Harris*, 114 F.3d at 1151; *Amhil*, 81 F.3d at 1562.

Here, in order to avoid the '398 Patent reading on the Fujii '239 Patent, the '398 Patent must be deemed to exclude from its coverage bats that include an insert that is tightly abutted or that is in a tight engaging relationship with the frame. As such, because each of the Miken bats have inserts that tightly abut their frames, none of the bats infringe the '398 Patent.

### E. The Ultra, Ultra II, M-Pulse, Velocit-E II, and Edge Bats Do Not Have an "Insert", and therefore Cannot Infringe Claims 1, 15 or 18.

Each of the asserted Claims 1, 15, and 18 require two chief structurally distinct components, a "frame" and an "insert." Claim 1 requires "an insert positioned within the frame;" Claim 15 requires an "internal structural insert;" and Claim 18 requires an "insert being held within the impact portion."

In each Claim, the '398 Patent claims an "insert" as a structural component separate and distinct from the "frame." "Insert" is defined as "something that is inserted or is for insertion." *Webster's New Collegiate Dictionary (1973)*. To "insert" is to "put or thrust in" or "to put or introduce into the body of something."[26] *Id.* This "insert" definition is entirely consistent with the term as used in the Claims, and in the specification:

> A tubular insert is suspended within the impact portion by interference fits at each insert end. A first interference fit is achieved by ***forcing the first end of the insert into the tapering portion*** of the bat frame. ('398 Patent Abstract (bold italics added); col. 2, lines 13-16.)
>
> A first end 20 of the tubular ***insert 18 is inserted*** through the impact portion . . . (*Id.*, col. 2, lines 50-51 (bold italics added).)

---

[26] During claim construction, Miken proposed that "insert" meant "a structural component that is inserted into the bat frame." (July 26, 2004 Order, at p. 12.) Wilson did not oppose this meaning, and the Court found the meaning of "insert" clear. (Id.)

> The grease is brought within the gap 26 by coating the insert 18 with grease before ***the insert is inserted into the tubular frame*** 11. (*Id.*, col. 3, lines 4-6 (bold italics added).)
>
> An ***insert 18 . . . is inserted into*** the impact portion 12. (*Id.*, col. 4, lines 12-14 (bold italics added).)
>
> [T]he insert is 19 is coated with the lubricant before ***being inserted into*** the tubular frame 11. The first end 20 of the ***insert 18 is forcefully inserted into*** the tapering portion . . . (*Id.*, col. 4, lines 24-27 (bold italics added).)

While the older Intensit-E, Velocit-E, hhd and Viper bats each include an "insert" that is inserted into the frame during the manufacturing process, the newer Ultra, Ultra II, M-Pulse, Velocit-E II, and Edge bats (hereinafter collectively referred to as the "New Bats") do not. Rather, the New Bats are multi-layered carbon composite bats. To produce these New Bats, composite layers are successively rolled over a mandrel and the previous layers to create an all-carbon-fiber composite bat.[27] There is no "insert" - only successive composite layers.

No matter how Wilson attempts to define them, the composite layers in each of the New Bats are incapable of being "inserted" into a "frame" as necessary to constitute an "insert." Instead, they are an integral part of the bat frame. Each composite layer of these bat frames are integral with the previous layer of composite, and each depends on the previous layer and the mandrel to provide support during the manufacturing process. (*Id.*) Since the New Bats do not contain an "insert," they cannot infringe Claims 1, 15 or 18.

## IV. <u>CONCLUSION</u>

For the reasons stated above, Miken respectfully requests that the Court grant its motion for summary judgment.

---

[27] The manufacturing process is somewhat akin to a plaster cast for a broken arm. The doctor simply layers successive sheets of fabric (composite) and uses water and calcium sulfate (resin) to secure and harden the fabric layers (composite).

Dated: September 7, 2004

BRIGGS AND MORGAN, P.A.

By:*s/Michael H. Streater*
Michael H. Streater (#106331)
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 977-8400

Kurt J. Niederluecke (#0271597)
FREDRIKSON & BYRON
4000 Pillsbury Center
200 South Sixth Street
Minneapolis, MN 55402-1425
(612) 492-7328

**Attorneys for Plaintiff Miken Composites, L.L.C.**