IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

MIKEN COMPOSITES, L.L.C., )
Plaintiff, )
vs. ) No. 02-CV-769
WILSON SPORTING GOODS COMPANY,)
Defendant. )

The deposition of DOUGLAS GUENTHER, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Elizabeth L. Vela, a Notary Public within and for the County of Cook, State of Illinois, at 8700 West Bryn Mawr, Chicago, Illinois, on the 12th day of May, 2004, at the hour of 10:00 o'clock a.m.

Reported by: Elizabeth L. Vela, CSR
License No.: 084-003650



APPEARANCES:

BRIGGS & MORGAN, by
MR. MICHAEL H. STREATER,
2200 IDS Center
Minneapolis, MN 55402
(612) 977-8499
Representing the Plaintiff,

KEY & ASSOCIATES, by
MR. JEFFREY A. KEY,
150 North Michigan Avenue, Suite 1115
Chicago, IL 60601
(312) 560-2148
Representing the Defendant.



INDEX


| WITNESS | EXAMINATION |
|---|---|
| DOUGLAS GUENTHER | |
| By MR. STREATER | 4 |


EXHIBITS


| NUMBER | MARKED FOR ID |
|---|---|
| Exhibit | |
| No. 65 | 14 |
| Nos. 47, 49, 66 | 25 |
| No. 67 | 37 |
| No. 68 | 66 |
| Nos. 46, 48, 50, 69, 70, 71 | 71 |




(Witness sworn.)
DOUGLAS GUENTHER,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. STREATER:

Q: Good morning, Mr. Guenther.
A: Good morning.
Q: Would you state your full name for the record, please?
A: Douglas Gerard Guenther.
Q: And where do you reside, Mr. Guenther?
A: Wheaton, Illinois.
Q: Can you give me a residential address?
A: It's 2 South 400 Burning Trail, Wheaton, Illinois. And the Zip is 60187.
Q: You're currently employed by Wilson Sporting Goods Company, is that correct?
A: That's correct.
Q: And I will show you in a few minutes a report that you prepared that contains a resume of your past work history. Are you familiar with that document, your resume?
A: Yes, I am.

Page 149

A: Uh-huh.
Q: Is that a yes?
A: Yes, it is. I'm sorry.
Q: If the Court were to rule that way, would you agree that none of the Miken bats would infringe the patent as construed by the Judge?
A: I think that's difficult for me to answer, because that's how they're construing the claim. It's not how I would construe the claim.
Q: I appreciate that.
MR. KEY: Just — could I just ask a question as a point of clarification? Are you only talking about Claims 1 and 15, the gap claims?
MR. STREATER: I'm just talking about Claim 1 in my hypothetical here.
MR. KEY: Okay.
BY MR. STREATER:
Q: If the Court were to conclude — were to construe Claim 1 as saying in order to infringe this claim, there has to be contact — strike that. Let me restate this.
If the Court were to construe Claim 1 of the patent as requiring, again, before impact that there be no contact whatsoever between the outer

Page 150

surface of the insert and the inner surface of the bat frame circumferentially around the insert and longitudinally down the insert except at the insert ends, if the Court were to construe the claim that way, you would agree that none of the Miken bats would infringe that claim as construed, true?
A: True.
Q: In other words, in each of the Miken bats that you looked at, there is, in fact, contact between the outer surface of the insert and the inner surface of the bat frame at some areas circumferentially and/or longitudinally, correct?
A: I can't prove that, but I would assume that to be the case.
Q: And you look —
MR. KEY: I'm getting a little bit worried about these feeler gauge samples going in and out, in and out. They're getting bent up.
MR. STREATER: I'm done with them.
MR. KEY: Are you sure?
MR. STREATER: I don't know.
MR. KEY: I was going to suggest, let's just leave them out.
MR. STREATER: That's fine. I don't know that

Page 151

they're going to be of evidentiary value anyway, but we'll see.
MR. KEY: Well, they're Wilson samples. And I know you don't mean to bend them up.
MR. STREATER: He was bending them. I wasn't bending them.
MR. KEY: Well —
MR. STREATER: I understand.
BY MR. STREATER:
Q: Dr. Dennehy in his report did some microscopic photography of the surfaces, the insert, the bat frame, and then also did some SEM views. And you've seen that, correct?
A: That's correct.
Q: And you would agree without going through each of those that there is, in fact, contact between the insert and the bat frame in the pictures that he's put together, correct?
A: I have — I can't agree with his pictures of what he did, because the way he cut the bats totally changed their configuration.
And I think the way they're sitting is not representative of how they sit in the full bat form.

