FILED

1999 JAN 14 P 1:52

CLERK U.S. DISTRICT COURT
DISTRICT OF OREGON
PORTLAND, OREGON

BY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEMARINI SPORTS INC., an Oregon Corporation,

Plaintiff,

v.

WORTH, INC., a Tennessee Corporation,

Defendant.

Civil No. 97-1693-KI

OPINION

John F. Neupert
Alan P. Polaski
Miller, Nash, Wiener, Hager & Carlsen
111 S. W. 5th Avenue
Suite 3500
Portland, Oregon 97204

Theodore F. Shiells
Kay Lyn Schwartz
Gardere & Wynne, LLP
3000 Thanksgiving Tower
1601 Elm Street, Suite 3000
Dallas, TX 75201

Attorneys for Plaintiff

Alan T. McCollom
Marger, Johnson, McCollom & Stolowitz, PC
1030 S. W. Morrison Street
Portland, Oregon 97205

- and -

Mark J. Patterson
Edward D. Lanquist, Jr.
Waddey & Patterson, A Professional Corporation
414 Union Street, Suite 2020
NationsBank Plaza
Nashville, Tennessee 37219

Attorneys for Defendant

KING, Judge:

Plaintiff DeMarini Sports, Inc. ("DeMarini") filed this action alleging that defendant Worth, Inc., infringed claims 1, 2, 15, and 18 of DeMarini's United States Patent No. 5,415,398 ("the '398 patent"). The parties' briefs filed in connection with DeMarini's motion for summary judgment revealed a difference of opinion on the proper construction of the terms in the '398 patent. Consequently, I granted Worth's motion for a Markman hearing. This opinion states my construction of the disputed terms.

## LEGAL STANDARDS

Patent infringement analysis has two steps: (1) determining the meaning and scope of the patent claims asserted to be infringed, commonly known as claim construction or interpretation; and (2) comparing the construed claims to the device accused of infringing. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). The claims measure the invention. SRI Intern. v. Matsushita Elec. Corp. of America, 775 F.2d 1107, 1118,1121 (Fed. Cir. 1985).

The construction of patent claims, including terms of art within the claims, is a matter of law exclusively for the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 390 (1996). A claim is construed by first examining the intrinsic evidence: the claim language, the specification, and the prosecution history. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Terms in a claim are given their ordinary meaning to one skilled in the art unless it appears from the patent and prosecution history that the inventor used them differently. A patentee may be his own lexicographer, but any special definition given to a word must be clearly defined in the specification or file history. Id.

Usually, the intrinsic evidence alone resolves any ambiguity in a disputed claim term. If so, it is improper to rely on extrinsic evidence such as expert testimony, inventor testimony, prior art not cited in the specification or file history, dictionaries, and technical treatises and articles. Id. at 1583-84. Although technical treatises and dictionaries are extrinsic evidence, the court may freely consult these resources to better understand the underlying technology, as long as their definitions do not contradict a definition found in the patent documents. Id. at 1584 n.6. In its discretion, a court may rely on prior art, whether or not cited in the specification or the file history. Prior art references may be very indicative of how those skilled in the art generally define a term. Prior art, dictionaries, and treatises, all available to the public, are preferred over opinion testimony of either attorneys or experts in the field of technology involving the patent. Id. at 1585.

Extrinsic evidence, particular expert testimony, may be used to help the court properly understand the claims as long as it is not used to vary or contradict the patent documents. If any extrinsic evidence contradicts the patent documents, it is entitled to no weight. Id. at 1584.

> Had the district court relied on the expert testimony and other extrinsic evidence solely to help it understand the underlying technology, we could not say the district court was in error. But testimony on the *technology* is far different from other expert testimony, whether it be of an attorney, a technical expert, or the inventor, on the *proper construction* of a disputed claim term, relied on by the district court in this case. The latter kind of testimony may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms. Such instances will rarely, if ever, occur.

Id. at 1585.

Although the specification may be consulted for help in interpreting the claims, limitations cannot be read into a claim from the specification apart from a need to interpret the meaning of a particular word or phrase. E.I. Du Pont De Nemours & Co. v. Phillips Petro., 849 F.2d 1430, 1433 (Fed. Cir.), cert. denied, 488 U.S. 986 (1988).

DISCUSSION

During the hearing, I received evidence on the underlying technology of aluminum softball bats, including both manufacturing techniques and how the double-walled bats get

additional distance from hits. None of this extrinsic evidence contradicts the patent documents.

I. Meaning of "Gap"

A. Claim 1

Claim 1 states:

> A bat, comprising:
>
> a hollow tubular bat frame having a circular cross-section; and
>
> an insert positioned within the frame, the insert having a circular cross-section, the insert having first and second ends adjoining the tubular frame,

The parties do not dispute the interpretation of this language. Simply put, a hollow, circular tube, called a frame, has a circular insert positioned within it so that the insert contacts the frame at the insert's ends.

