**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**THIRD DIVISION**

MIKEN COMPOSITES, L.L.C.,

Plaintiff,

v.

WILSON SPORTING GOODS CO.

Defendant.

**Court File No. 02-CV-769 DSD/SRN**

**DEFENDANT WILSON SPORTING GOODS CO.'S *MARKMAN* CLAIM CONSTRUCTION EXPERT REPORT OF DAVID M. PARKS, Ph.D**

Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, David M. Parks tenders the following expert report.

## I. QUALIFICATIONS FOR SUBMISSION OF EXPERT TESTIMONY.

I am a tenured Professor of Mechanical Engineering at the Massachusetts Institute of Technology ("MIT") in Cambridge, Massachusetts.

I received a Bachelor of Science in Engineering Mechanics from the University of Illinois in 1971; a Master of Science in Engineering from Brown University in 1973; and a Ph.D. in Engineering from Brown University in 1975.

I have been employed as a faculty member in the Department of Mechanical Engineering at MIT since 1979; prior to that time, I was a faculty member in the Department of Engineering and Applied Science at Yale University.

My areas of technical specialization include the application of numerical methods to the analysis of fracture and inelastic deformation of materials. I have taught courses and conducted research in the mechanical behavior of structures and materials. I have well over one hundred publications relating to these subjects and have consulted with industry and government in these

as well as other areas. I have also served as consultant to the United States Golf Association and the PGA Tour on technical and performance standards for golf clubs.

I am a member of the American Society of Mechanical Engineers; a member of the American Academy of Mechanics; a member of the Society of Engineering Science; a member of the American Society of Materials. I am a member of the Editorial Advisory Board of *Engineering Fracture Mechanics*.

I have testified as an expert witness at *Markman* hearings, including *Johnson v. Mabuchi*, Southern District of New York; *Bailey v. Dart Container Corporation of Michigan*, District of Massachusetts; and *Freeman, et al. v. The First Years, Inc.*, District of Kansas. In addition, I provided deposition testimony in *DeMarini Sports, Inc. v. Worth, Inc.* A copy of my professional resume is attached as Attachment A.

I am being compensated for my work in connection with this case at a rate of $300.00 per hour.

## II. Materials Reviewed for the Opinions Expressed in this Report.

I have been asked to provide technical expert opinions regarding the technology and design of multi-walled aluminum and composite softball and baseball bats, including how a person skilled in the art of making such bats would understand certain terms used in claims 1, 15, and 18 of U.S. Patent No. 5,415,398, entitled "Softball Bat" ("the '398 Patent"), Attachment B.

In forming the opinions expressed in this report I have considered the '398 Patent and its prosecution history (Attachments B and C), the prior art cited during its prosecution (Attachment D), and the prior art cited in opposition to the validity of the '398 Patent (Attachment E). I have reviewed certain of the legal correspondence between plaintiffs and defendants, including that from when Plaintiff Miken Composites was a defendant in the related, pending case of *Wilson Sporting Goods, Co. v. Hillerich & Bradsby Co., et al.*, Northern District of Illinois, Case no. 00 C 6517 ("*Wilson v. H&B*"). I have reviewed specifications for aluminum tubing (Attachment F), technical drawing and manufacturing procedures used for making aluminum bats. In addition, I have also reviewed the deposition transcripts and certain attached exhibits of Michael D.

Eggiman, and Mark Fritzke taken in *Wilson v. H&B.* I have reviewed my Expert Report and the Expert Report of Dennis E. Stenzel submitted in *Wilson v. H&B.* I have reviewed material from the *DeMarini v. Worth* case, including certain legal documents and filings, the transcript of the Markman hearing held in *DeMarini v. Worth*, and the opinion dated January 14, 1999 in the *DeMarini v. W*orth case. I have reviewed my Expert Report in the *DeMarini v. Worth* case, and the materials identified there as having been reviewed.

My opinions are based on my own personal knowledge and experience, and a review of the literature, documents, and exhibits provided to me. All opinions and facts stated herein are true and correct to the best of my knowledge. Nevertheless, I expressly reserve the right to modify or supplement my opinions in the event that any additional information is provided to me.

## II. <u>Statement of Opinions and the Reasons Therefore.</u>

### A. List of Opinions

1. The term "gap" in claims 1 and 15 of the `398 Patent means a sufficient separation between the inside surface of the tubular bat frame and the outside surface of the insert within the frame, that, on impact, permits independent movement of the frame and insert, in the nature of a leaf-spring; the separation may include contact between the frame and the insert, providing the independent motion is still permitted.

2. The term "annular" in claims 1 and 15 of the `398 Patent means reasonably close to ring-like shape, but does not require the shape to be perfectly (in a mathematical sense) ring-shaped.

3. In claim 18 of the `398 Patent, the phrase "the impact portion being elastically deflectable such to establish a tight interference fit," means that the inward deflection of the tubular bat frame into the insert is sufficiently

tight to prevent global movement of the insert with respect to the bat frame during impact, but not so tight as to prevent local independent movement of the bat frame and insert, in the nature of a leaf-spring.

### B. Background of the `398 Patent

The invention of the `398 Patent relates to tubular baseball and softball bats, disclosing a double or multi-walled bat having a hollow, tubular bat frame (also known as an "outer tube") and an insert (which is tubular in the preferred embodiment) having a circular-cross section within the tubular bat frame; i.e., a tube within a tube. ('398 Patent, col. 5, lns. 55-58, Attachment B). The double or multi-walled bat of one preferred embodiment includes an aluminum outer tube and insert. At the time of the invention of the `398 Patent, monolithic (or single-wall) tubular metallic bats were well-known in the art. Such bats have the advantage of a generally good impact response, meaning that the bat effectively transfers power to a batted ball (`398 Patent, col. 1, lns. 15-19). Although such bats perform well, there was a desire for better "slugging" capacity. (`398 Patent, col. 1, lns. 27-34). The '398 Patent does not, however, limit itself to the use of aluminum for such double or multi-wall bats, providing:

> Moreover, ***insert and bat frame materials which are themselves slippery so as to permit the independent movement of insert and frame*** may work equally as well. Indeed, lubricant may be omitted entirely, so long as the resulting arrangement permits independent movement of insert and bat frame.

('398 Patent, col. 4, lns. 18-21 and col. 5, lns. 19-25, Exhibit B)(emphasis added). In addition, dependent claim 12 expressly anticipates the use of composite materials.

The `398 Patent teaches that, generally speaking, impact response of a bat is best when a bat undergoes a greatest elastic deflection before rebounding in the shortest amount of time. Optimization of these factors increases the "spring" of a ball off a bat, yielding a bat with superior power transfer and facility for "slugging". (`398 Patent, col. 1, lns. 27-34).

