20. Re-insert the inner tube taking any necessary precautions to ensure as complete a bonding (without voids) between the insert and outer tube as possible.
21. Allow the assemble tube to set undisturbed for a sufficient time for the glue to cure (typically 24 hours).
22. Clean any excess glue off of the outer edges of the 10-inch tube to ensure that the tube seats firmly in the test fixture, and run a load deflection rate test. Record the result.
23. Compare the results of the 3 load deflection rate tests. The load deflection rate of the full bat compared to the 10-inch tube will usually be lower by 20%) due to the fact that the end cap and taper sections add stiffness, and are now are cut off. If the load deflection rate of the glued 10-inch tube is higher then the load deflection rate of the non-glued 10-inch tube it shows the existence of independent movement between the insert and the bat frame.
24. Load Deflection rate Comparison of a multi-walled tube with a solid tube (I.E. Multi-wall independent movement, leaf spring affect verses Single wall no independent movement). Add a 1/Load Deflection rate Comparison of a multi-walled tube with a solid tube (I.E. Multi-wall independent movement, leaf spring affect verses Single wall no independent movement).

For example: A test was run on a multi-wall tube that has a 0.052 thick outer shell and 0.055 inner shell with lubricant between the inner and outer tube. The total multi-wall thickness is 0.052+0.055=0.107. The bat was a Wilson/DeMarini Doublewall bat. Compare those results with a single wall tube, constructed of the same material, with a thickness is 0.107.

The **"Load Deflection Comparison Chart,"** Figure 18 below, shows the lubricated multi-wall tube with a load deflection rate of approximately 10,000 Lbs/In. The Single wall with the same total thickness has a load deflection rate of approximately

30,000 Lbs/In. The difference of 20,000 lbs/In load deflection rate is the measure of how much independent movement there is between the frame and the insert, and therefore the existence of a "gap" under the '398 Patent.



## V. Test Results And Infringement Opinions.

An infringement analysis of the Miken bats begins with an examination of the elements of the asserted claims of the '398 Patent. The elements of the respective claims are as follows:

**1.**
- A bat, comprising:
- a hollow tubular bat frame having a circular cross-section; and
- an insert positioned within the frame, the insert having a circular cross-section,
- the insert having first and second ends adjoining the tubular frame,
- the insert being separated from the tubular frame by a gap forming at least part of an annular shape along a central portion between said first and second ends,
- the frame elastically deflectable across the gap to operably engage the insert along a portion of the insert between the insert first and second ends.

**15.**
- In a hollow bat having a small-diameter handle portion and a large-diameter impact portion
- an improvement comprising an internal structural insert defining an annular gap with an inside wall of the impact portion of the bat
- the impact portion elastically deflectable to close a portion of the annular gap an operably engage the insert.

**18.**
- A bat comprising:
- a hollow tubular bat frame
- having a small-diameter handle portion and a large-diameter impact portion
- having a circular cross-section with an inner and outer diameter;
- at least one insert having a substantially circular cross-section
- with an outer diameter less than the inner diameter of the frame impact portion,
- the insert being held within the impact portion and the impact portion being inwardly elastically deflectable such to establish a tight interference fit between the insert and impact portion .

('398 Patent, col. 5, ln. 54 to col. 8, ln. 5, Attachment B).

An analysis of the Miken bats pursuant to the test procedures outlined above, leads to the conclusions, set forth in the following Claim Chart for infringement of the '398 Patent:

| CLAIM CHART – Miken Composites, LLC<br><br>'398 Patent, Claim 1 Elements | HHD, Viper, Intensit-E Velocit-E, Velocit-E II, Ultra I, Ultra II, Edge and M-Pulse | | |
|---|---|---|---|
| A bat, comprising: | Yes | | |
| a hollow tubular bat frame | Yes | | |
| having a circular cross-section; and | Yes | | |
| an insert positioned within the frame, | Yes | | |
| the insert having a circular cross-section, | Yes | | |
| the insert having first and second ends adjoining the tubular frame, | Yes | | |
| the insert being separated from the tubular frame by a gap forming at least part of an annular shape along a central portion between said first and second ends, | Yes | | |
| the frame elastically deflectable across the gap to operably engage the insert along a portion of the insert between the insert first and second ends. | Yes | | |
| | | | |
| '398 Patent, Claim 15 Elements | | | |
| In a hollow bat having a small-diameter handle portion and a large-diameter impact portion, | Yes | | |
| an improvement comprising an internal structural insert | Yes | | |

