(see FIG. 3) and along the length of the insert between the first and second ends 20, 22 thereof.

As best seen in FIG. 2, the gap 26 is filled with a lubricant, such as grease. The grease is brought within the gap 26 by coating the insert 18 with grease before the insert is inserted into the tubular frame 11. Once the insert 18 is secured between the first and second interference fits, the lubricant-filled gap 26 is effectively sealed by the first and second interference fits.

The operation of the softball bat of the illustrated embodiment is designed for an improved transfer of power to a batted ball. Specifically, the bat 10 responds to the impact with a ball by providing a large elastic deflection, which rebounds with a large force in a short amount of time.

The tubular frame 11 with the suspended insert 18 attached at both ends to the tubular frame 11 yields a mechanical system with characteristics similar to a leaf spring. When the bat 10 strikes a ball on the impact portion 12, the impact portion 12 wall deflects inwardly through the grease-filled gap 26 to load and inwardly deflect the underlying insert wall. The deflection of the impact portion 12 can be considered as generally arcuate. Accordingly, the insert 18 deflects arcuately to cradle the arcuate deflection of the impact portion 12.

Because the insert 18 arcuate cradles the impact portion 12 arcuate, the insert 18 arcuate has a radius of curvature greater than the impact portion 12 arcuate. Because the insert 18 is fixed within the tubular frame at the insert ends 20, 22, the greater radius of curvature of the insert deflection causes the insert 18 to be stretched, as well as bent, around the deflection of the impact portion 12. Therefore, the insert 18 undergoes substantial tensile, as well as bending stress when a ball is batted.

The leaf-spring-like attachment of the insert 18 within the impact portion 12 provides a rebound to yield improved power transmission to the ball. The bending stresses are released as the walls of the impact portion 12 and the insert 18 rebound into the unloaded state. The tensile loading of the underlying insert wall is released simultaneously, adding "snap" which increases the force and velocity of the rebound. Accordingly, the extra snap owing to the leaf-spring-like suspension of the insert 18 within the tubular frame yields an improved transfer of power to the batted ball, and a heightened "slugging" capacity for the bat.

The grease permits relative movement between the impact portion 12 and the insert 18, so that the insert can independently stretch around the deflection of the impact portion 12. The sealed condition of the grease within the gap offers another advantage. The impact with a ball may occur so rapidly that the grease cannot appreciably flow. Rather, the grease hydrostatically supports the wall of the impact portion away from the insert. In this case, a substantial layer of grease is maintained between the impact portion and the insert, facilitating the movement of the insert relative to the impact portion. In another aspect, any flow of the grease that does occur during impact serves to distribute the force of impact over an expanded area of the impact portion 12. The distribution of the impact stress permits a thinner-walled impact portion because high stress concentrations causing plastic deformation are not likely to occur.

In a preferred embodiment, both the tubular frame and the insert are made of aluminum. An exemplary construction of the bat has the tubular frame 11 swaged from a constant-diameter aluminum tube to yield an integral, weld-free frame. Such swaging results in a tubular frame with thinner walls at the impact portion 10 and thicker walls at the handle portion 16. While swaging is used to produce the tubular frame 11 of the illustrated embodiment, it shall be understood that other methods of manufacturing the tubular frame may work equally as well.

Using aluminum of 80,000 pounds/inch$^2$ yield strength, an excellent batting response is achieved when the impact portion 12 is about 13 inches long with a wall thickness of 0.058 inch. An insert 18 slightly shorter than the impact portion 12 and having a wall thickness of 0.048 inch is inserted into the impact portion 12. The outer diameter of the insert is chosen so that the gap between the outer surface of the insert 18 and the inner surface of the impact portion 12 is about 0.007 inch.

While such dimensions yield excellent results, it is to be understood that they are exemplary only, and that many permutations of bat frame, insert, and gap dimensions will work equally as well. All permutations of component dimensions and configurations fall within the scope of the present invention.

