UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

---

Miken Composites, L.L.C.,

Plaintiff,

-vs-

Wilson Sporting Goods Co.,

Defendant.

File No. CV-02-169 DSD/SRN

ORIGINAL

---

Deposition of: DR. KEITH T. DENNEHY

Taken at: Briggs and Morgan
80 South Eighth Street
2200 IDS Center
Minneapolis, Minnesota

Date: April 29, 2004

Commencing at: 1:00 p.m.

AFFILIATED COURT REPORTERS
By Martha M. Rivard, Court Reporter
2935 Old Highway 8
St. Paul, Minnesota 55113
(612) 338-4348

LITIGATION SUPPORT--COLOR VIDEOTAPING SERVICE

A. It can be an internal pressure that creates a tensile hoop stress or there can be a compressive type loading that creates a compressive hoop stress.

Q. So what member is experiencing a tensile stress?

A. On page nine, the member that I'm referring to with the tensile stress would be the frame. Or tensile hoop stress, which is the term that you prefer.

Q. And that's because the insert inside is seeking to expand outward?

A. That would be correct.

Q. And what member of the bat is experiencing compressive stress?

A. That would be the insert is experiencing a compressive hoop stress.

Q. And why is that?

A. Due to the interference fit.

Q. I need for you to provide for me your definition of interference fit.

A. Interference fit in this context would be where the outside diameter of the insert is greater than the inside diameter of the frame.

Q. At what point in time?

A. Time is not involved.

Q. The outer diameter of the insert -- in order

for the outer diameter of the insert to be greater than the inner diameter of the frame, it would be possible for the parts to be assembled?

A. Yes. Well, could you restate that?

Q. Well, yes. Is it possible for the outer diameter of the insert to be greater than the inner diameter of the frame when the parts are assembled together and when the insert is inside the frame?

A. Right. That's not possible when they're assembled together.

Q. And if the parts of a multi-layered cylindrical bat were in tight abutment, would the tight abutment prevent the parts from moving independently under load?

MR. STREATER: I'll just object to the form of the question.

BY MR. KEY:

Q. Do you understand my question?

A. I didn't hear what Mike said.

Q. He just objected.

A. Oh.

MR. STREATER: I don't know what tight abutment means. Do you want to define that for us or is that --

MR. KEY: No.

MR. STREATER: You want him to guess what that means?

MR. KEY: Well, no. If he understands my question, he can answer.

THE WITNESS: Could you repeat the question?

MR. KEY: Now that he's adequately coached, he's not going to. Would you read it back?

(WHEREUPON, the reporter read from the record as requested.)

THE WITNESS: Tight abutment, how do you quantify that?

BY MR. KEY:

Q. Well, it's actually a term you used in one of your reports, so what do you mean by tight abutment?

MR. STREATER: Why don't you show him the report.

THE WITNESS: Yeah, can you show me?

BY MR. KEY:

Q. Yes, I'll show you.

(WHEREUPON, Dennehy Deposition Exhibit No. 48 was marked for identification by the Reporter.)

BY MR. KEY:

Q. Handing you what has been marked as Exhibit

No. 48, can you identify that for the record?

A. It would be the rebuttal expert report dated December 1, 2003 authored by myself.

Q. And this is your second report, correct?

A. Yes.

Q. Would you turn to page six? On page six in your conclusions --

A. Uh-huh.

Q. -- your very last sentence states, "It would not require over 1,000 pounds of force to move the inserts within the frames of the Miken bats" -- and this is the 10-inch sections that you were talking about.

A. Correct.

Q. -- "unless there was 'tight abutment.'"

A. Yes.

Q. So what did you mean there?

A. I actually took that term from one of your reports from Guenther. That's why it's in quotations and italics.

Q. I understand. But --

A. So I was using a term that he used in his context.

Q. And what did you understand it to mean when you used it in your sentence?

A. I would have to look at his report and see

where it is that I actually drew that from.

Q. You don't know, as we sit here?

A. I would like to see the context in which it was used.

Q. It's used in your report, sir.

MR. STREATER: Well, Counsel, he's referencing another person's report there.

THE WITNESS: That's the reason why it's in italics and quotations. It's not a term that -- I took that term from -- if you notice, throughout this entire report, anything that's taken out of the Guenther report is in italics and quotations.

BY MR. KEY:

Q. I understand that, but in your conclusion you state that "It wouldn't require over 1,000 pounds of force to move the inserts within the" 10-inch section of the frame, unless there was this thing, which means that you have an understanding of what this thing is.

A. Well, whatever --

Q. Tight abutment.

A. Whatever meaning Guenther gave to that word, or to those words right there, that would be the sense in which I used it here.

Q. Did you have any discussions with Doug Guenther?

A. No, it's taken from his report.

Q. And you have no independent understanding of tight abutment?

A. Those are his words.

Q. Do you have any independent understanding of tight abutment?

A. Whatever meaning Guenther gave to that term in his report would be the same sense in which I used it.

Q. Do you have any independent understanding of tight abutment? Yes or no?

A. As far as the meaning of the words?

Q. The meaning of the words together.

A. Or the words used in the context of his report?

Q. Do you have any independent understanding of the term tight abutment?

MR. STREATER: Of what, Counsel? Independent of what?

BY MR. KEY:

Q. Independent of Doug Guenther.

A. The reason I used it in the sentence was the same meaning that he attributed to those words in his report.

Q. I've heard that --

A. So do I have -- in this context, I have no independent opinion of what those words mean --
Q. Out of --
A. -- as used in this sentence right here.
Q. Outside of this sentence, do you have any independent understanding of the words tight abutment?
A. I guess as a layperson I know what the word tight means and I know what the word abutment means.
Q. But as a --
A. I would go to the dictionary if you want a meaning for those words.
Q. As an individual in your field with your experience, have you ever heard tight abutment before reading Doug Guenther's report?
A. No.
Q. You've never heard it before.
A. I never heard it used. Well, I shouldn't say never. I don't recall seeing that used as an engineering term.
Q. So would it be fair to say you have no independent understanding of tight abutment as an engineering term, outside of Doug Guenther's report?
A. I would say that's correct.
Q. Could you turn in your first report, Exhibit No. 46, to figure 3.8. In this picture, how do you

STATE OF MINNESOTA )
)
COUNTY OF BLUE EARTH)

BE IT KNOWN that, I took the foregoing deposition of KEITH T. DENNEHY, pursuant to Notice;

That I was then and there a notary public in and for the County of Blue Earth, State of Minnesota;

That said witness before testifying was duly sworn to tell the truth, the whole truth, and nothing but the truth relative to the cause specified in the Notice;

That the witness did not waive the reading and signing of said deposition;

That I am neither attorney nor counsel for, not related to or employed by any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action;

That the testimony was taken down in stenotype by me; then reduced to typewriting under my direction by means of computer-aided transcription, and is a true and correct transcript of my stenotype notes.

Witness my hand and seal this 6th day of May, 2004.

MARTHA M. RIVARD

MARTHA M. RIVARD
NOTARY PUBLIC-MINNESOTA
MY COMMISSION EXPIRES 1-31-2005