SEARCH LOGIN SUGGESTIONS USER PREF'S COURTWATCH HELP HOME →

RACER U.S. District Court Case Search

# Docket Sheet for 1:00-CV-6517 U.S. District Court for the Northern District of Illinois - Click here for Caption Page

## Proceedings include all events

| Date Filed | Doc. No. | Image | Description |
|---|---|---|---|
| 10/05/2004 | 117 | No | MINUTE ORDER of 10/5/04 by Hon. Ruben Castillo : Status hearing set for 11/3/04 at 9:45 a.m. Jury trial set for 12/13/04 at 10:00 a.m. Settlement conference held in chambers. The parties' motion for a status report,pursuant to Local Rule 78.5 on Wilson's objections to Magistrate Judge Ashman's claim construction ruling is granted [115-1]. After a careful review of the plaintiff's objections to Magistrate Judge Ashman's claim construction opinion, said objections are totally overruled and this Court hereby fully adopts and enters this 8/7/03 opinion.Final Pretrial order, with jury instructions will be due on or before 10/29/04. Mailed notice [Date Entered: 10/06/04, By: rm] |
| 10/01/2004 | 116 | Yes: 4 Page(s); 88 KB; PDF | JOINT STATUS REPORT by plaintiff and defendant [Date Entered: 10/04/04, By: rm] |
| 09/16/2004 | -- | No | SCHEDULE set on 9/16/04 by Hon. Ruben Castillo : The court will hold a settlement conference in chambers on 10/5/04 at 11:00 a.m. Clients with settlement authority are directed to appear or be available by telephone. Parties to file ajoint status report on or before 10/1/04. (SEE REVERSE SIDE OF THIS ORDER FOR FURTHER INFORMATION.) Counsel for plaintiff to notify all other parties of the Court's Order. A full litigation schedule including a firm trial date will be set at the conference on 10/5/04. Mailed notice [Date Entered: 09/16/04, By: ro] |
| 09/14/2004 | 115 | Yes: 3 Page(s); 42 KB; PDF | REQUEST by defendant for status report, pursuant to Local Rule 78.5 on Wilson's objections to Magistrate Judge Ashman's claim construction ruling [Date Entered: 09/17/04, By: rm] |
| 09/14/2004 | 114 | Yes: 2 Page(s); 31 KB; PDF | REASSIGNMENT ORDER of 9/14/04 Case assigned to Hon. Ruben Castillo from the Hon. Charles Castillo. This case should be reassigned as a replacement for case number 02 C 2763 in which a recusal was permitted pursuant to InternalOperations Procedure 13. (For further detail see order.) Mailed notice [Date Entered: 09/15/04, By: rm] |
| 02/24/2004 | 113 | No | TRANSCRIPT of proceedings for the following date(s): 2/12/03 Before Honorable Martin C. Ashman [Date Entered: 02/25/04, By: rm] |
| 02/10/2004 | 112 | No | TRANSCRIPT of proceedings for the following date(s): 1/15/03 before Honorable Martin C. Ashman [Date Entered: 02/10/04, By: |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILSON SPORTING GOODS CO., Plaintiff, | ) | Case No. 00 C 6517 |
| v. | ) | Judge Charles R. Norgle |
| HILLERICH & BRADSBY CO., Defendant. | ) | Magistrate Judge Martin C. Ashman |

## MEMORANDUM OPINION AND ORDER

### I. Background

Wilson Sporting Goods Company filed suit against Hillerich & Bradsby Company ("H&B") alleging that it infringed Claims 1, 15 and 18 of United States Patent No. 5,415,398. The '398 patent, titled *Softball Bat*, describes a bat containing an interior structural member (or "insert") inside the outer bat wall. Wilson claims that the construction of the bat allows it to work like a leaf-spring, which gives the ball superior slugging performance. Wilson alleges that numerous models of bats made by H&B infringe the '398 patent. H&B disputes Wilson's construction of various claim terms, and denies that its products infringe the '398 patent. This Court ordered both parties to submit briefs on the issue of claim construction, and subsequently held a *Markman* hearing. This Court's construction of the claims at issue in this case is set forth below.[1]

[1]This matter comes before this Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1.

EXHIBIT B

## Disputed Claims

### A. Claim 1

Claim 1 reads as follows:

A bat, comprising:

a hollow tubular bat frame having a circular cross-section; and

an insert positioned within the frame, the insert having a circular cross-section, the insert having first and second ends adjoining the tubular frame, the insert being separated from the tubular frame by a gap forming at least part of an annular shape along a central portion between said first and second ends, the frame elastically deflectable across the gap to operably engage the insert along a portion of the insert between the insert first and second ends.