Page 152

MR. STREATER: Could you just read his answer back?
(Whereupon, the record was read.)
BY MR. STREATER:
Q: The quarter-inch sections that you cut out of these bats in your view are representative, is that correct?
A: That's correct.
Q: But the way Dr. Dennehy has cut the bats, it distorts the bats in a way that the findings of the bases on those photographs are invalid in your view?
A: That's correct.
Q: And as I — I think that is dealt with in your Exhibit 66, which is your supplemental report, is that correct?
A: That's correct.
Q: It's also dealt with — you also deal with this in Exhibit 47.
You're talking about the release of the hoop stresses, is that correct?
A: That's right.
Q: Let's just focus on Exhibit 47 for a minute.

Page 157

hand in a number of these bats, would that suggest to you the degree of contact between the respective surfaces of the insert and the bat frame?
A: No.
Q: It wouldn't tell you anything about that?
A: Not really, no.
Q: If one wanted to make a determination as to how much of the surface area of the insert was actually in contact with the inside of the bat frame in each of these bat models, how would you do it?
A: You'd have to run different types of tests.
Q: I'm trying to get at a specific test that you think — you don't like the test that Dr. Dennehy did.
You think that distorted or disturbed the relationship of the bat frame and the insert, such that his conclusions are invalid, correct?
A: Right.
Q: So what test would you propose if you were going to try to measure the — again, just the amount of surface and contact?
A: I don't know — without — I don't have

Page 158

the ability to manufacture these bats.
So you know, I think it would have to fall on Miken to figure that — to understand that more. I don't have that ability so —
Q: With respect to the Velocit-E and Intensit-E bats, we talked earlier, if I can find it — I don't know if I've given it to you or not, but Exhibit 46 is Dr. Dennehy's initial report.
And at Page 4, the bottom of that page, it talks about the manufacturing of the Intensit-E and the Velocit-E bats.
And it indicates that with respect to both bats, the inserts are run through a grinder to achieve an outside diameter of 2.004 inches to 2.008 inches.
And then, he indicates that the — if you go to Page 5, that the inner diameter of the bat frame was specked at 2.000 inches, but he measured one and it came out to be 1.999 inches. Do you see that?
A: Let's see here.
Q: Now, assuming that to be the case, that the inserts for the Velocit-E and Intensit-E were, in fact, 2.004 inches to 2.008 inches and that the

Page 159

inner diameter of the bat frame was 2.000 inches and that the inserts were hydraulically jacked or forced into the bat barrel, assuming all that to be true, would you expect there to be contact between the outer surface of the insert and the inner surface of the bat frame throughout most, if not all of the insert?
A: The one sentence that he states that the outside diameter of the mandrel would also be the inside diameter of the bat frames, I do not agree with that. So I really don't know what the inside diameter of the frame is.
Q: Why do you disagree with his comment?
A: Because I'm not sure what the material is of the mandrel.
I'm assuming it's steel. And once you mold over it and you take the part off, once it cools or changes temperature, it's going to change its dimension. It's not going to be the same. So I don't know what that's going to end up.
Q: Well, let's just assume per my question that it did, in fact, end up at 2.000 inches and that the insert ended up at 2.004 inches or something greater than that and that the insert was

Page 160

forced into the bat barrel.
Would you agree that there would be contact between the outer surface of the insert and the inner surface of the bat frame throughout most, if not all of the insert?
A: I would agree that there would be contact. What degree that contact would be of the overall surface area between the two parts would have to be determined.
Q: Does the term interference fit mean anything to you as an engineer?
A: Yes.
Q: What does interference fit mean?
A: It means that two parts are put together in such a way that there are stresses applied to each part due to the fit of the joint.
Q: The situation that I just described to you, assuming that that's what, in fact, happened during the manufacture of the Velocit-E and the Intensit-E, would that create an interference fit?
A: Theoretically, from the numbers, it would. What actually happens in reality may be different due to several factors, like the elasticity of the structure, the concentricity of the parts, and