> the insert being separated from the tubular frame by a gap forming at least part of an annular shape along a central portion between said first and second ends, the frame elastically deflectable across the gap

The parties dispute the meaning of the word "gap." DeMarini contends that the term gap does not require an absence of contact between the frame and insert around either the circumference or central portion of the insert, as long as a sufficient separation exists so that the frame and insert are free to move independently. Worth contends that the gap must be a space that extends continuously around the circumference of the insert and along a portion of the length of the insert between its ends.

> to operably engage the insert along a portion of the insert between the insert first and second ends.

Here, the only disagreement concerns the meaning of "operably engaged" depending on whether the gap must exist at all locations. Putting that issue aside for a moment, the frame bends inward when the ball impacts it, makes contact with the insert, and the frame and insert return to their original positions without permanently deforming.

The specification of the '398 patent mentions a gap in a few places, including:

> A gap exists along the length of the suspended insert separating the insert from the interior of the impact portion. The gap is filled with grease

> to facilitate relative movement between the insert and the tubular frame when a ball is batted.

Col. 2, lines 19-23.

> Because the outer diameter of the insert 18 is slightly less than the inner diameter of the tubular frame impact portion 12, the suspended insert 18 contacts the tubular frame only at the interference fits of the first and second insert ends 20, 22. A narrow, uniform gap 26 exists between the insert 18 and the inner wall of the impact portion 12. The gap extends uniformly around the insert (see FIG. 3) and along the length of the insert between the first and second ends 20, 22 thereof.

Col. 2, line 62 to col. 3, line 2.

Figures 2 and 3 show continuous gaps while Figure 1 shows a discontinuous gap. Evidence at the hearing shows that aluminum tubes are not perfectly formed. They are ordered by specifying either the inner or outer nominal (average) diameter and the wall thickness. The Aluminum Association publishes standards which specify the allowable deviations from the specified diameter. The evidence established that a person with ordinary skill in the art of making aluminum bats would understand that dimensions are all nominal and that manufacturing tolerances must be expected.

The specification gives measurements for a particular preferred embodiment made out of aluminum tubing. Col. 4, lines 9-17. A bat with the dimensions specified in the preferred embodiment cannot be built with a continuous uniform gap of .007 inches because of the deviations in the aluminum tubing normally used to build aluminum bats. The evidence also established that a bat with a continuous gap could be built in one of three ways: (1) sizing the tubing with a gap large enough that imperfections in the tubing would not cause contact; (2) specify tubing with smaller deviations than standard tubing used for bats, presumably at a higher cost; or (3) machine the tubing after purchase to remove the imperfections. There is no evidence, however, that anyone skilled in the art of making bats takes these extra measures for normal production bats.

Engineers at both DeMarini and Worth drew sketches of double-walled bats indicating dimensions similar to those in the preferred embodiments. Both sketches have the space between the frame and insert labeled as a gap. These sketches also would not

have continuous gaps of the size stated in the sketches.

There is evidence that noncontinuous gaps perform the patent's objective of increasing the power transferred from the bat to the ball as long as there is a sufficient gap to allow a leaf-spring-like action between the frame and the insert. Evidence also establishes that maximum deflection, and consequently maximum power transfer, is achieved with a continuous gap. A patented inventions must be new and useful; it is not required to be the best way to achieve the objective. See 35 U.S.C. § 101.

It is unlikely that an inventor would define an invention in a way that excludes the preferred embodiment or that people skilled in the art would read the specification to exclude the preferred embodiment. Hoechst Celanese Corp. v. BP Chemicals Ltd., 78 F.3d 1575, 1581 (Fed. Cir.), cert. denied, 117 S. Ct. 275 (1996). Worth cites Senmed Inc. v. Richard-Allen Medical Industries Inc., 888 F.2d 815 (Fed. Cir. 1989), which states that manufacturing tolerances are immaterial to the interpretation of claim language. Id. at 1513 n.10. Senmed is distinguishable, however. The patent, covering surgical skin staplers, had a claim stating in part: "to place a forwardmost staple on said anvil surface . . . ." The parties disputed whether the word "on" meant in physical contact with the anvil surface or juxtaposed, that is, near or close by the anvil surface but not necessarily touching it. During the prosecution of the claim, the patentee's attorney amended the claim to avoid prior art and explained that the amendment clarified that another part of the stapler did not have to shift a staple to the anvil surface before forming the staple. The court concluded that the attorney knew the difference between "on" and "closely adjacent," which is used elsewhere in the claim. Id. at 1513.

Worth points to parts of the prosecution history to contend that the history requires the gap to be continuous. I do not agree. To distinguish the invention from Peng '164, DeMarini amended claim 1 to require the frame to be communicable with the insert across the gap. Peng '164, however, has a gap between its insert and frame which is so large that the insert only contacts the frame at its two end pieces. Thus, the question of whether the gap had to be continuous was not at issue, DeMarini only needed to show that at some

point between the ends of the insert, its frame was communicable with the insert across the gap. I see nothing in the prosecution history in which DeMarini distinguished its claimed invention from prior art in which a generally annular gap was not continuous. Thus, it is distinguishable from Senmed.