All other factors being equal, on impact with a ball, the amount of inward elastic deflection of the frame of a bat is greater with thinner walls. But, for example, constraining the design of aluminum bats is the requirement that the peak stress in the bat wall that is driving the elastic deformation not be so large as to cause any plastic (i.e., permanent) deformation. (`398 Patent, col. 1, lns. 35-37). For example, when a tubular bat is too thin, a desirable large amount of elastic deflection of the bat wall is achieved on impact, but with the unwanted consequence of permanent plastic deformation, denting or cracking. Even slight amounts of unwanted accompanying plastic deformation, too small to result in readily observable denting, can lead, on repeated impacts, to fatigue damage and cracking that ultimately compromises the usefulness of the bat. On the other hand, when the [single] wall of an aluminum or reinforced composite tubular bat is too thick, the bat may be too stiff to exhibit the desired large elastic deflection on impact. In the latter case, the bat responds with relatively little spring, resulting in lower power transfer to the batted ball. (`398 Patent, col. 1, lns. 42-48).

### C. Invention of the `398 Patent

An object of the invention of the `398 Patent is to provide for an improved impact response yielding a better transfer of power from the bat to the batted ball. To accomplish this, the `398 Patent discloses a circular tubular bat having a frame with a relatively small-diameter handle portion, an intermediate-diameter tapering portion, and a large-diameter impact portion, with a circular insert positioned within the tubular frame, the insert having an outer diameter slightly smaller than the inner diameter of the large-diameter portion of the frame, so that a gap exists between the insert and the frame. (`398 Patent, col. 2, ln. 44 to col. 3, ln.2). With the gap, the contacting surfaces of the insert and frame can move independently upon impact (i.e., in the vicinity of the impact point the two surfaces can exhibit small tangential sliding movement with

respect to one another as the walls of both the frame and the insert deflect inwardly together), ***in the nature of a leaf-spring.*** (`398 Patent, col. 3, lns. 16-19; col. 3, lns. 36-38 ).

To facilitate the independent movement, lubricant may optionally be placed between the insert and the bat frame. (`398 Patent, col. 3, lns. 3-9). However, lubricant may be omitted entirely, so long as the resulting arrangement permits independent movement. (`398 Patent, col. 5, lns. 22-25).

Leaf-springs are commonly used on the suspension of automobiles and trucks, and are formed of two or more relatively thin layers. The thin layers of a leaf-spring may be in contact, but they are sufficiently separate from one another so that they are free to slide relative to one another when the spring is laterally loaded and the layers of the leaf-spring deflect.

### *1.* ***Mechanics of Leaf-Springs***

Because the central design concept underlying the `398 Patent is the strong analogy between the mechanical behavior of its independently-moveable double-wall construction on impact with a ball, and the corresponding mechanical behavior of a multi-layer leaf-spring, it is important first to understand the leaf-spring's mechanical behavior. We review essential features of the bending of a leaf-spring by first considering the bending of a single, thin, integral-layer leaf-spring. Then we review essentials of deformation in multi-layer leaf-springs that are free to slide relative to one another when the spring is laterally loaded and the layers of the leaf-spring deflect.

#### **a)** ***Lateral loading of a thin, integral, single-layer leaf-spring***

When a force is applied perpendicular to the surface of a thin structure (such as a leaf-spring), it causes several kinds of mechanical processes to occur in the structure. (Such loads are sometimes termed "lateral loads".) Most visible of these is the lateral deflection of the leaf-spring layer, generally in the direction of the applied force. The lateral deflection is non-uniform along the length of the leaf-spring, and the mid-surface of a thin, integral, constant-thickness, single-layer leaf-spring generally displaces in such a way as to exhibit bending deformation that changes the initial curvature (if any) of the leaf-spring.

The bending deformation causes material on one side of the layer's mid-surface to stretch in tension; for example, increasing the distance between two nearby points on that [tensile] surface of the bent spring layer. On the opposite side of the mid-surface, bending deformation compressively strains the material so that, for example, two nearby points on that [compression] surface of the bent spring layer move closer together. The tensile or compressive strain (fractional change in length) varies linearly through the thickness of a thin structure under bending deformation, and the largest and smallest strain values occur on the respective surfaces of the bent layer. The largest bending strain is proportional to the change in local curvature associated with the bending deformation and to the thickness of the layer. The curvature is the inverse of the local radius of curvature, and has units of dimension inverse length (e.g., 1/inch).

In an elastic material (such as an aluminum alloy or a composite material), the bending strain distribution is accompanied by a corresponding through-thickness variation of bending stresses, which are distributed internal forces in the material acting in a direction generally parallel to the deformed mid-surface of the layer. Units of stress are force/area (e.g., pounds/inch$^2$, or "psi"). For elastic response of a homogeneous elastic layer (such as a metal), the bending stress distribution varies linearly through the thickness, proportional to the variation

of bending strain, with the proportionality constant being a material property, its elastic modulus. Units of elastic modulus are force/area. The largest and smallest bending stress values in a bent layer occur on its tensile and compressive surfaces, respectively, and each is proportional to elastic modulus, curvature change, and layer thickness If the layer subjected to bending deformation is a long-fiber-reinforced composite, anisotropy and fiber placement details give piecewise-linear [homogenized] stress variation through-thickness, with the local proportionality constants at any through-thickness position dependent on the fiber orientation, and on fiber, matrix, and interface properties, and fiber volume fraction. For any two similarly-reinforced locations within the thickness of a thin elastic composite layer, the bending stress will generally be higher in the location closer to the surface than in the one closer to the mid-thickness because of the corresponding difference in bending strain.

In order for the material to deform elastically, and to return, undamaged, to its initial shape on removal of load, it is necessary that the stress everywhere in the material remains less than a critical, material-dependent value. In a ductile metal such as an aluminum alloy, a limiting value of stress may be termed the "yield stress" of the material. In less ductile materials, such as many composites, other limiting values of stress must not be exceeded if elastic deformation without damage is to be assured. Dimensionless ratios of these stress-limiting material properties to the corresponding elastic stiffness constants limit the permissible bending strains, and hence the [non-dimensional] value of the product of through-thickness location and curvature change; maximum values of strain on the outer surfaces scale with curvature change and layer thickness.