| (*'398 Patent, Claim 15 Elements – continued*) | HHD, Viper, Intensit-E Velocit-E, Velocit-E II, Ultra I, Ultra II, Edge and M-Pulse |
|---|---|
| defining an annular gap with an inside wall of the impact portion of the bat | Yes |
| and the impact portion elastically deflectable to close a portion of the annular gap and operably engage the insert. | Yes |
| | |
| **'398 Patent, Claim 18 Elements** | |
| A bat, comprising: | Yes |
| a hollow tubular bat frame having a small-diameter handle portion and a large-diameter impact portion | Yes |
| having a circular cross-section with an inner and outer diameter; | Yes |
| at least one insert having a substantially circular cross-section | Yes |
| with an outer diameter less than the inner diameter of the frame impact portion, | Yes |
| the insert being held within the impact portion; | Yes |
| and the impact portion being inwardly elastically deflectable such to establish a tight interference fit between the insert and the impact portion. | Yes |

Each of the HHD, Viper, Intensit-E, Velocit-E, Velocit-E II, Ultra I, Ultra II, Edge and M-Pulse (collectively "Miken Infringing Bats"), is a bat, with a hollow tubular frame, having a small diameter handle portion and a large diameter impact (or hitting) area. Each of the Miken Infringing Bats has at least one insert positioned within the frame. The impact portion of each of the Miken Infringing Bats is elastically deflectable and the insert in each has a circular cross-section and first and second ends adjoining the frame or the insert held within the frame.

Miken has previously stated, through the opinions of Eugene L. Johnson, Esq., dated May 4, 2001, and submitted when Miken was a defendant in *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., et al.*, that Miken's Intensit-E and Velocit-E bats do not infringe any of the asserted claims of the '398 Patent, claims 1, 15 and 18, because their bats have no "gap" limitation. Although claim 18 does not contain a "gap" limitation, Mr. Johnson asserted that the claim "calls for relative inside and outside diameters of the frame and insert, which yields a gap between them… ." Such a position is meritless since all claim 18 requires is "at least one insert having a substantially circular cross-section with an outer diameter less than the inner diameter of the frame impact portion." If the insert is within the frame, as it is for ***all*** of the Miken Infringing Bats, then necessarily the insert has a smaller outside diameter than the inside diameter of the frame, regardless of the relative diameters of those members prior to their complete manufacture into a finished bat. This is also proved by the aforementioned test procedures.

Accordingly, the remaining analysis focuses on the "gap" limitations of claims 1 and 15, and on the "interference fit" limitation of claim 18. These limitations were

construed in *DeMarini v. Worth* (Attachment C), the only final *Markman* patent construction available on the '398 Patent. According to the Court in the *DeMarini* case, in connection with claim 1's limitation of a "gap forming at least part of an annular shape", the Court recited that "claim 1 states that the gap forms at least part of an annular, or ring, shape." (*Worth* Opinion, page 7, Attachment C). Noting that in a preferred embodiment the specification describes a uniform gap (filled with grease), the Court reiterated that:

> limitations can not be read into a claim from the specification apart from a need to interpret the meaning of a particular word or phrase. [Citation omitted.] Requiring the gap in claim 15 to be uniform would destroy the meaning of the phrase "at least part of an annular shape." A partial annular shape can include a discontinuous gap. I conclude that the ordinary meaning of "gap" in claim 1 to one skilled in the art allows some contact between the frame and insert as long as a sufficient separation exists for the frame and insert to move independently.

(*Worth* Opinion, page 7, Attachment C).