Further describing a preferred construction, the insert 18 is coated with the lubricant before being inserted into the tubular frame 11. The first end 20 of the insert 18 is forcefully inserted into the tapering portion to achieve a tight interference fit. Plastic deformation of the aluminum insert at the interference fit increases the tightness of the attachment and the seal. The second interference fit is then obtained within a frame head portion 24, which is formed by curling the topmost end of the impact portion 12 over upon the insert second end 22. It has been found that a tight fit is achieved by curling in a one-half-inch radius forcefully enough to cause some plastic deformation in the insert second end 22. The curling may be facilitated by locally heating the end of the impact portion.

It should be understood that the foregoing is exemplary only, and that equally good results can be achieved without heating, curling, or plastic deformation of the insert ends. For instance, the head portion 24 of the frame could be pre-formed and threaded into the top of the impact portion 12. In this case, the head portion 24 may be threaded to impinge tightly upon the insert second end 22, to create the interference fit.

The interference fits of the illustrated embodiment offer excellent performance and are advantageous in the simplicity of design and manufacture (notably in the absence of any required welding). However, it is to be understood that welding or other fasteners may also be used. For instance, additional friction-improving devices may be used at the interference fits of the inserts and the tubular frame 11. Alternatively, adhesives or mechanical fasteners for joining the insert ends to the tubular frame may be used. Any fastener may also serve the purpose of sealing the lubricant within the gap 26. Any attachment mechanism or fastener maintaining the leaf-spring-like suspension falls within the scope of the present invention.

While the present embodiment utilizes aluminum for the frame and the insert, it should be understood that many other materials will perform equally well with the present invention. For instance, at a slightly higher cost, titanium could be used as insert material with excellent results. A titanium insert is advantageous owing to its excellent impact response characteristics. In addition, because the insert is a hollow tube, the machining and

cold working problems associated with titanium are minimized. The titanium insert provides a bat with an superb impact response, but at a cost vastly reduced from that of a solid titanium bat.

Furthermore, where cost is less a consideration, a titanium insert may be used within a titanium bat with outstanding results. It should be understood that various other metals, composite materials, plastics, and other materials may likewise perform equally as well with the present invention.

Many types of lubrication may be utilized with bats of the present invention. Varying the viscosity of the lubricant may modify the feel and response of such bats. In a preferred embodiment, a heavy grade of grease is used to accentuate the hydro-static effect of the grease during impact. Synthetic lubricants may be used as well as petroleum-based greases and oils. Equally good results may be also obtained from the use of lubricants such as Teflon TM. Moreover, insert and bat frame materials which are themselves slippery so as to permit the independent movement of insert and frame may work equally as well. Indeed, lubricant may be omitted entirely, so long as the resulting arrangement permits independent movement of insert and bat frame.

It will be recognized that the lubricant is a plastically deformable material. Plastic deformation of this material is restored by action of the bat frame and the insert. Certain advantages of the present invention can be achieved by substituting any plastically deformable material in the gap 26, irrespective of whether it is a lubricant.

In yet another embodiment of the invention, positive attachments of the insert 18 within the frame 11 may be dispensed with altogether. In this case, the insert would "float" on the layer of lubricant. An impact with a ball will cause the frame to deflect, thereby creating interference attachments for the insert 18 during impact. The swing of the bat during impact may tend to lodge the insert 18 in the end of the frame, contributing to an attachment. A bat with an insert held in this manner may respond much like a bat with an insert held at two interference fits. Furthermore, this alternative embodiment will also perform well when the lubricant is omitted.

In view of the many possible embodiments to which the principles of the present invention may be put, it should be recognized that the detailed embodiment is illustrative only and should not be taken as limiting the scope of the invention. Rather, I claim as my invention all such embodiments as may come within the scope and spirit of the following claims and equivalents thereto.

I claim:

1. A bat, comprising:
   - a hollow tubular bat frame having a circular cross-section; and
   - an insert positioned within the frame, the insert having a circular cross-section, the insert having first and second ends adjoining the tubular frame, the insert being separated from the tubular frame by a gap forming at least part of an annular shape along a central portion between said first and second ends, the frame elastically deflectable across the gap to operably engage the insert along a portion of the insert between the insert first and second ends.

2. A bat according to claim 1 in which the insert is suspended within the frame and is secured thereto at said first and second ends.