### B. Claim 15

Claim 15 reads as follows:

In a hollow bat having a small-diameter handle portion and a large-diameter impact portion, an improvement comprising an internal structural insert defining an annular gap with an inside wall of the impact portion of the bat and the impact portion elastically deflectable to close a portion of the annular gap and operably engage the insert.

### C. Claim 18

Claim 18 reads as follows:

A bat, comprising:

a hollow tubular bat frame having a small-diameter handle portion and a large-diameter impact portion having a circular cross-section with an inner and outer diameter;

at least one insert having a substantially circular cross-section with an outer diameter less than the inner diameter of the frame impact portion, the insert being held within the impact portion; and

the impact portion being inwardly elastically deflectable such to establish a tight interference fit between the insert and the impact portion.



EXHIBIT B

## II. Discussion

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (internal citation omitted) ("*Markman I*"), *aff'd*, 517 U.S. 370 (1996) ("*Markman II*").

### A. Claim Construction Standards

Claims are construed as a matter of law. *Markman I*, 52 F.3d at 979. The object of claim construction is to determine how one of ordinary skill in the art would have understood the claims at the time the patent was issued. *Id.* at 986. There is a "heavy presumption in favor of the ordinary meaning of claim language . . . ." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *Markman I*, 52 F.3d at 980 ("[A]ny special definition given to a word must be clearly defined in the specification."). *See also CAE Screenplates Inc., v. Heinrich Fiedler GMBH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000). Plain meaning is the common definition understood by a person of ordinary skill in the arts. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

In determining claim construction, both intrinsic and extrinsic evidence is available to the court. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The process of claim construction begins with the examination of intrinsic evidence--specifically the claim language. *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). The language of the claim defines the bounds of the claim's scope. *Teleflex, Inc., v. Ficosa N.*



EXHIBIT B

*Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). The claim "frames and ultimately resolves all issues of claim interpretation." *Id.* (*citing Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997). Proper claim interpretation requires an evaluation of the intrinsic evidence including the patent itself, the claims, the written description, the drawings, the specification, and the prosecution history. *Teleflex*, 299 F.3d at 1325. Extrinsic evidence should only be used by the court if the intrinsic evidence alone does not resolve any ambiguity in a disputed claim term. *Vitronics Corp.*, 90 F.3d at 1583-84.

Claims are read independently. The doctrine of claim differentiation permits the creation of a "rebuttable presumption that each claim in a patent has a different scope" which supports a broader construction of the claim. *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1341 (Fed. Cir. 2000). Limitations of a dependent claim ordinarily should not be read onto the independent claim nor can a claim be broadened beyond its correct scope. *Id.* at 1341-42. Similarly, the preamble must read in the context of the claim itself. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). If the preamble does not offer any distinctive definitions of claim limitations, but rather states the intended use or purpose of the claimed invention, then the preamble has no significance in the claim construction. *Id.*

The claim language is interpreted in light of the intrinsic evidence, as a basis for context and clarification concerning the meaning the terms present in the claim. *Teleflex*, 299 F.3d at 1324-25. The specification is "always highly relevant" in an analysis of claim construction to the point of being dispositive. *Vitronics*, 90 F.3d at 1582. The specification is the "single best guide to the meaning of a disputed term." *Id.* Similarly, the written description may aid in proper claim construction. *See Comark,* 156 F.3d at 1186-87. Within the written description, the



EXHIBIT B

inventor may act as his own lexicographer and define terms in accordance with a specialized meaning as long as "he defines the specific terms used to describe the invention 'with reasonable clarity, deliberateness, and precision.'" *Teleflex*, 299 F.3d at 1325 (*quoting In re Paulsen*, 30 F.3d 1275, 1280 (Fed. Cir. 1994)). The prosecution history, if available, may also demonstrate the patentee's intended meaning of certain words. *Id.* at 1326. Finally, the preferred embodiments or examples listed within the patent specifications do not limit the patent. *Dow Chem.*, 226 F.3d at 1342. Although such limitations may not be read into the claim, they can be useful in understanding the intentions of the patentee. *Teleflex*, 299 F.3d at 1326.