Claim 1 states that the gap forms at least part of an annular, or ring, shape. Although the specification describes a uniform gap, limitations cannot be read into a claim from the specification apart from a need to interpret the meaning of a particular word or phrase. E.I. Du Pont De Nemours, 849 F.2d at 1433. Requiring the gap in claim 1 to be uniform would destroy the meaning of the phrase "at least part of an annular shape." A partial annular shape can include a discontinuous gap. I conclude that the ordinary meaning of "gap" in claim 1 to one skilled in the art allows some contact between the frame and insert as long as a sufficient separation exists for the frame and insert to move independently. My conclusion is primarily based on the wording of the claim itself, but is bolstered by the engineering sketches containing the word "gap," the inability to build the preferred embodiment under Worth's interpretation using normal manufacturing techniques for this product, and the deviations specified in aluminum tubing standards and relied upon by people skilled in the art.

B. Claim 2

There is no disputed language in claim 2.

C. Claim 15

Claim 15 states:

> In a hollow bat having a small-diameter handle portion and a large-diameter impact portion, an improvement comprising an internal structural insert defining an annular gap with an inside wall of the impact portion of the bat and the impact portion elastically deflectable to close a portion of the annular gap and operably engage the insert.

The parties make the same contentions on the meaning of the word gap. Claim 15 does not contain the language from claim 1 concerning part of an annular shape. In spite of that difference, however, I still conclude that the ordinary meaning of "gap" in claim 1 to one skilled in the art allows some contact between the frame and insert as long as a

sufficient separation exists for the frame and insert to move independently. A discontinuous gap is still shaped in the form of a ring, albeit a discontinuous one. The shape is still a round, circular one.

## II. Meaning of "Interference Fit"

Claim 18 states:

> A bat, comprising:
>
> a hollow tubular bat frame having a small-diameter handle portion and a large-diameter impact portion having a circular cross-section with an inner and outer diameter;
>
> at least one insert having a substantially circular cross-section with an outer diameter less than the inner diameter of the frame impact portion, the insert being held within the impact portion; and
>
> the impact portion being inwardly elastically deflectable such to establish a tight interference fit between the insert and the impact portion.

The specification refers to a tight interference fit:

> Further describing a preferred construction, the insert 18 is coated with the lubricant before being inserted into the tubular frame 11. The first end 20 of the insert 18 is forcefully inserted into the tapering portion to achieve a tight interference fit. Plastic deformation of the aluminum insert at the interference fit increases the tightness of the attachment and the seal. The second interference fit is then obtained within a frame head portion 24, which is formed by curling the topmost end of the impact portion 12 over upon the insert second end 22. It has been found that a tight fit is achieved by curling in a one-half-inch radius forcefully enough to cause some plastic deformation in the insert second end 22. The curling may be facilitated by locally heating the end of the impact portion.

Col. 4, lines 24-38.

DeMarini contends that this description of an interference fit refers to the manufacturing process for claims other than claim 18. It contends that claim 18 redefined interference fit from the traditional engineering sense as follows:

> In yet another embodiment of the invention, positive attachments of the insert 18 within the frame 11 may be dispensed with altogether. In this case, the insert would "float" on the layer of the lubricant. An impact with a ball will cause the frame to deflect, thereby creating interference attachments for the insert 18 during impact. The swing of the bat during impact may tend to lodge the insert 18 in the end of the frame, contributing to an attachment. A bat with an insert held in this manner may respond much like a bat with an insert held at two interference fits. Furthermore, this alternative embodiment will also perform well when the lubricant is omitted.

Col. 5, lines 33-45. DeMarini contends that claim 18's interference fit is transient, occurring only on impact with the ball, and that it occurs under the ball.

Worth contends that DeMarini changed its position during litigation because when he was deposed, Michael Eggiman, the named inventor on the '398 patent and senior vice president of engineering and manufacturing at DeMarini, stated that the interference fit in claim 18 took place at the ends of the insert. I reject this contention. The specification gives two different definitions for interference fit as the term is used in the different claims. Eggiman stated at the hearing that he confused the two uses at the deposition and I have no reason to doubt him. Worth contends: (1) engineers never use the term interference fit to denote a transient occurrence; (2) DeMarini is being inconsistent by contending that the interference fit in claim 18 causes the walls to lock together but still allow movement between them; and (3) the frame and insert should be separated by a space that extends continuously around the circumference of the insert and along the length of the impact portion of the frame.[1]

I accept that DeMarini redefined the term "interference fit" in claim 18, as it is allowed to do, with the language quoted above from Col. 5. I conclude that the term "interference fit" in claim 18 is interpreted to be a transient attachment at impact which occurs anywhere along the insert, including but not limited to the impact point of the insert ends. The separation between the insert and the frame is not required to be continuous but is only limited by the requirement that the frame bend inward enough to make a momentary attachment between the frame and the insert. There is no requirement that the insert float within the frame prior to impact.

///

///

///

///

---

[1] This is the same interpretation Worth proposed for the term "gap," even though claim 18 does not use the term.

## CONCLUSION

The '398 patent will be construed as discussed above. The court will schedule a telephone conference to discuss a briefing schedule for the summary judgment motion.

DATED this 14 day of January, 1999.

GARR M. KING
United States District Court Judge