The maximum lateral deflection of an integral single-layer leaf-spring is proportional to the peak curvature change. In turn, the peak curvature change is proportional to the applied load,

and inversely proportional to the flexural stiffness of the layer. For a homogeneous elastic material layer, the flexural stiffness is proportional to both the elastic stiffness of the material and to the third power of the layer thickness ("thickness cubed"). For composite layers, the flexural stiffness is a weighted, through-thickness average of fiber/matrix elastic stiffness times distance from the layer mid-surface; the resulting expression for the flexural stiffness is dominated by the elastic stiffnesses near the surfaces of the layer, since they are furthest from the mid-surface of the layer.

Thus, if a small lateral load is applied to a homogeneous elastic single-layer leaf-spring of constant thickness "t", and the resulting elastic displacement is "d", then, were the same load to be applied to an otherwise identical spring, but of half the thickness, "t/2", the resulting displacement would be dramatically increased, by a factor of eight, to "8d". (8 = 1/ (½ x ½ x ½ ) ). In the case of a single-layer composite leaf-spring, also of thickness "t", the resulting lateral displacement for a similarly reinforced composite, but of only half the total thickness, t/2, would again be much larger than observed for the thicker spring. Because of the discrete through-thickness positions and orientations of stiff fibers in composites, the precise ratio observed for the lateral displacements in similarly-reinforced, but different-thickness composite layers depends on several factors, principally the concentration and orientations of the fibers near the outer-most surfaces in each layer (which dominate flexural rigidity). In the limit of a large number of uniformly distributed and similarly sequenced and oriented fiber reinforcements in both the thick (t) and the thin (t/2) composite leaf-springs, the resulting lateral displacement ratio should approach 8, the value noted above for homogeneous elastic materials.

This calculation assumes that the load is sufficiently small so that the thinner leaf-spring layer also responds elastically and without damage, even though the peak strains in the

homogeneous elastic half-thickness layer will, for a fixed force, be four times larger than in the full-thickness layer. To see this, recall that peak bending strain is proportional to the product of curvature (or of peak bending displacement) times layer thickness; letting "s" be the peak bending strain for thickness "t", the peak strain in the half-thickness (t/2) layer will be "4s" ( 8 x ½ = 4). Again, the precise ratio of peak bending strains in the corresponding composite leaf-springs would be one-half their deflection ratio; in the limit of a large number of similarly sequenced and oriented fiber reinforcements in both the thick (t) and the thin (t/2) composite leaf- springs, the resulting peak bending strain ratio should approach 4, the value noted above for homogeneous elastic materials.

### *b) Lateral loading of two adjacent, integral leaf-springs that are free to slide*

Suppose instead that lateral loading is applied to a leaf-spring assembly consisting of two identical half-thickness thin leaf-spring layers, of either composite or homogeneous metallic construction, stacked one over the other so they are separated by an interface that is free to slide when the assembly is loaded. When lateral load is applied to the surface of one of the leaf-spring layers (layer 1), that layer pushes or bears against the adjacent layer (layer 2), mechanically engaging it at their common interface and forcing layer 2 to deform laterally in a geometrically compatible pattern. If each layer was initially flat (zero initial curvature), the deformed shapes of the two distinct layers of the leaf-spring assembly are essentially identical. Lateral load communication between the layers is such that layer 2 locally exerts a reaction on layer 1 at the interface, opposing the applied load and equal to half the applied load in magnitude. In turn, the reaction of layer 1 produces a force on layer 2 that is one-half of the total applied load. Each layer, then, individually supports a net lateral load of one-half of the total applied load. Recalling that the displacement of a single homogeneous elastic half-thickness layer in response

to full load is "8d" (eight times the corresponding displacement magnitude "d" of the full-thickness layer), the lateral deflection of each half-thickness layer, when each is supporting only half the load, would be "4d" (4 = 8 x ½). The overall deflection of the free-sliding leaf-spring assembly comprising two half-thickness layers would also be "4d". By permitting the independent sliding movement in the two-layer, equal-thickness homogeneous elastic leaf-spring, the elastic deflection of the leaf-spring is increased to four times what it would have been had the independent sliding movement been prevented. The corresponding ratio of overall lateral deflections for an assembly of two identical, independently-sliding composite leaf-springs of thickness t/2, as compared to that of a similarly-reinforced single composite leaf-spring of thickness t, would be one-half of the displacement ratio they exhibit when the full-thickness and half-thickness layers are loaded separately, since each similarly-deformed, half-thickness layer of the composite leaf-spring assembly carries one-half the overall load.

To understand the importance of the independent sliding motion of the flat adjacent surfaces of layer 1 and layer 2 in establishing the increased elastic deflection ("4d", compared to "d", the deflection of an integral, single, homogeneous elastic layer of full thickness "t"), note that the bending deformation (or curvature) in each half-thickness layer is identical, at corresponding locations along the two layers. At a given position along the leaf-spring, suppose that the "bottom" (or "inner") side of each layer undergoes tensile straining due to bending deformation, while the opposing "top" (or "outer") side of each layer is subject to compressive straining. Now consider the (sliding) interface between the two identically-deformed layers: the bottom of layer 1 is immediately next to the top of layer 2. Had two small reference markers been placed on the side of the leaf-spring assembly before loading (e.g., two thin scoring lines crossing the interface at nearby points along the length of the leaf-spring), the application of

lateral loading would graphically confirm the independent sliding motion of the two adjacent interface surfaces. The two score lines on the bottom of layer 1 would tend to move further apart, owing to the tensile bending strain on that side of layer 1. Conversely, the two score lines on the top side of layer 2 would tend to move towards each other, owing to the compressive bending strain on that side of layer 2. The sliding at the common surface manifests the independent movement of the two layers.

This situation of independent sliding motion of the two half-thickness (t/2) leaf-spring layers can be contrasted with the identical cases of (a) an integral, single-layer leaf-spring of full thickness (t), which leads to a peak lateral displacement of only "d" and, equivalently, (b) a non-sliding (no independent movement) leaf-spring formed by bonding, adhering, welding, brazing or otherwise fixedly attaching the bottom of layer 1 (thickness t/2) to the top of layer 2 (also of thickness t/2) across the interface, resulting in a non-sliding interface incapable of independent movement, and also leading to a peak lateral displacement of only "d". Were score marks of the sort described above to be put in place at mid-thickness of both the integral and the bonded composite leaf-springs, no independent sliding movement would be discerned, and both of these structures would exhibit the same lateral displacement, "d".

Had the thicknesses of the two flat layers comprising the sliding-interface homogeneous elastic leaf-spring assembly been different, say, $t_1$ and $t_2$, respectively, such that $t_1 + t_2 = t$, the fractions of the net lateral force carried by each layer would differ, the curvatures of each layer would still be identical at corresponding locations along the leaf-spring, and the peak lateral displacement of such a sliding-interface, homogeneous elastic leaf-spring assembly would be between "d" and "4d". If the thicknesses $t_1$ and $t_2$ are nearly equal, the resulting peak displacement will be near "4d", while if one of the thicknesses is much greater than the other, the

peak total displacement will be near "d"; the precise values can be calculated from the principles of solid mechanics. A similar range of lateral deflection ratios would be observed for an independently-moving composite leaf-spring assembly, should the individual flexural rigidities of the two composite layers be unequal.