The court concluded similarly for the "annular gap" limitation of claim 15:

> Claim 15 does not contain the language from claim 1 concerning part of an annular shape. In spite of that difference, however, I still conclude that the ordinary meaning of "gap" in claim 1 to one skilled in the art allows some contact between the frame and insert as long as a sufficient separation exists where the frame and insert can move independently. A discontinuous gap is still shaped in the form of a ring, albeit a discontinuous one. The shape is still a round, circular one.

(*Worth* Opinion, pages 7-8, Attachment C).

Finally, with respect to claim 18, the *Worth* court held that the operative "interference fit" limitation was redefined from the traditional engineering sense (described in the '398 Patent, col. 4, lns. 24-34), as provided in the following section of the specification:

> In yet another embodiment of the invention, positive attachments of the insert **18** within the frame **11** may be dispensed with altogether. In this case, the insert

> would "float" on the layer of the lubricant. An impact with a ball will cause the frame to deflect, thereby creating interference attachments for the insert **18** during impact. The swing of the bat during impact may tend to lodge the insert **18** in the end of the frame, contributing to an attachment. A bat with a insert held in this manner may respond much like a bat with an insert held at two interference fits. Furthermore, this alternative embodiment will also perform well when the lubricant is omitted.

(*Worth* Opinion, page 8, Attachment C; '398 Patent, col. 5, lns. 33-45, Attachment B).

In consideration of the foregoing, the Court held that:

> DeMarini redefined the term 'interference fit' in claim 18, as it is allowed to do, with the language quoted above from col. 5. I conclude 'interference fit' in claim 18 is interpreted to be a transient attachment at impact which occurs anywhere along the insert, including but not limited to the impact point of the insert ends. The separation between the insert and the frame is not required to be continuous but is only limited by the requirement that the frame bend inward enough to make a momentary attachment between the frame and the insert. There is no requirement that the insert float within the frame prior to impact.

(*Worth* Opinion, page 9, Attachment C).

### A. Infringement of Claim 1 by the Miken Infringing Bats

In order to establish that the Miken Infringing Bats infringe claim 1, Test Procedures A, B, and C were followed, as set forth above. In connection with Test Procedure A, the Lengthwise cut, it was discovered that the Miken Infringing Bats have hollow tubular frames, and at least one insert positioned within the frame. The inserts have first and second ends adjoining the frame, or held within the frame with an outer diameter less than the inner diameter of the frame. See Figure 1 above. In addition no bonding or adhesive materials whatsoever were found between the frames and inserts.

In connection with test procedure B, the crosswise cut of 1/4 inch rings, it was determined that the inserts are removable from the frames of Miken Infringing Bats with finger pressure. See Figure 4. This establishes that the inserts are <u>not</u> in tight abutment with the frames, In addition, the inserts are rotatable, with finger pressure, within the

frames. See Figures 5 and 6. This demonstrates the looseness of the interface and the reason why the bats demonstrate independent movement between the frames and inserts on impact, or under load.

Significantly, the 1/4 inch crosswise cut is useful in revealing a visible, annular separation between the frame and insert of the Miken bats, particularly the Ultra II.



**Figure 3, Miken, with visible light between frame and insert, <u>without</u> use of any magnification.**

The light coming through the space between the frame and insert members is additional evidence of the "gap" element present in the bats sold by Miken.

In connection with Test Procedure C, the Load Deflection Test, each of the Miken Infringing Bats were measured in the same manner, according to the procedure. The

results are summarized in the following chart which clearly shows that when the Miken inserts of each of the accused bats are bonded to the frame, inhibiting the independent movement of the two members, which is manufactured in by Miken, a dramatic increase in the load deflection rate of the bat members is seen. This increase in deflection, from the unglued to the glued, is the measure of independent movement, and the existance of a "gap" as required by claims 1 and 15, in the Miken Infringing Bats, and is consistent with that of the DeMarini multi-wall bats, which are also embodiments of the invention.

**[See Chart on next page.]**