3. A bat according to claim 2, wherein the insert is rigid and the gap is filled with a lubricant to facilitate the relative movement between the insert and the tubular frame when a ball is struck.

4. A bat according to claim 3, wherein the tubular frame has a small-diameter handle portion, an intermediate tapering portion, and a large diameter impact portion, and the insert is suspended within the frame impact portion.

5. A bat according to claim 4, wherein the insert is tubular.

6. A bat according to claim 5, wherein the gap thickness is small relative to the thickness of the impact portion wall and the insert wall.

7. A bat according to claim 6, with the tubular frame further having a reduced-diameter head portion atop the impact portion; and
   - the first insert end being secured within the frame by a first interference fit within the tapering portion of the frame, and the second insert end being secured with the frame by a second interference fit within the head portion of the bat.

8. A bat according to claim 7, wherein the interference fits seal the lubricant within the gap.

9. A bat according to claim 8, wherein the insert is made of aluminum.

10. A bat according to claim 8, wherein the tubular frame is made of aluminum.

11. A bat according to claim 8, wherein the insert is made of titanium.

12. A bat according to claim 8, wherein the insert is made of composite material.

13. A bat according to claim 8, wherein the insert is made of steel.

14. A bat according to claim 10, wherein the lubricant is grease.

15. In a hollow bat having a small-diameter handle portion and a large-diameter impact portion, an improvement comprising an internal structural insert defining an annular gap with an inside wall of the impact portion of the bat and the impact portion elastically deflectable to close a portion of the annular gap and operably engage the insert.

16. The bat of claim 15 in which the gap is filled with a plastically deformable substance.

17. A bat, comprising:
   - a hollow tubular frame having a small diameter handle portion, an intermediate tapering portion, a large diameter impact portion, and a reduced-diameter head portion;
   - a tubular insert adapted to be suspended within the frame impact portion;
   - a first end of the tubular insert being received into the tapering portion and secured therein by a first interference fit;
   - a second end of the tubular insert being received by the head portion of the frame and secured therein by a second interference fit;
   - a gap separating the insert from the tubular frame, the gap extending from the first interference fit to the second interference fit, the gap being filled with grease to facilitate relative movement between the tubular frame and the insert when the bat strikes a ball; and
   - the insert and the frame being made of aluminum.

18. A bat, comprising:
   - a hollow tubular bat frame having a small-diameter handle portion and a large-diameter impact portion

having a circular cross-section with an inner and outer diameter;

at least one insert having a substantially circular cross-section with an outer diameter less than the inner diameter of the frame impact portion, the insert being held within the impact portion; and

the impact portion being inwardly elastically deflectable such to establish a tight interference fit between the insert and the impact portion.

* * * * *

FILED

1999 JAN 14 P 1:52

U.S. DISTRICT COURT
DISTRICT OF OREGON
PORTLAND, OREGON
BY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DEMARINI SPORTS INC., an Oregon Corporation, Plaintiff, v. WORTH, INC., a Tennessee Corporation, Defendant. | Civil No. 97-1693-KI<br>OPINION |

John F. Neupert
Alan P. Polaski
Miller, Nash, Wiener, Hager & Carlsen
111 S. W. 5th Avenue
Suite 3500
Portland, Oregon 97204

Theodore F. Shiells
Kay Lyn Schwartz
Gardere & Wynne, LLP
3000 Thanksgiving Tower
1601 Elm Street, Suite 3000
Dallas, TX 75201

Attorneys for Plaintiff

Alan T. McCollom
Marger, Johnson, McCollom & Stolowitz, PC
1030 S. W. Morrison Street
Portland, Oregon 97205

- and -

WILSON PRODUCED DOC.
HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

WS 003753



Ex. C

WILSON PRODUCED DOC.
HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

Mark J. Patterson
Edward D. Lanquist, Jr.
Waddey & Patterson, A Professional Corporation
414 Union Street, Suite 2020
NationsBank Plaza
Nashville, Tennessee 37219

Attorneys for Defendant

KING, Judge:

Plaintiff DeMarini Sports, Inc. ("DeMarini") filed this action alleging that defendant Worth, Inc., infringed claims 1, 2, 15, and 18 of DeMarini's United States Patent No. 5,415,398 ("the '398 patent"). The parties' briefs filed in connection with DeMarini's motion for summary judgment revealed a difference of opinion on the proper construction of the terms in the '398 patent. Consequently, I granted Worth's motion for a Markman hearing. This opinion states my construction of the disputed terms.