Under recent cases, "dictionaries, encyclopedias and treatises are particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms." *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002); *see also, CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Dictionaries are considered intrinsic evidence. *Teleflex*, 299 F.3d at 1325. As a result, they are available to the court at any time in the proceedings to aid in determining the ordinary meaning understood by a person of ordinary skill in the relevant art, regardless of whether they were entered into evidence by a party to the proceeding. *Texas Digital*, 308 F.3d at 1202-03. Dictionaries are to be considered "objective resources that serve as reliable sources of information on the established meanings that would have been attributed to the terms of the claims by those of skill in the art." *Id.* at 1203. Only the definitions that are consistent with the intrinsic record may be considered to determine the proper claim construction. *Id.* at 1203-04. When multiple dictionary definitions are consistent, the "claim terms may be construed to encompass all such consistent meanings" according to judicial discretion. *Id.* at 1203.



EXHIBIT B

**B. The *Worth* Opinion**

The parties disagree as to the precedential value of the claim construction opinion of the District Court of Oregon, *DeMarini Sports, Inc., v. Worth, Inc.*, No. 97-1693-KI, (Jan. 14, 1999) (unpublished). Wilson asserts that the Court should give the *Worth* Opinion "special deference" that rises to the level of the "'application of *stare decisis*,'" especially because the case was appealed and affirmed. (Plf. Markman Hearing Mem. at 2 (quoting *Markman II*, 517 U.S. at 390.) H&B counters that the *Worth* Opinion offers nothing more than persuasive authority, that the claims critical to the instant lawsuit were not addressed by the Federal Circuit, *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1330 (Fed. Cir. 2001), and that the *Worth* Opinion made errors, but is not inconsistent with H&B's position in certain parts. While we do not find the opinion of a district court judge in Oregon to be binding on us, it certainly is a persuasive opinion. Nevertheless, at times we may not agree with that court[2] and *Markman II* is not to the contrary. *See Markman II*, 517 U.S. at 391 ("[T]reating interpretive issues as purely legal will promote (though it will not guarantee) intrajurisdictional certainly through the application of *stare decisis* on those questions not yet subject to interjurisdictional uniformity under the authority of the single appeals court.").

**C. Gap Limitations**

The first point of contention between the parties essentially boils down to the word "gap" which appears in Claim 1 (col. 5, ll. 61), and Claim 15 (col. 6, ll. 40), but which does not appear

---

[2] For example, the court stated that Figure 2 and 3 showed continuous gaps while Figure 1 shows a discontinuous gap; however, Figure 2 is a "magnified cutaway view" of the bat in Figure 1. (col. 2, ll. 30-34.)

in Claim 18 although the issue of whether the insert can touch the frame is raised with respect to each claim. Wilson maintains that the term "gap" allows for some contact between the frame and the insert before the frame is hit with a ball, as long as the frame and insert are allowed to move independently, like a leaf-spring. H&B counters that the "gap" means a single, continuous space between the interior of the frame and the exterior of the insert. The interior of the frame and the exterior of the insert are not in contact before the ball hits the exterior of the frame.

The Court agrees with H&B's proposed claim construction. First we look to the words of the claims. Words are given their ordinary meaning unless it appears that the inventor used them otherwise. *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995). In Claim 1, while the first and second ends of the insert are "adjoining the tubular frame," the insert is "separated from the tubular frame by a gap," not adjoining the frame. (col. 5, ll. 59-61.) "Separate" is defined as "set apart from others" and "existing by itself." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 1994. A "gap" is a "suspension of continuity." ID. Wilson latches on to this latter definition and also refers to "separate" as a discontinuation of continuity. (Markman Hr'g Tr. at 21). It argues that the discontinuation occurs because the frame and the insert are separate entities, but not necessarily separated by a void. The word "void," however, is defined as an "open space or a break in continuity," (i.e., a discontinuation of continuity) and it is also synonymous with "gap." WEBSTER'S.

Furthermore, the frame must be "elastically deflectable across the gap." (col. 5, ll. 63-64.) If it is moving "across" the gap, it must be moving through the void or the empty space separating the frame and the insert in order to "operably engage the insert." (col. 5, ll. 63-64.) The frame engages the insert after impact because the frame and the insert were not



EXHIBIT B

touching (i.e., engaged) before impact. Wilson argues that because the gap as described in Claim 1 forms "at least part of an annular shape along a central portion" that the gap is partially ring shaped but not continuous. (col. 5, ll. 61-62.) However, this is referring to the part "along a central portion between said first and second ends," (col. 5, ll. 61-63), and does not limit the gap from being continuous.