The large difference between the peak deflection of a two-layer, equal-thickness and equal flexural rigidity, free-sliding leaf-spring assembly and that of a bonded, non-sliding two-layer leaf-spring of the same respective layer thicknesses and flexural rigidities provides a robust mechanical diagnostic test to identify the "sliding" or "bonded; not sliding" nature of the interface. If a lateral load is applied to the leaf-spring assembly and the measured lateral displacement is near the value of "4d" expected for a sliding interface, then it is not feasible that the interface could have been "bonded" or "non-sliding": the two layers must have exhibited independent sliding motion in order to accommodate_the relatively large_displacement. Conversely, if identical loading is applied and the lateral displacement is near the value of "d" expected for a bonded, non-sliding interface, then it is not feasible that the interface could have been "freely-sliding": the two layers must have been prevented from independent sliding motion in order to support the load with such relatively small displacement. The corresponding large difference in deflection for a composite leaf-spring assembly provides a similar diagnostic test to determine if its layers are exhibiting independent movement and relative sliding.

This discussion of flat, single-layer, and both free-sliding and bonded multi-layer leaf-springs and leaf-spring assemblies under lateral loading has thus-far focused on the kinematics of bending deformation. Apart from the equi-partitioning of net lateral load noted in the case of two free-sliding layers of equal-thickness and equal flexural rigidity in a leaf-spring assembly, little has been said about the ways that the lateral load is supported within a leaf-spring.

However, the net lateral load supported by each leaf-spring layer is reacted by two types of stresses within the layer. An opposing transverse shear stress distribution through the wall thickness carries the majority of the internal force for initially flat layers under small lateral deflections. The direction of the transverse shear stress points generally from one side of the layer to the other (e.g., from the tensile face of bending deformation, through the layer thickness, toward the compressive face of bending deformation). At leaf-spring positions removed from the point of the applied lateral load, a portion of that load is carried by net tensile stresses in the layer, but which have been rotated in direction slightly by the non-uniform lateral deflection so as to have a component opposing the direction of the applied lateral loading.

### 2. *Leaf-spring-like behavior of bat frame and insert*

The foregoing principles are directly applicable to multi-walled bats. The `398 Patent describes the way in which the leaf-spring-like action of the double-walled construction is used to improve performance of a bat in accordance with the invention as follows:

> The tubular frame 11 with the suspended insert 18 attached at both ends to the tubular frame 11 yields a mechanical system with characteristics similar to a leaf spring. When the bat 10 strikes a ball on the impact portion 12, the impact portion 12 deflects inwardly through the … gap 26 to load and inwardly deflect the underlying insert wall… The leaf-spring-like attachment of the insert 18 within the impact portion 12 provides a rebound to yield improved power transmission to the ball. The bending stresses are released as the wall of the impact portion 12 and the insert 18 rebound into the unloaded state. The tensile loading of the underlying insert wall is released simultaneously, adding "snap" which increases the force and velocity of the rebound. Accordingly, the extra snap owing to the leaf-spring-like suspension of the insert 18 within the tubular frame yields an improved transfer of power to the batted ball, and a heightened "slugging" capacity for the bat.

(`398 Patent, col. 3, lns. 16-47).

On impact with a ball, a bat and insert designed according to the `398 Patent indeed respond mechanically in a way quite similar to the action of a leaf-spring assembly, as described above. The circular tubular bat frame and insert are thin shell structures, possessing one

direction (circumferentially around the bat) of positive initial curvature, and a perpendicular surface direction (longitudinally along the length of the bat) which initially has zero curvature (it is straight). The positive initial circumferential curvature of the insert is slightly greater than that of the bat frame within which it is suspended, since the radius to its mid-thickness internal surface is less than that of the bat frame.

When the ball impacts the outer surface of the frame, it deflects the frame radially inwards, mechanically forcing the insert to deflect inwards also. The inward deflection is non-uniform over the surfaces of the respective shell structures: greatest inward deflection occurs in the vicinity of the impact point, with smaller inwards deflections occurring at points on the surface further from the point of impact. Both principal curvatures of the bat frame and the insert decrease near the point of maximum inward deflection: the circumferential curvature, which was initially positive, decreases to a less-positive value (larger radius of curvature), and the axial curvature, which was initially zero, decreases to a negative value, meaning that the surface tends to wrap around the surface of the impacting ball, which is also deforming. In the vicinity of the impact point, both the bat frame and the insert are forced to undergo same-sense curvature changes at respective radially-disposed mid-surface points. Thus, the inner surfaces of both the bat frame and the insert experience tensile bending strain both axially and circumferentially, while their respective outer surfaces are subjected to compressive bending strain. As in the leaf-spring example, the relative sliding that occurs across the annular gap separating the insert from the bat frame is obvious: nearby pairs of points on the inner surface of the bat frame move away from each other, due to the tensile straining of that surface, while corresponding pairs of nearby points on the outer surface of the insert move closer toward each

other, due to the compressive straining on that surface. The sliding at the common surface manifests the independent movement of the two layers.

Because the circular cylindrical shells are initially curved, the radially inward force of the impact is locally supported internally within the shell by a distribution of transverse shearing stress (opposing, radially-outward-directed internal forces per unit area within the wall thickness), net thickness-averaged compressive stresses oriented generally circumferentially (in the manner of an arch), and net thickness-averaged tensile stress oriented generally axially, but slightly re-oriented by the inward deflection of the shell so as to have a radially-outward component. Indeed, the last of these load-supporting mechanisms is explicitly cited in the `398 Patent by reference to the tensile stress in the insert as providing " 'snap' which increases ... the velocity of the ball." The bat frame, which receives the loading of the impact on its outer surface, also receives an opposing, supporting load transferred to its inner wall by mechanical reaction with the insert; the net result is that the bat frame carries only a fraction of the applied force of impact. In turn, the insert supports the inwardly-directed transverse load conveyed to its outer surface by means of its mechanical interaction with the deflecting bat frame, and thus supports the remaining fraction of the impact loading. Comparison with the flat leaf-spring examples discussed above shows that the double-wall bat design of the `398 Patent not only deforms in a manner similar to a leaf-spring, permitting independent movement, but it also supports the lateral load of impact in a similar fashion, based on a combination of transverse shear stress, compressive circumferential stress, and re-oriented axial tensile stress.