## LEGAL STANDARDS

Patent infringement analysis has two steps: (1) determining the meaning and scope of the patent claims asserted to be infringed, commonly known as claim construction or interpretation; and (2) comparing the construed claims to the device accused of infringing. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). The claims measure the invention. SRI Intern. v. Matsushita Elec. Corp. of America, 775 F.2d 1107, 1118,1121 (Fed. Cir. 1985).

The construction of patent claims, including terms of art within the claims, is a matter of law exclusively for the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 390 (1996). A claim is construed by first examining the intrinsic evidence: the claim language, the specification, and the prosecution history. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Terms in a claim are given their ordinary meaning to one skilled in the art unless it appears from the patent and prosecution history that the inventor used them differently. A patentee may be his own lexicographer, but any special definition given to a word must be clearly defined in the specification or file history. Id.



WS 603754

WILSON PRODUCED DOC.
HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

Usually, the intrinsic evidence alone resolves any ambiguity in a disputed claim term. If so, it is improper to rely on extrinsic evidence such as expert testimony, inventor testimony, prior art not cited in the specification or file history, dictionaries, and technical treatises and articles. Id. at 1583-84. Although technical treatises and dictionaries are extrinsic evidence, the court may freely consult these resources to better understand the underlying technology, as long as their definitions do not contradict a definition found in the patent documents. Id. at 1584 n.6. In its discretion, a court may rely on prior art, whether or not cited in the specification or the file history. Prior art references may be very indicative of how those skilled in the art generally define a term. Prior art, dictionaries, and treatises, all available to the public, are preferred over opinion testimony of either attorneys or experts in the field of technology involving the patent. Id. at 1585.

Extrinsic evidence, particular expert testimony, may be used to help the court properly understand the claims as long as it is not used to vary or contradict the patent documents. If any extrinsic evidence contradicts the patent documents, it is entitled to no weight. Id. at 1584.

> Had the district court relied on the expert testimony and other extrinsic evidence solely to help it understand the underlying technology, we could not say the district court was in error. But testimony on the *technology* is far different from other expert testimony, whether it be of an attorney, a technical expert, or the inventor, on the *proper construction* of a disputed claim term, relied on by the district court in this case. The latter kind of testimony may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms. Such instances will rarely, if ever, occur.

Id. at 1585.

Although the specification may be consulted for help in interpreting the claims, limitations cannot be read into a claim from the specification apart from a need to interpret the meaning of a particular word or phrase. E.I. Du Pont De Nemours & Co. v. Phillips Petro., 849 F.2d 1430, 1433 (Fed. Cir.), cert. denied 488 U.S. 986 (1988).

## DISCUSSION

During the hearing, I received evidence on the underlying technology of aluminum softball bats, including both manufacturing techniques and how the double-walled bats get



WS 003755

WILSON PRODUCED DOC.
HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

additional distance from hits. None of this extrinsic evidence contradicts the patent documents.

I. Meaning of "Gap"

A. Claim 1

Claim 1 states:

> A bat, comprising:
>
> a hollow tubular bat frame having a circular cross-section; and
>
> an insert positioned within the frame, the insert having a circular cross-section, the insert having first and second ends adjoining the tubular frame,

The parties do not dispute the interpretation of this language. Simply put, a hollow, circular tube, called a frame, has a circular insert positioned within it so that the insert contacts the frame at the insert's ends.

> the insert being separated from the tubular frame by a gap forming at least part of an annular shape along a central portion between said first and second ends, the frame elastically deflectable across the gap

The parties dispute the meaning of the word "gap." DeMarini contends that the term gap does not require an absence of contact between the frame and insert around either the circumference or central portion of the insert, as long as a sufficient separation exists so that the frame and insert are free to move independently. Worth contends that the gap must be a space that extends continuously around the circumference of the insert and along a portion of the length of the insert between its ends.