Turning to Claim 15, the language describes a "hollow bat" with an internal "insert defining an annular gap with an inside wall of the impact portion of the bat . . . ." (col. 6, ll. 37, 39-41.) The impact portion of the frame is "elastically deflectable to close a portion of the annular gap . . . ." (col. 6, ll. 41-42.) Again, we conclude that the ordinary meaning of "gap" in Claim 15, as in Claim 1, is a void or space. The insert forms one side of the ring shaped gap in between the insert and the frame, and the inner portion of the frame must "close a portion" of the gap before the insert is operably engaged. (col. 6, ll. 42-43.) If the insert and the frame were touching (or already engaged), the gap would not have to be closed. The description of the gap in Claim 1 as "forming at least part of an annular shape" does not go against this determination, because, as discussed above, that language is describing the shape longitudinally between the first and second ends.

Turning to Claim 18, the insert is described as having "an outer diameter less than the inner diameter of the frame impact portion, the insert being held within the impact portion . . . ." (col. 7, ll. 6 to col. 8, ll. 2.) The Court finds that this should be construed as a "gap," the same as Claims 1 and 15. Not only is the outer diameter of the insert less than the inner frame diameter (as it would have to be to fit inside of the frame even if the frame and the insert were touching),



EXHIBIT B

but again, the frame must be "inwardly elastically deflectable such to establish a tight interference fit between the insert and the impact portion." (col. 8, ll. 3-4.)

Next, other intrinsic evidence also supports the conclusion that the frame and the insert are not in contact. The abstract and the summary of the invention describe a grease filled gap separating the frame from the suspended insert. (Abstract; col. 2, ll. 13-23.) Figure 3, which is a sectional view of Figure 2, which is a cutaway view of Figure 1, clearly shows a "narrow, uniform gap" existing "between the insert 18 and the inner wall of the impact portion 12." (col. 2, ll. 66-68.) In the specification, the suspended insert, (col. 2, ll. 46, 64), "contacts the tubular frame only at the interference fits of the first and second insert ends 20, 22." (col. 2, ll. 64-66.) In one preferred embodiment the gap between the inner impact surface of the frame and the outer diameter of the insert is about .0007 inch. (col. 4, ll. 14-17.) While we have taken care to not write in a limitation from the specification that is not found in the claim language, *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed. Cir. 1988), we must not in the alternative write out limitations that are found in the claim language, *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 93 F.3d 1572, 1582-83 (Fed. Cir. 1996).

Furthermore, the prosecution history and the efforts to avoid prior art also support this conclusion. The January 12, 1994 amended Claim 1 described the frame as being "communicable with the insert <u>across</u> the gap," as distinguishable from the Peng No. 5,219,164 patent in which the frame only communicated with the insert through the end pieces. The April 26, 1994 amendment was again described as distinguishable from Peng '164 because it was "elastically deflectable to cross the gap and engage the insert" before it "rebound[ed] back across the gap." Again, the insert was not engaged by the frame prior to the inward deflection of the

frame. Neither side disputes that the frame and the insert cannot be in tight abutment because that is what the Fuji patent teaches (No. 3,966,239). (See col. 1, ll. 58-68.)

Wilson repeatedly emphasizes the leaf-spring-like nature of the mechanism. (See col. 3, ll. 18-19, 36; col. 4, ll. 59.) The Court agrees that the mechanism may act like a leaf spring, as the frame is deflected across the gap, causing the insert to move independently from the frame. But this does not mean that the frame and the insert are touching each other before impact.

Accordingly, we construe the term "gap," in Claim 1 and Claim 15 and the language of Claim 18 (line 3-4 of column 7 to lines 1-2 of column 8) to mean a single continuous space or void between the interior of the frame and the exterior of the insert great enough to allow for deflection of the frame across the gap.

**D. Frame and Insert Limitations**

The next matter in dispute involves the limitations placed upon the frame and insert. With respect to the frame, the Federal Circuit held:

> In view of the ordinary definition of the term "frame" and the explanation of that term in conjunction with the term "bat" in the written description and intrinsic record, we conclude that "frame" as modified by the term "bat" and used in claims 1 and 18 means a tubular structure having a large-diameter impact portion, a tapered portion and a small-diameter handle, all of which are connected when the bat is fully constructed for its intended use.