Although it was not originally discussed, even the net compressive stress mechanism could be found in a leaf-spring having positive initial curvature along its length: the example leaf-spring considered was initially flat, having no curvature. Since the leaf-spring is thin and

long, it possesses curvature in only one direction, along its length. If that one curvature is initially positive, the leaf-spring is arch-like and partially supports lateral loading with net compression (in addition to transverse shear stress), similar to the circumferential direction of the circular cylindrical shell. If the one-dimensional leaf-spring is initially flat, imposed lateral loading creates negative curvature in the spring, and part of the applied lateral load is supported by net tensile stress (in addition to transverse shear stress), similar to the axial direction of the circular cylindrical shell.

Returning to the radial inward displacement of the independently-moveable frame and insert of the `398 Patent, for the same reasons discussed in connection with the leaf-spring, permitting independent sliding movement of the surfaces greatly increases the elastic deflection which would be obtained, compared to the equivalent cases of (a) an integral, single-wall bat of the same material and the same total thickness as the sum of the thicknesses of the insert and the bat frame, and (b) a double-walled bat consisting of the same bat frame and insert, but bonded to each other so as to prevent sliding and independent motion. Again, if the same homogeneous elastic material is used in the bat frame and the insert, and if the wall thicknesses of insert and bat frame are close to being equal, then the radial inward displacement which would be measured in the independently-moveable case, in response to lateral loading of the surface of the bat, would again be as much as four times as large as would be observed in the non-sliding (bonded) and integral wall thickness cases. Similarly large increases in inward radial displacement would be obtained if the fame or the insert or both were of similarly-reinforced composite construction, provided the frame and insert were independently moveable. Again, this difference is sufficiently great that mechanical tests of the inward deflection of a double-wall bat serve as a

robust diagnostic to determine if the bat is acting in the manner of a leaf-spring, in accordance with the teaching of the `398 Patent.

### 3. *Embodiments of the `398 Patent*

In a preferred embodiment disclosed in the `398 Patent, a circular tubular aluminum insert is smaller in outside diameter than the inside diameter of the circular tubular aluminum bat frame in the large-diameter impact portion of the bat, thus forming a gap between the insert and the impact portion. (`398 Patent, col. 2, lns. 47-49 and 67-69).

As an illustrative example, the `398 Patent suggest that a bat yielding excellent results will be achieved when the dimensions of the inner and outer diameters of the bat frame and insert, respectively, are selected so that the wall thickness of the bat frame is 0.058 inches thick, the wall of the insert is 0.048 inches thick, and the space between them is approximately 0.007 inches (`398 Patent, col. 4, lns. 9-18). However, the invention of the `398 Patent is clearly not limited to these dimensions. In fact, the `398 Patent states "[w]hile such dimensions yield excellent results, it is to be understood that they are exemplary only, and that many permutations of bat frame, insert, and gap dimensions will work equally as well. All permutations of component dimensions and configurations fall within the scope of the present invention." (`398 Patent, col. 4, lns. 18-23). The invention of the `398 Patent is also clearly not limited to bat frame and inserts made of aluminum. In fact, the `398 Patent states "[i]nsert and bat frame materials which are themselves slippery so as to permit the independent movement of insert and frame may work equally as well" ('398 Patent, col. 5, lns. 19-22).

Provided that the gap permits the walls to move independently during impact, like a leaf-spring, the gap can be arbitrarily small.

One of ordinary skill in the art would know that strict uniformity of the gap is not required for the bat to function as described in the `398 Patent, nor is it possible in practice when assembling real closely-fitted concentric circular cross-section inserts within bat frame tubes, because such inserts and bat frame tubes have normal variations in their dimensions.

Indeed, real tubing is not perfect. In 1993, when the patent application leading to the '398 Patent was filed, industry practice was to specify circular cross-section tubing in terms of "mean", or average values of, diameters and wall thicknesses, notwithstanding small deviations from specified dimensions that may occur in real tubes. For example, standards published in 1993 by the Aluminum Association Incorporated provide that annealed tubing (tubing that has gone through a standard heat treatment rendering the tubing malleable for subsequent deformation processing into final shape; e.g., a bat frame), having a specified outer diameter of 2.250 inches (standard diameter for softball bats), may be out of round by as much as 0.036 inches. That is, an outer diameter at any point around the tube circumference may be more or less than the specified mean diameter by up to 0.036 inches. See Exhibit XX, attached hereto. When the specified wall thickness of the tubing is less than 2.5% of the tube's specified outside diameter, the permitted out-of-roundness increases. For example, when the specified wall thickness is between 2% and 2.5% of the specified outer diameter, the factor multiplying the ordinarily-permitted deviation of diameter is increased to 1.5; had that factor been applied to the 2.25-inch outer diameter bat frame tube, the permitted diameter deviation would be 0.054 inches (0.054 = 1.5 x 0.036).

Strictly, the critical value of thickness that would trigger the enlarged diametral tolerance in the bat frame of the preferred embodiment is 0.05625 inches (0.05625 = 0.025 x 2.25); this value is slightly smaller than the suggested wall thickness of 0.058 inches in the preferred

embodiment discussed above, so the applicable tolerance for the disclosed preferred embodiment remains 0.036 inches. However, only a small change of specified wall thickness in the disclosed preferred embodiment to 0.056 inches would make the resulting tube thin enough that the enlarged diametral deviation of 0.054 inches would be tolerated. Moreover, using the suggested dimensions of the "gap" as 0.007 inches and the inner diameter of the preferred embodiment's bat frame as 2.134 inches (2.134 = 2.25 – (2 x 0.058)), the specified outer diameter of the insert tube in the preferred embodiment would be 2.12 inches (2.12 = 2.134 – (2 x 0.007)). Thus, using the preferred embodiment's specified wall thickness of 0.048 inches, the ratio of the insert tubing's wall thickness to its outer diameter is 0.0226 = 2.26% (0.0226 = 0.048 / 2.12). Since this value is less than the standard's 2.5% thickness/outer diameter threshold for allowing enhanced deviation of local diameter, the applicable diametral tolerance on the insert tubing in the preferred embodiment is indeed the larger value of 0.054 inches (0.054 = 1.5 x 0.036).

The Aluminum Association standards also provide that aluminum tubing may deviate from straightness by up to 0.010 inches per 1 foot of length. For example, in a 12-inch long impact portion, roughly in the range of the impact portion of normal bats, there could be a maximum lateral deviation of the tubular cross-section by as much as 0.010 inches toward one side or the other.