> to operably engage the insert along a portion of the insert between the insert first and second ends.

Here, the only disagreement concerns the meaning of "operably engaged" depending on whether the gap must exist at all locations. Putting that issue aside for a moment, the frame bends inward when the ball impacts it, makes contact with the insert, and the frame and insert return to their original positions without permanently deforming.

The specification of the '398 patent mentions a gap in a few places, including:

> A gap exists along the length of the suspended insert separating the insert from the interior of the impact portion. The gap is filled with grease.



WS603756

WILSON PRODUCED DOC.
HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

> to facilitate relative movement between the insert and the tubular frame when a ball is batted.

Col. 2, lines 19-23.

> Because the outer diameter of the insert 18 is slightly less than the inner diameter of the tubular frame impact portion 12, the suspended insert 18 contacts the tubular frame only at the interference fits of the first and second insert ends 20, 22. A narrow, uniform gap 26 exists between the insert 18 and the inner wall of the impact portion 12. The gap extends uniformly around the insert (see FIG. 3) and along the length of the insert between the first and second ends 20, 22 thereof.

Col. 2, line 62 to col. 3, line 2.

Figures 2 and 3 show continuous gaps while Figure 1 shows a discontinuous gap. Evidence at the hearing shows that aluminum tubes are not perfectly formed. They are ordered by specifying either the inner or outer nominal (average) diameter and the wall thickness. The Aluminum Association publishes standards which specify the allowable deviations from the specified diameter. The evidence established that a person with ordinary skill in the art of making aluminum bats would understand that dimensions are all nominal and that manufacturing tolerances must be expected.

The specification gives measurements for a particular preferred embodiment made out of aluminum tubing. Col. 4, lines 9-17. A bat with the dimensions specified in the preferred embodiment cannot be built with a continuous uniform gap of .007 inches because of the deviations in the aluminum tubing normally used to build aluminum bats. The evidence also established that a bat with a continuous gap could be built in one of three ways: (1) sizing the tubing with a gap large enough that imperfections in the tubing would not cause contact; (2) specify tubing with smaller deviations than standard tubing used for bats, presumably at a higher cost; or (3) machine the tubing after purchase to remove the imperfections. There is no evidence, however, that anyone skilled in the art of making bats takes these extra measures for normal production bats.

Engineers at both DeMarini and Worth drew sketches of double-walled bats indicating dimensions similar to those in the preferred embodiments. Both sketches have the space between the frame and insert labeled as a gap. These sketches also would not



WS 603757

WILSON PRODUCED DOC.
HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

have continuous gaps of the size stated in the sketches.

There is evidence that noncontinuous gaps perform the patent's objective of increasing the power transferred from the bat to the ball as long as there is a sufficient gap to allow a leaf-spring-like action between the frame and the insert. Evidence also establishes that maximum deflection, and consequently maximum power transfer, is achieved with a continuous gap. A patented inventions must be new and useful; it is not required to be the best way to achieve the objective. See 35 U.S.C. § 101.

It is unlikely that an inventor would define an invention in a way that excludes the preferred embodiment or that people skilled in the art would read the specification to exclude the preferred embodiment. Hoechst Celanese Corp. v. BP Chemicals Ltd., 78 F.3d 1575, 1581 (Fed. Cir.), cert. denied, 117 S. Ct. 275 (1996). Worth cites Senmed Inc. v. Richard-Allen Medical Industries Inc., 888 F.2d 815 (Fed. Cir. 1989), which states that manufacturing tolerances are immaterial to the interpretation of claim language. Id. at 1513 n.10. Senmed is distinguishable, however. The patent, covering surgical skin staplers, had a claim stating in part: "to place a forwardmost staple on said anvil surface . . . ." The parties disputed whether the word "on" meant in physical contact with the anvil surface or juxtaposed, that is, near or close by the anvil surface but not necessarily touching it. During the prosecution of the claim, the patentee's attorney amended the claim to avoid prior art and explained that the amendment clarified that another part of the stapler did not have to shift a staple to the anvil surface before forming the staple. The court concluded that the attorney knew the difference between "on" and "closely adjacent," which is used elsewhere in the claim. Id. at 1513.