*DeMarini Sports*, 239 F.3d at 1327. This construction is dispositive, and we find that it also applies to Claim 15 for the same reasons even though Claim 15 does not use the terms "hollow tubular bat frame," but rather describes a "hollow bat." The Federal Circuit discussed the ordinary meaning of the term "bat," and Claim 15 describes the frame as having a small-diameter and a large-diameter, implicitly referring to a hollow circular, or tube shape.



EXHIBIT B

Next, the parties disagree as to whether the insert must be tubular, rigid, circular and hollow. Wilson argues that H&B is improperly taking limitations found in dependant claim 3 ("wherein the insert is rigid" at lines 1-2, column 6) and dependant claim 5 ("wherein the insert is tubular" at lines 10-11, column 6) and applying them to the independent claims. H&B argues that the claims, the specification, and the prosecution history define the term "insert" to mean a rigid, circular, hollow tube having an outer diameter less than the inner diameter of the tubular frame impact portion. We agree with H&B.

Claim 1 requires the insert to have a "circular cross-section," (col. 5, ll. 58), Claim 15 describes the insert as forming an "annular gap" with its outer wall, (col. 6, ll. 40), and Claim 18 describes the insert as having a "substantially circular cross-section" and describes the diameter of the insert in relation to the diameter of the frame (col. 7, ll. 3-4 and col. 8, ll. 1). The insert must be tubular to meet these descriptions. Furthermore, the specification refers to a "tubular insert," (col. 2, ll. 46, 47, 50, 54, 56), a "hollow tube," (col. 2, ll. 48 and col. 4, ll. 68), and an insert having an outer diameter less than the inner diameter of the frame, (col. 2, ll. 48-49, 62-63). The drawings also depict a hollow tubular insert and the abstract refers to a tubular insert. Wilson cannot escape its repeated recognition that the insert is hollow and tube shaped.

The parties also disagree as to whether the insert must be rigid. According to the specification, the insert is described as "undergo[ing] substantial tensile, as well as bending stress" when the frame deflects inwardly. (col. 3, ll. 33-35.) The insert snaps back "which increases the force and velocity of the rebound." (col. 3, ll. 42-43.) A non-rigid structure would not snap back to increase the slugging capacity of the bat. The insert is also described as being made from aluminum (col. 3, ll. 67), titanium (col. 4, ll. 65), and "various other metals,

composite materials, plastics, and other materials" that "perform equally as well with the present invention," (col. 5, ll. 7-10). Materials that would work equally well as titanium or aluminum would have to be rigid in order to avoid deadening the impact of the ball. The inventor acknowledged this during the patent prosecution when distinguishing his invention from Lanctot No. 5,180,163 in the January 12, 1994 amendment: "The Lanctot et al. spine is collapsible and positioned in a bat handle to deaden shock at the bat handle. On the contrary, applicant's insert is rigid and positioned in a bat impact portion to heighten the response of the impact portion to a batted ball." We therefore conclude that the term "insert" means a rigid, circular, hollow tube having an outer diameter less than the inner diameter of the tubular frame impact portion.

## III. Conclusion

For the foregoing reasons, this Court construes the claims of the '398 patent as stated above.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: August 7, 2003.



**EXHIBIT B**

Copies have been mailed to:

JEFFERY A. KEY, Esq.
Attorney at Law
150 North Michigan Avenue
Suite 1115
Chicago, IL 60601

MICHAEL R. LEVINSON, Esq.
Seyfarth Shaw
55 East Monroe Street
Suite 4200
Chicago, IL 60603

Attorneys for Plaintiff

ROBERT UNIKEL, Esq.
KATHARYN D. ZALEWSKI, Esq.
Schiff, Hardin & Waite
6600 Sears Tower
Chicago, IL 60606

MANOTTI L. JENKINS, Esq.
Michael Best & Friedrich
401 N. Michigan Ave.
Suite 1700
Chicago, IL 60611

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

MIKEN COMPOSITES, L.L.C., )
Plaintiff, )
vs. ) No. 02-CV-769
WILSON SPORTING GOODS COMPANY,)
Defendant. )

The deposition of DOUGLAS GUENTHER, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Elizabeth L. Vela, a Notary Public within and for the County of Cook, State of Illinois, at 8700 West Bryn Mawr, Chicago, Illinois, on the 12th day of May, 2004, at the hour of 10:00 o'clock a.m.

Reported by: Elizabeth L. Vela, CSR
License No.: 084-003650



APPEARANCES:

BRIGGS & MORGAN, by
MR. MICHAEL H. STREATER,
2200 IDS Center
Minneapolis, MN 55402
(612) 977-8499
Representing the Plaintiff,

KEY & ASSOCIATES, by
MR. JEFFREY A. KEY,
150 North Michigan Avenue, Suite 1115
Chicago, IL 60601
(312) 560-2148
Representing the Defendant.