In view of these tolerated deviations in tubing diameter and straightness, it would not be possible in practice to obtain strict "mathematical" uniformity of the gap (both circumferentially and axially) when assembling real, closely-fitted concentric circular cross-section inserts within bat frame tubes; the permitted deviations in each tube would not coincide, so that, on insertion of the inner tube, there would inevitably be local variations in the spatial separation of the tubes,

both circumferentially and along the length of the double-wall impact portion; moreover, such variations could include local contact.

Variations in diameter and straightness are also to be expected in the manufacture of composite tubing.

The `398 Patent discloses that the insert and the frame are preferably attached to one another by means of interference fits at the ends of the impact portion. (`398 Patent, col. 2, lns. 50-59). Such interference fits, though advantageous, are not required. The `398 Patent also teaches that welding, adhesives, mechanical fastening or "[a]ny attachment mechanism or fastener maintaining the leaf-spring-like suspension" may be used and falls within the scope of the invention. (`398 Patent, col. 5, lns. 50-60).

**D. Claims of the `398 Patent**

The `398 Patent has four independent claims (claims 1, 15, 17, and 18), and fourteen dependent claims. Only claims 1, 15, and 18 are at issue in this case. These claims read as follows:

> 1. A bat, comprising:
>
> a hollow tubular bat frame having a circular cross-section; and an insert positioned within the frame, the insert having a circular cross- section, the insert having first and second ends adjoining the tubular frame, the insert being separated from the tubular frame by a gap forming at least part of an annular shape along a central portion between said first and second ends, the frame elastically deflectable across the gap to operably engage the insert along a portion of the insert between the insert first and second ends.
>
> 15. In a hollow bat having a small-diameter handle portion and a large-diameter impact portion, an improvement comprising an internal structural insert defining an annular gap with an inside wall of the impact portion of the bat and the impact portion elastically deflectable to close a portion of the gap and operably engage the insert.

18. A bat, comprising:

> a hollow tubular bat frame having a small-diameter handle portion and a large-diameter impact portion having a circular cross-section with an inner and outer diameter; at least one insert having a substantially circular cross-section with an outer diameter less than the inner diameter of the frame impact portion, the insert being held within the impact portion; and
>
> the impact portion being inwardly deflectable such as to establish a tight interference fit between the insert and the impact portion.

(`398 Patent, col. 5, ln. 54 to col. 8, ln. 5).

***<u>Interpretation of Claim Language</u>***

*1. <u>"Gap"-Claims 1 and 15</u>*

The term "gap" appears in claims 1 and 15. A common meaning of "gap" is a "hole or opening" or an "interruption of continuity . . ." Webster's New World Dictionary of the American Language (College Edition 1966), at 596 (Attachment G). The common meaning of "annular" is "like or forming a ring". Webster's New World Dictionary, <u>supra</u>, at 60.

In the context of the `398 Patent, an "annular gap" is a ring-like shaped separation between the inner surface of a circular cross-section bat frame and the external surface of a concentric circular cross-section insert that permits, on impact, the independent movement of the bat frame wall and the insert, in the nature of a leaf-spring. The separation will exist if the bat frame and insert are not bonded, adhered, welded, brazed, riveted, or otherwise attached so as to prevent a sliding interface.

Because the `398 Patent is concerned with making real bats with real inserts, one of ordinary skill in the art would understand the terms "annular gap" and "gap" having an "annular shape" in a practical sense to mean a separation which has a ring-like shape.

Claim 1 states that the gap need form only "part" of such a ring-like shape. However, in the context of the `398 Patent, the "part" must permit operable engagement and independent movement of the walls of the bat frame and of the insert.

Claim 15 uses the term "annular gap", rather than "a gap forming at least part of an annular shape", as used in claim 1. Claim 15 does not explicitly state that the gap may be "part" of an annular shape; however, in a practical sense "annular" means a ring-like shape that is not necessarily continuous; i.e., not in a perfect geometrical sense.

Real circular cross-section bat frames and inserts may have variations from specified dimensions. These variations from specified dimensions may result in non-uniformity of the separation between the outer surface of the insert and the inner surface of the large-diameter tubular impact portion of the bat and may result in contact between the outer diameter of the insert and the inner diameter of the large-diameter impact portion of the bat. A person of ordinary skill in the art would not construe the language "annular gap" or "gap forming at least part of an annular shape" to preclude contact resulting from such normal variations, providing such contact does not prevent the insert and the impact portion of the bat frame from moving independently.

None of the claims specify any particular dimension for the gap. The gap can be arbitrarily narrow, providing the mechanical interaction of those surfaces is sufficiently weak in shear so as to permit the adjacent surfaces to move independently, in the nature of a leaf spring, in response to impact with a ball. However, if the gap is too large, the walls will not be able to operably engage during impact. As long as the gap is not too large, the magnitude of the gap is not important and is not a limitation of the claims.

### 2. ***Summary of Conclusions Regarding the Meaning of the Gap Limitation in Claims 1 and 15***

The term "gap forming at least part of an annular shape", used in claim 1, means a ring-like separation between the circular cross-section insert and the bat frame that permits independent movement, in the nature of a leaf-spring, viewed in the practical context of real inserts within real bats. Such a separation is formed naturally where the insert has a circular cross-section and an outer diameter less than the inner diameter of a circular cross-section bat frame. The separation must permit operative engagement and can be arbitrarily narrow, as long as it permits independent movement of the walls of the insert and bat frame.

The term "annular gap" used in claim 15 means a ring-like separation between the circular cross-section insert and the circular cross-section bat frame that permits independent movement, in the nature of a leaf-spring, viewed in the practical context of real inserts within real bats. Such a separation is formed naturally where the insert has a circular cross-section and an outer diameter less than the inner diameter of a circular cross-section bat frame. The separation must permit operative engagement and can be arbitrarily narrow, as long as it permits independent movement of the walls of the insert and bat frame.

Real inserts within real bats may have variations in dimensions that cause non-uniformity of the size of the gap between the insert and the bat frame, and may even cause contact between the insert and the bat frame. A person of ordinary skill in the art would not construe "annular gap" or "gap" having an "annular shape" to preclude contact between the insert and the bat frame resulting from normal variations from specified dimensions, providing the contact does not prevent the inner and outer walls from moving independently.

### *3.* ***Impact portion that is "Inwardly elastically deflectable such to establish a tight interference fit between the insert and the impact portion".***

The language used in claim 18, that the impact portion elastically deflects inwardly "to establish a tight interference fit between the insert and the impact portion" is fully supported by the disclosure in the specification of the `398 Patent, and is definite in claim 18, such that a person of ordinary skill in the art would be able to make and use the invention and understand claim 18.