Worth points to parts of the prosecution history to contend that the history requires the gap to be continuous. I do not agree. To distinguish the invention from Peng '164, DeMarini amended claim 1 to require the frame to be communicable with the insert across the gap. Peng '164, however, has a gap between its insert and frame which is so large that the insert only contacts the frame at its two end pieces. Thus, the question of whether the gap had to be continuous was not at issue, DeMarini only needed to show that at some



WS603758

WILSON PRODUCED DOC.
HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

point between the ends of the insert, its frame was communicable with the insert across the gap. I see nothing in the prosecution history in which DeMarini distinguished its claimed invention from prior art in which a generally annular gap was not continuous. Thus, it is distinguishable from Senmed.

Claim 1 states that the gap forms at least part of an annular, or ring, shape. Although the specification describes a uniform gap, limitations cannot be read into a claim from the specification apart from a need to interpret the meaning of a particular word or phrase. E.I. Du Pont De Nemours, 849 F.2d at 1433. Requiring the gap in claim 1 to be uniform would destroy the meaning of the phrase "at least part of an annular shape." A partial annular shape can include a discontinuous gap. I conclude that the ordinary meaning of "gap" in claim 1 to one skilled in the art allows some contact between the frame and insert as long as a sufficient separation exists for the frame and insert to move independently. My conclusion is primarily based on the wording of the claim itself, but is bolstered by the engineering sketches containing the word "gap," the inability to build the preferred embodiment under Worth's interpretation using normal manufacturing techniques for this product, and the deviations specified in aluminum tubing standards and relied upon by people skilled in the art.

B. Claim 2

There is no disputed language in claim 2.

C. Claim 15

Claim 15 states:

> In a hollow bat having a small-diameter handle portion and a large-diameter impact portion, an improvement comprising an internal structural insert defining an annular gap with an inside wall of the impact portion of the bat and the impact portion elastically deflectable to close a portion of the annular gap and operably engage the insert.

The parties make the same contentions on the meaning of the word gap. Claim 15 does not contain the language from claim 1 concerning part of an annular shape. In spite of that difference, however, I still conclude that the ordinary meaning of "gap" in claim 1 to one skilled in the art allows some contact between the frame and insert as long as a



WS 603759

WILSON PRODUCED DOC.
HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

sufficient separation exists for the frame and insert to move independently. A discontinuous gap is still shaped in the form of a ring, albeit a discontinuous one. The shape is still a round, circular one.

II. Meaning of "Interference Fit"

Claim 18 states:

> A bat, comprising:
>
> a hollow tubular bat frame having a small-diameter handle portion and a large-diameter impact portion having a circular cross-section with an inner and outer diameter;
>
> at least one insert having a substantially circular cross-section with an outer diameter less than the inner diameter of the frame impact portion, the insert being held within the impact portion; and
>
> the impact portion being inwardly elastically deflectable such to establish a tight interference fit between the insert and the impact portion.

The specification refers to a tight interference fit:

> Further describing a preferred construction, the insert 18 is coated with the lubricant before being inserted into the tubular frame 11. The first end 20 of the insert 18 is forcefully inserted into the tapering portion to achieve a tight interference fit. Plastic deformation of the aluminum insert at the interference fit increases the tightness of the attachment and the seal. The second interference fit is then obtained within a frame head portion 24, which is formed by curling the topmost end of the impact portion 12 over upon the insert second end 22. It has been found that a tight fit is achieved by curling in a one-half-inch radius forcefully enough to cause some plastic deformation in the insert second end 22. The curling may be facilitated by locally heating the end of the impact portion.

Col. 4, lines 24-38.

DeMarini contends that this description of an interference fit refers to the manufacturing process for claims other than claim 18. It contends that claim 18 redefined interference fit from the traditional engineering sense as follows:

> In yet another embodiment of the invention, positive attachments of the insert 18 within the frame 11 may be dispensed with altogether. In this case, the insert would "float" on the layer of the lubricant. An impact with a ball will cause the frame to deflect, thereby creating interference attachments for the insert 18 during impact. The swing of the bat during impact may tend to lodge the insert 18 in the end of the frame, contributing to an attachment. A bat with an insert held in this manner may respond much like a bat with an insert held at two interference fits. Furthermore, this alternative embodiment will also perform well when the lubricant is omitted.