INDEX


| WITNESS | EXAMINATION |
|---|---|
| DOUGLAS GUENTHER | |
| By MR. STREATER | 4 |


EXHIBITS


| NUMBER | MARKED FOR ID |
|---|---|
| Exhibit | |
| No. 65 | 14 |
| Nos. 47, 49, 66 | 25 |
| No. 67 | 37 |
| No. 68 | 66 |
| Nos. 46, 48, 50, 69, 70, 71 | 71 |




(Witness sworn.)
DOUGLAS GUENTHER,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. STREATER:

Q: Good morning, Mr. Guenther.
A: Good morning.
Q: Would you state your full name for the record, please?
A: Douglas Gerard Guenther.
Q: And where do you reside, Mr. Guenther?
A: Wheaton, Illinois.
Q: Can you give me a residential address?
A: It's 2 South 400 Burning Trail, Wheaton, Illinois. And the Zip is 60187.
Q: You're currently employed by Wilson Sporting Goods Company, is that correct?
A: That's correct.
Q: And I will show you in a few minutes a report that you prepared that contains a resume of your past work history. Are you familiar with that document, your resume?
A: Yes, I am.

Page 53

is larger than the inner diameter of the frame, correct?
A: I understand that's what Dr. Dennehy says.
Q: All right. And you understand that Dr. Dennehy says that those inserts are hydraulically forced into the bat frame, correct?
A: That's what he says, that's correct.
Q: Assuming that to be true, would you — wouldn't you assume that there would be contact throughout most, if not all, of the impact portion of the insert — the outer wall of the impact portion of the insert and the inner wall of the bat frame?
A: I can't make that assumption.
Q: Why is that?
A: I don't know the ovality of the two parts. I don't know the tolerances that they're made to.
There are many factors that are involved in a manufacturing sense that I don't have the details to understand how these parts will fit together.
Q: Well, part of what you were trying to do in this case was to look at the interface between the outer wall of the insert and the inner wall of

Page 54

the bat frame, correct?
A: That's correct.
Q: And did you do that with respect to the Velocit-E or the Intensit-E? Did you look at that interface?
A: That's correct.
Q: How did you do that?
A: Through the procedures listed in this report.
Q: Well, let's take a look at Exhibit 49. As I understand what you've done in this report or the testing that is described in this report, you have three different test procedures that these bats were potentially subjected to.
You've got a Test Procedure A that involves a length-wise cut, correct?
A: That's correct.
Q: You have a Test Procedure B that involves a cross-wise cut, and then, you've got your Test Procedure C, which is a load deflexion test, correct?
A: That's correct.
Q: Now, I understand from the data that you've presented in your report that you subjected

Page 55

every one of the Miken bats at issue — and when I talk about the bats at issue, let's put the Freak aside, because that has not been tested yet.
We're talking about the H — I believe it's HHD — you reference it as the HDD. The Viper, the Intensit-E, the Velocit-E, the Velocit-E II, the Ultra I, the Ultra II, the Edge, and the M-Pulse.
Let me step back. Those are the bats that you actually did some work on in this case, correct?
A: Correct.
Q: Okay. Now, your report reflects that you subjected every one of those bats to the load deflexion test, correct?
A: Correct.
Q: Tell me which bats were subjected — which bat models were subjected to Test Procedure A.
A: I don't recall every model and which ones were subjected to that test. We did do the test on various models.
Q: You have a picture on the bottom of Page 4 under Test Procedure A of an Edge bat that has been apparently subjected to your length-wise cut Test

Page 56

Procedure a, is that correct?
A: That's correct.
Q: As you sit here today, you can't tell me what other bat models were subjected to that test?
A: I cannot.
Q: Do you have any documentation, data that would tell us what bats were subjected to that test and what the results of that test were with respect to those other models?
A: No, I do not.
Q: Let's jump to Test Procedure B for a second. Tell me what bat models were subjected to Test Procedure B.
A: I don't have the exact models that were tested.
Q: But we know, looking at your report, there are some photographs between Pages 6 and 10 that show an Ultra II that has been subjected to Test Procedure B, correct?
A: That's correct.
Q: As you sit here today, you can't tell me what other Miken bat models were subjected to Test Procedure B?
A: That's correct.