An embodiment of an interference fit in accordance with claim 18 is described in the `398 Patent as follows:

> In yet another embodiment of the invention, positive attachments of the insert 18 within the frame 11 may be dispensed with altogether. In this case, the insert would "float" on the layer of lubricant. An impact with a ball will cause the frame to deflect, thereby creating interference attachments for the insert during impact. The swing of the bat during impact may tend to lodge the insert 18 in the end of the frame, contributing to an attachment. A bat with an insert held in this manner may respond much like a bat with an insert held at two interference fits. Furthermore, this alternative embodiment will also perform well when the lubricant is omitted.

(`398 Patent, col. 5, lns. 33-45).

Based on the disclosure in the `398 Patent specification, one of ordinary skill in the art would readily recognize that the inward elastic deformation of both the impact portion of the frame and of the insert that occurs during impact tends to create forces between the two bodies which, during the time of impact, tend to lock the insert in place and restrain global relative motion of the insert and bat frame, and/or increase the tightness of the attachment already existing. Because the deformation is elastic, when the impact force is removed, the insert and the impact portion of the frame would normally return to their pre-impact condition.

There is no specific degree of tightness specified for these transient interference fits in claim 18. However, one of ordinary skill in the art would recognize that the temporary interference fit should be tight enough to hold the insert in place during the impact, but not so

tight that it prevents independent movement of the walls of the insert and the frame in the impact portion of the bat.

### *4. "Interference Fits" may be either Elastic or Plastic*

The `398 Patent explicitly states that plastic deformation is not required of an interference fit. Although one embodiment is described in which the reduced-diameter head end of the frame is curled in forcefully enough to cause plastic deformation of the second end 22 of the insert (i.e., the end of the insert at the head end of the bat), the `398 Patent also states that "equally good results may be achieved without heating, curling, or plastic deformation of the insert ends." (`398 Patent, col. 4, lns. 39-42).

### D. Prior Art Cited

I have reviewed the prior art cited during the prosecution history of the `398 Patent, and the prior art raised by the defendants in the *Wilson v. H&*B case, which included Miken Composites L.L.C. None of this prior art limits the meaning of any claim terms to exclude the possibility of contact resulting from normal dimensional variations, providing that the walls of the bat frame and of the insert are still free to move independently, in the nature of a leaf spring, upon impact.

### *1. Fujii '239*

Miken has referred to U. S. Patent No. 3,963,239 ("Fujii `239"). Fujii `239 was cited by the applicant during prosecution of the `398 Patent. Fujii `239 notes that if "the batting portion of the bat is ... too thin", it will cause "a serious drawback in the resisting force of the batting portion of the bat against the impulse produced when the bat strikes the ball" (Fujii `239, col. 1, lns. 48-51). Accordingly, it continues "the present invention ... has as one of its main objects, a

novel type of metallic bat containing a batting portion which possesses a high impact resistance when the bat strikes a ball" (Fujii `239, col. 1, lns. 52-56). Thus it is clear that an intended purpose of the Fujii `239 invention is to increase the stiffness of the batting portion, in direct contrast to the increased elastic deflection (reduced stiffness) taught in the `398 Patent.

The Fujii `239 bat includes a cylindrical reinforcing member whose outer perimeter is in tight engaging relationship with the inner periphery of the barrel portion of the bat to adjust the weight and improve the repelling action of the bat (Fujii `239, Abstract and col. 3, lns. 58-64).

Figures 5 and 6 of Fujii `239 show a coil spring and a helical spring, respectively. The coils of the insert are in "tight abutment" with the inner diameter of the bat (Fujii `239, col. 3, lns. 24-29), so that there is no gap between the material of the springs and the inside wall of the bat frame. When forcibly placing any of the Fujii `239 inserts into the impact portion of the bat, "it is <u>necessary</u> to provide said insertion members in tight abutment with the inner periphery of the metallic tubular body." (Fujii `239, col. 3, lns. 58-64). (Emphasis added).

Fujii `239 discloses a short cylindrical insert 16b in "tight abutment" with the inner periphery of the tubular body 11, and/or glued in place so that it is fixed securely to the frame. The purpose of this tightly-abutted and/or glued insert is to increase the "hardness [i.e., stiffness] and reinforcing stability" of the batting portion. (Fujii `239, col. 3, lns. 56-57).

Fujii `239 does not disclose a gap. Without a gap, the bat frame tube and the insert act together as a single tube having a thicker wall. The insert 16b of Fujii is also not free to move independently of the inner wall of the bat frame [to which it is tightly abutted], and thus the Fujii construction can not act in a manner like a leaf-spring.

Thus, as the applicant correctly pointed out, the tightly-abutted and/or glued insert of Fujii serves merely to thicken the wall of the impact portion. This makes the impact portion

much stiffer, thus increasing the "hardness and reinforcing stability", as intended by Fujii `239. However, increasing the hardness (stiffness) of the bat makes it less able to deflect elastically on impact, contrary to the principles of the `398 Patent.

There is no such disclosure or suggestion of any separations between the walls in Fujii `239, intentional or otherwise. To the contrary, the description of the bat tube and insert as being in "tight abutment" teaches the absences of separation and independent movement. Furthermore, the walls of the insert of Fujii `239 must be "tightly abutted" and/or glued to fix them securely together, and to prevent independent movement of the insert walls.

*Easton*

U. S. Patent No. 5,3364,095 ("Easton") has been referred to by Miken as allegedly pertinent to claim interpretation.

The Easton patent discloses a bat with a reinforcing insert compressively engaged with the interior surface of the bat frame with considerable compressive forces of several thousand pounds per square inch. (Easton, col. 2, lns. 3-21 and col. 3, ln. 66 to col. 4, ln. 1). The insert is constructed of a composite material and is formed by winding a sheet of carbon fibers and matrix materials onto an expandable mandrel. (Id. at col. 3, lns. 8-18). The insert or sleeve is installed by inserting the sleeve into the bat tube and expanding the sleeve under pressure, in order to expand and compress the sleeve against the inner surface of the bat tube. (Easton, col. 3, lns. 35-44). The compression fit locks the insert in the bat tube. (Id. at col. 2, lns. 21-22). To ensure bonding of the sleeve 26 of Easton to the barrel 14, a film adhesive 28 may be employed. (Id. at col. 3, lns. 44-48). In addition, on cooling down the thermosetting resin matrix, differential thermal expansion between the aluminum of the bat wall and the fiber-reinforced insert results in very high compressive forces between the cylinders (Easton, col. 3, ln. 58 to col. 4, ln. 1),

enhancing the locking of the insert to the bat wall and preventing them from independent movement.