WS003760

WILSON PRODUCED DOC.
HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

Col. 5, lines 33-45. DeMarini contends that claim 18's interference fit is transient, occurring only on impact with the ball, and that it occurs under the ball.

Worth contends that DeMarini changed its position during litigation because when he was deposed, Michael Eggiman, the named inventor on the '398 patent and senior vice president of engineering and manufacturing at DeMarini, stated that the interference fit in claim 18 took place at the ends of the insert. I reject this contention. The specification gives two different definitions for interference fit as the term is used in the different claims. Eggiman stated at the hearing that he confused the two uses at the deposition and I have no reason to doubt him. Worth contends: (1) engineers never use the term interference fit to denote a transient occurrence; (2) DeMarini is being inconsistent by contending that the interference fit in claim 18 causes the walls to lock together but still allow movement between them; and (3) the frame and insert should be separated by a space that extends continuously around the circumference of the insert and along the length of the impact portion of the frame.[1]

I accept that DeMarini redefined the term "interference fit" in claim 18, as it is allowed to do, with the language quoted above from Col. 5. I conclude that the term "interference fit" in claim 18 is interpreted to be a transient attachment at impact which occurs anywhere along the insert, including but not limited to the impact point or the insert ends. The separation between the insert and the frame is not required to be continuous but is only limited by the requirement that the frame bend inward enough to make a momentary attachment between the frame and the insert. There is no requirement that the insert float within the frame prior to impact.

///

///

///

///

[1] This is the same interpretation Worth proposed for the term "gap," even though claim 18 does not use the term.



WS 603761

WILSON PRODUCED DOC.
HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

## CONCLUSION

The '398 patent will be construed as discussed above. The court will schedule a telephone conference to discuss a briefing schedule for the summary judgment motion.

DATED this 14 day of January, 1999.

GARR M. KING
United States District Court Judge

WS603762



01/18/99 12:22 503 224 0186 MILLER NASH 012
JAN-18-99 14:20 503 224 0186 P.12 R-093 Job-628

**EXECUTIVE SUMMARY** 22-Oct-03

**Miken Spring Rate Comparison**

| | SPRING RATES | | |
|---|---|---|---|
| | **Full Bat** | **10" Cut Section** | **10" Cut Section Glued** |
| **.107 DeMarini DWI** | 12523 | 10294 | 25957 |
| **HDD** | 13795.6 | 12973.4 | 23274.6 |
| **Viper** | 15513.8 | 13575.8 | 24467.2 |
| **Intensite** | 9642 | 9444 | 18913.6 |
| **Velocity** | 10637.8 | 9720 | 17801.4 |
| **Velocite 2** | 14793.2 | 13106.4 | 21796.6 |
| **Ultra 1 Max Load** | 11026.8 | 7653.6 | 18993.6 |
| **Ultra 2** | 11211.2 | 9003.4 | 23985.8 |
| **Edge** | 12057.6 | 11615.6 | 18934.4 |
| **M-Pulse** | 12895.4 | 11261.4 | 16115.6 |

Ex D

**DeMarini Double Wall, V-block with shaped pusher 9 inch space** 22-Oct-03

.107 wall thickness

| Spring Rate | Average spring Rate |
|---|---|
| Full Bat | 12,523 |
| 10 inch Tube | 10,294 |
| Glued Tube | 25,957 |

**Miken Viper, V-block with shaped pusher 9 inch space** 22-Oct-03

| | Spring Rate | | | | | Average spring Rate |
|---|---|---|---|---|---|---|
| Full Bat | 15859 | 15196 | 15428 | 15232 | 15854 | 15513.8 |
| 10 inch Tube | 13839 | 13616 | 13500 | 13018 | 13906 | 13575.8 |
| Glued Tube | 24842 | 24445 | 25510 | 22969 | 24570 | 24467.2 |