2. *Middlekauff*

U. S. Patent No. 1,611,858, ("Middlekauff") has been referred to by Miken as allegedly pertinent to claim interpretation.

Middlekauff teaches the design of a hollow steel baseball bat. The bat can be made of seamless steel tubing or from a strip of steel sheet by forming it into a tubular shape and securing its edges together. Middlekauff also discloses "an interior sleeve 17 suitably secured by brazing, riveting, or welding to the body" [of the bat], noting also that "this inner sleeve 17 may serve as the means for connecting the edges of the strip of which the body tube is formed". Clearly, if the integral sleeve is connected to the two edges of the strip forming the body tube, it is not possible for the sleeve and the bat body to move independently, in the manner of a leaf-spring.

Middlekauff teaches the use of steel for the bat and also for the insert. The elastic modulus of steel is approximately three times larger than that of aluminum, so the use of a high-stiffness material runs counter to the teaching of the `398 Patent that a greatest elastic deflection is desired; with all other geometric factors equal, a steel bat would deflect under a given load only one-third as much as would an aluminum bat.

Nothing in Middlekauff teaches, suggests, or discloses the limitations of Claims 1, 15, and 18 of the `398 Patent. Nothing in Middlekauff teaches, suggests, or discloses a gap between the frame and the insert, the elastic deflection of the frame and operable engagement of the insert under impact, leading to independent movement of the walls in the manner of a leaf-spring.

3. *Iwase Japanese Application Publication No. S50-7976*

Japanese Application Publication No. S50-7976 ("Iwase `976") has been referred to by Miken as allegedly pertinent to claim interpretation.

Iwase `976 shows that aluminum bats can be formed by swaging of thinner-walled tubes, leading to thinner walls in the small-diameter grip portion, if a strengthening metal pipe is attached by embedding or attached by fitting inside the ball-striking part of the bat. As Fig. 3 of Iwase `976 shows the end of the ball-striking part of the bat tube to be open-ended, it is necessary for the inserted pipe to be firmly attached to the outer shell of the bat; otherwise the insert would dislodge from the bat. The firm degree of fixity required to hold such an inserted pipe is not compatible with independent motion of the bat tube and insert.

Nothing in Iwase `976 teaches, suggests, or discloses the limitations of Claims 1, 15, and 18 of the `398 Patent. Nothing in Iwase `976 teaches, suggests, or discloses a gap between the frame and the insert, the elastic deflection of the frame and operable engagement of the insert under impact, leading to independent movement of the walls in the manner of a leaf-spring.

4. *Iwase Japanese Application Publication No. S51-13165*

Japanese Application Publication No. S51-13165 ("Iwase `165") has been referred to by Miken as allegedly pertinent to claim interpretation.

Iwase `165 shows a vibration-reducing bat design in which a rubber-like or synthetic resin sheet or a pipe thereof 2 is inserted between a metallic bat pipe 1 and an interior metal reinforcement pipe 3 and "is bonded by means of an adhesive agent." There is no possibility of sliding, in the manner of a leaf-spring, since the intervening rubber layer is bonded to the insert and bat wall.

Nothing in Iwase `165 teaches, suggests, or discloses the limitations of Claims 1, 15, and 18 of the `398 Patent. Nothing in Iwase `165 teaches, suggests, or discloses a gap between the frame and the insert, the elastic deflection of the frame and operable engagement of the insert under impact, leading to independent movement of the walls in the manner of a leaf-spring.

5. *Takahashi Japanese Application Publication No. S63-38477*

Japanese Application Publication No. S63-38477 ("Takahashi") has been referred to by Miken as allegedly pertinent to claim interpretation.

Takahashi shows a tapered hard insert that is "fitted and fixed" within the bat and "which can be used without this inner tube becoming detached or moving." It is clear that Takahashi runs counter to the teaching of the `398 Patent. Takahashi suggests that "stainless steel, manganese steel, titanium, or the like" would be suitable materials for constructing the hard tapered insert, while the bat is made of a light metallic alloy (aluminum-based). The elastic modulus of steel is approximately three times larger than that of aluminum, so that, for a given force, a steel insert of a given size and shape would deflect elastically only one-third as much as a corresponding aluminum insert. The elastic modulus of titanium also exceeds that of aluminum. The use of such stiff insert materials would intrinsically limit the desired large elastic deflection taught in the `398 Patent

Due to the higher elastic modulus of steel and titanium (compared to aluminum) and the lack of independent movement of the insert with respect to the bat frame, the deflection of the resulting aluminum/steel (or aluminum/titanium) wall, for insert thicknesses relatively close to the frame thickness, would be even smaller than the deflection of an all-aluminum wall of the same total thickness. Indeed, Takahashi notes that his invention and manufacturing process results in "forming the bat body and inner tube as a single body" (Takahahsi translation, p. 2, ln.

14). This is important since the insert becomes a major stiffener in the Takahashi design, meant primarily to increase stiffness rather than to reduce stiffness and increase deflection (or "trampoline" effect), as taught in the `398 Patent.

Nothing in Takahashi teaches, suggests, or discloses the limitations of Claims 1, 15, and 18 of the `398 Patent. Nothing in Takahashi teaches, suggests, or discloses a gap between the frame and the insert, the elastic deflection of the frame and operable engagement of the insert under impact, leading to independent movement of the walls in the manner of a leaf-spring.

*6. <u>Sato Japanese Application Publication No. H2-243173</u>*

Japanese Application Publication No. H2-243173 ("Sato") has been referred to by Miken as allegedly pertinent to claim interpretation.

Sato shows a noise-reducing and vibration-reducing bat design that involves a 2-layer tubular insert having a fluid gel between its layers, the tube itself being "tightly bonded to the interior of a bat body." Clearly, this tight bonding of the outer surface of the tubular insert to the inner surface of the bat will not permit independent movement, in the manner of a leaf-spring, as taught by the `398 Patent.

Nothing in Sato teaches, suggests, or discloses the limitations of Claims 1, 15, and 18 of the `398 Patent. Nothing in Sato teaches, suggests, or discloses a gap between the frame and the insert, the elastic deflection of the frame and operable engagement of the insert under impact, leading to independent movement of the walls in the manner of a leaf-spring.

For the foregoing reasons, I do not find that any part of the prior art, including that referred to by Miken , poses any limitation or special meaning for the terms used in the claims of the `398 Patent pertinent to the bats at issue in this lawsuit.

I declare under penalty of perjury under the laws of the United States that the foregoing accurately reflects my opinions, and the statements therein are true and correct to the best of my knowledge.

Executed this 24th day of October, 2003, at Cambridge, MA.

David M. Parks, Ph.D.