**Miken HDD V-block with shaped pusher 9 inch space**

22-Oct-03

| | Spring Rate | | | | | Average spring Rate |
|---|---|---|---|---|---|---|
| Full Bat | 13994 | 13664 | 13857 | 13956 | 13507 | 13795.6 |
| 10 inch Tube | 12531 | 12713 | 13354 | 13191 | 13078 | 12973.4 |
| Glued Tube | 23068 | 23688 | 23555 | 23187 | 22875 | 23274.6 |

**Miken IntensitE (MFI-3) V-block with shaped pusher 9 inch space (NOTE: USED BAT)**

22-Oct-03

| | Spring Rate | | | | | Average spring Rate |
|---|---|---|---|---|---|---|
| Full Bat | 9530 | 9594 | 9604 | 10063 | 9419 | 9642 |
| 10 inch Tube | 9422 | 9647 | 9728 | 9037 | 9386 | 9444 |
| Glued Tube | 18712 | 18867 | 19398 | 18888 | 18703 | 18913.6 |

**Miken Velocity (MSVE-1) V-block with shaped pusher 9 inch space** 22-Oct-03

| | Spring Rate | | | | | Average spring Rate |
|---|---|---|---|---|---|---|
| Full Bat | 11177 | 11227 | 10297 | 9910 | 10578 | 10637.8 |
| 10 inch Tube | 9656 | 10178 | 10043 | 9257 | 9466 | 9720 |
| Glued Tube | 18175 | 17112 | 18566 | 17126 | 18028 | 17801.4 |

**Miken Velocite 2 (MSVE-3) V-block with shaped pusher 9 inch space** 22-Oct-03

| | Spring Rate | | | | | Average spring Rate |
|---|---|---|---|---|---|---|
| Full Bat | 14113 | 15244 | 15088 | 14589 | 14932 | 14793.2 |
| 10 inch Tube | 13298 | 13178 | 12696 | 12930 | 13430 | 13106.4 |
| Glued Tube | 19956 | 22206 | 22504 | 21809 | 22508 | 21796.6 |

**Miken Ultra 1 Max Load (MSUM) V-block with shaped pusher 9 inch space** 22-Oct-03

| | Spring Rate | | | | | Average spring Rate |
|---|---|---|---|---|---|---|
| Full Bat | 11197 | 11167 | 10880 | 10677 | 11213 | 11026.8 |
| 10 inch Tube | 7577 | 7676 | 7775 | 7685 | 7555 | 7653.6 |
| Glued Tube | 18612 | 17998 | 19652 | 20131 | 18575 | 18993.6 |

**Miken Ultra 2 (MSU2) V-block with shaped pusher 9 inch space** 22-Oct-03

| | Spring Rate | | | | | Average spring Rate |
|---|---|---|---|---|---|---|
| Full Bat | 11211 | 10896 | 11276 | 11331 | 11342 | 11211.2 |
| 10 inch Tube | 8894 | 8892 | 9285 | 9654 | 8292 | 9003.4 |
| Glued Tube | 22872 | 22695 | 23759 | 26676 | 23927 | 23985.8 |

**Miken Edge (MSED) V-block with shaped pusher 9 inch space** 22-Oct-03

| | Spring Rate | | | | | Average spring Rate |
|---|---|---|---|---|---|---|
| Full Bat | 11845 | 12645 | 12308 | 12041 | 11449 | 12057.6 |
| 10 inch Tube | 11635 | 11625 | 11579 | 11704 | 11535 | 11615.6 |
| Glued Tube | 18059 | 18259 | 20612 | 19616 | 18126 | 18934.4 |

**Miken M-Pulse (MFM) V-block with shaped pusher 9 inch space** 22-Oct-03

| | Spring Rate | | | | | Average spring Rate |
|---|---|---|---|---|---|---|
| Full Bat | 12791 | 12655 | 13154 | 12852 | 13025 | 12895.4 |
| 10 inch Tube | 10756 | 11078 | 11614 | 11320 | 11539 | 11261.4 |
| Glued Tube | 14892 | 16074 | 17024 | 18769 | 13819 | 16115.6 |