**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**THIRD DIVISION**

Court File No. CV 02-769 DSD/SRN

Miken Composites, L.L.C.,

Plaintiff,

v.

Wilson Sporting Goods Co.,

Defendant.

**MIKEN COMPOSITES, L.L.C.'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# I. INTRODUCTION

Defendant Wilson Sporting Goods Co. ("Wilson") has accused Miken Composites, L.L.C. ("Miken") of infringement of United States Patent No. 5,415,398 ("the '398 Patent") relating to double wall bats. Wilson has identified nine separate bat models manufactured by Miken that it contends infringe claims 1 and 18 of the '398 Patent.[1]

Following this Court's July 26, 2004 Order construing certain of the claims contained in the '398 Patent, Miken moved for summary judgment of non-infringement with respect to all of the accused bat models. *See* Plaintiff's Motion For Summary Judgment, dated September 7, 2004. Following argument on Miken's summary judgment motion, this Court stayed all proceedings in this case pending resolution of an appeal taken from the Illinois District Court to the United States Court of Appeals for the Federal Circuit, titled *Wilson Sporting Goods v. Hillerich & Bradsby Co.*, that involved construction of certain claims in the '398 Patent also at issue in this proceeding (the "H&B Appeal"). *See* Order, dated March 17, 2005.

The Federal Circuit issued its decision in the H&B Appeal on March 23, 2006 (hereafter the "Federal Circuit Decision"). The Federal Circuit construed terms in claims 1 and 18 of the '398 Patent consistent with this Court's July 26, 2004 Order, and defined additional terms to clarify the limited configurations covered by claims 1 and 18.

---

[1] Wilson initially asserted that the Miken bats also infringed claim 15 of the '398 Patent. Wilson has since abandoned that claim. *See* Defendant Wilson Sporting Goods Co.'s Memorandum in Opposition to Plaintiff's Motion For Summary Judgment (hereafter "Wilson Memo."), p. 1, n. 1.

Specifically, the Federal Circuit construed claim 1's "gap" forming "part of an annular shape" and the insert's and frame's "circular cross-section" to allow contact only at one point in any cross-section. The Federal Circuit also reinforced this Court's construction of claim 18 as requiring a "space" between the frame and insert pre-impact, at the point of impact, and precluding an interference fit between the frame and insert before the ball hits the bat. Finally, the Federal Circuit construed "insert" as "something inserted or intended for insertion," eliminating many of Miken's bat models from further infringement consideration because they have no "inserts." The Federal Circuit Decision reinforces Miken's right to summary judgment of non-infringement on all of its bat models.

## II. <u>THE ULTRA, ULTRA II, M-PULSE, VELOCIT-E II, AND EDGE BATS DO NOT HAVE INSERTS AND THEREFORE CANNOT INFRINGE CLAIMS 1 OR 18</u>

Claims 1 and 18 of the '398 Patent require two structurally distinct components, a "frame" and an "insert." Specifically, claim 1 requires "a hollow tubular bat frame," and "an **insert** positioned within the frame." Similarly, claim 18 requires "a hollow tubular bat frame," with an "**insert** being held within the impact portion" of the frame.

Addressing the term "insert" in the '398 Patent, the Federal Circuit adopted its ordinary and customary meaning as "something inserted or intended for insertion." Federal Circuit Decision, p. 13.[2] Miken demonstrated in its initial brief that several of the

---

[2] The Federal Circuit's definition of "insert" is entirely consistent with the term as used in the claims and in the specification. Repeatedly, the inventor references the insert being inserted into the frame: "a first interference fit is achieved by ***forcing the first end***

accused bats do not contain "inserts" under exactly the same definition now adopted by the Federal Circuit. Although Wilson dismissed this definition as "merely an exercise in word play" (Wilson Memo., p. 7), the Federal Circuit has confirmed that -- far from "word play" -- this construction is binding law.

The Intensit-E, Velocit-E, hhd, and Viper Bats each include a separate structural member that is hydraulically inserted into separately manufactured frames during the manufacturing process (*see* Dr. Dennehy Reports of October 15, 2003 and January 15, 2004, p. 5 and p. 4, respectively),[3] and thus have "inserts" within the meaning of claims 1 and 18. In contrast to these bats, however, the Ultra, Ultra II, M-Pulse, Velocit-E II and Edge Bats (hereafter collectively referred to as the "New Bats") do not have inserts. Rather, as demonstrated by Miken in its initial brief, each of the New Bats consists of carbon fiber layers that are successively rolled over a mandrel and the previous layers to create an all carbon fiber composite bat. *Id.*, p. 4 and p. 3, respectively.

---

***of the insert into the tapering portion*** of the bat frame" ('398 Patent Specification; col. 2, lines 13-16); "[a] first end 20 of the tubular ***insert 18 is inserted*** through the impact portion . . ." (*Id.*, col. 2, lines 50-51); "[t]he grease is brought within the gap 26 by coating the insert 18 with grease before ***the insert is inserted into the tubular frame*** 11." (*Id.*, col. 3, lines 4-6); "[***a***]***n insert 18 . . . is inserted into*** the impact portion 12." (*Id.*, col. 4, lines 12-14); "[t]he insert 18 is coated with the lubricant before ***being inserted into*** the tubular frame 11." and "[t]he first end 20 of the ***insert 18 is forcefully inserted into*** the tapering portion . . . " (*Id.*, col. 4, lines 24-27).

3 Except as otherwise noted, all of the materials referenced in these citations are to the attachments to the Declaration of Michael H. Streater, dated September 7, 2004, filed in connection with Miken's original motion for summary judgment.

Given the undisputed manufacturing processes for Miken's New Bats, no serious argument can be made that these bats contain "inserts" as defined by the Federal Circuit. Very simply, the internal composite layers in the New Bats are neither "inserted" nor "intended for insertion" into the bat frames. Rather, they are constituent layers in a multi-layered, carbon fiber composite bat and an integral part of the bat frames. Because they do not contain an insert, none of the New Bats infringes claim 1 or 18 of the '398 Patent.

Wilson argued in its initial opposition, without citing to any authority whatsoever, that Miken's "New Bats" have "a structural member that is inserted into the frame assembly during the bats manufacture." Wilson Memo., p. 11. Tellingly, Wilson failed to offer any evidence in support of this bald claim, which is a demonstrable misstatement of Miken's manufacturing process. Nor could it because, as established by Dr. Dennehy's Reports of October 15, 2003 and January 15, 2004, no structural members are inserted into the frames during the manufacture of any of the New Bats.

Wilson also argues that the Ultra and Ultra II bats "have separate, removable inserts which can be slid out from their frames" (Wilson Memo., p. 8) – a contention that is not only incorrect, but which has absolutely no relevance to the definition of "insert" established by the Federal Circuit. Wilson bases this assertion entirely on two photographs (identified as Figs. 1A and 1B, Wilson Memo., p. 9), which lack any evidentiary foundation. These photographs do not appear in any of Wilson's expert witness reports submitted in connection with the summary judgment motion, nor does Wilson provide any other foundation for the figures, including identifying the manner in which the bats were dissected or how the supposed "inserts" were removed from the

"frames." As such, and even if this "evidence" had any relevance to the term "insert" (and it does not), these figures, and Wilson's argument based upon them, must be ignored. In any event, whether Miken's composite bat layers in the New Bats can be *deconstructed* is not instructive of whether these layers constitute something "inserted or intended for insertion."[4] Wilson's argument is akin to saying an orange is an "insert" because it is removable from its own peel. Though one can remove the peel from the orange, the orange is not "inserted" into the peel.[5]

In its initial opposition, Wilson for the first time asserted the Doctrine of Equivalents in an attempt to save its infringement arguments on the New Bats. However, Wilson waived this unavailing argument by relying solely on literal infringement throughout this litigation, and failing to assert the Doctrine of Equivalents or provide any factual basis for such a claim. *See* Miken Reply Brief, p. 5. *Boss Control, Inc. v.*

---

4 In contrast to these unsupported photographs, Miken submitted in connection with its summary judgment motion 10-inch sections cut from the impact portions of each of the bat models at issue in this case. *See* Declaration of Keith T. Dennehy, dated September 7, 2004, ¶ 5.) Miken invites the Court to attempt to pull apart the so-called "inserts" in the New Bat models, as well as in the other models. As the Court can readily determine, the so-called "inserts" in the New Bats are not removable from the bat frame as Wilson contends – they are an integral part of the frame.

5 Because Wilson cannot point to any *evidence* that the New Bats contain "inserts," Wilson contends that Dr. Dennehy's identification in his reports of the first composite wrap layers as an "insert" is somehow proof that the New Bats have "inserts." As explained in the Second Declaration of Keith Dennehy, filed herewith (hereafter "Dennehy Second Decl."), Dr. Dennehy used the terms "insert" and "frame" to identify the different layers of the bats, not to imply any information regarding the manufacturing or assembly processes. Dennehy Second Decl., p. 1 n.1. Moreover, Dennehy's use of the term "insert" does not alter the Federal Circuit's claim construction or create an insert in the New Bats where none exists.

*Bombardier, Inc.*, 420 F.3d 1372, 1380 (Fed. Cir. 2005). Moreover, Wilson's "leaf-spring" contention, which it offers in supports of its untimely Doctrine of Equivalents argument, was rejected by the Federal Circuit.[6] Finally, Wilson's argument impermissibly attempts to show an equivalent of the entire invention as a whole, rather than the individual elements (including "insert") of the claimed invention." The doctrine of equivalents must be applied to the individual elements of the claim, not to the invention as a whole. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("Each element [] in a patent claim is deemed material to defining the scope of the patented invention . . . It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.").

## III. NONE OF THE MIKEN BAT MODELS INFRINGES CLAIM 1 BECAUSE THERE IS NO GAP FORMING PART OF AN ANNULAR SHAPE BETWEEN THE INSERT IN THE FRAME IN THE IMPACT PORTION OF ANY BAT MODEL AND BECAUSE THE "FRAMES" AND "INSERTS" DO NOT HAVE CIRCULAR CROSS-SECTIONS

### A. The Federal Circuit's Construction of "Gap"

Claim 1 of the '398 Patent requires, among other things, that the insert within the bat frame be "separated" from the frame by a "gap" that "forms at least part of an annular shape":

---

6 In its brief filed with the Federal Circuit in the H & B Appeal, Wilson argued at length that as long as the configuration of the frame and the insert allowed them to move "independently" and achieve a "leaf spring" effect, the frame and insert could be in contact with one another. *See* Third Declaration of Michael H. Streater, filed herewith, Ex. B. The Federal Circuit's decision does not even reference this unsupportable argument, let alone adopt it.

> ... the ***insert*** being ***separated*** from the tubular frame by a ***gap forming at least part of an annular shape*** along a central portion between said first and second ends, the frame elastically deflectable across the ***gap*** to operably engage the insert along a portion of the insert between the insert first and second ends. (Emphasis added).

In its claim construction order, this Court rejected Wilson's contention that the term "gap" means an "interruption in continuity" and, instead, held that "gap" means "a space or void between the inner surface of the frame and the outer surface of the insert." July 26, 2004 Order, pp. 5-6, 10. In addition, this Court found that there could not be any physical contact anywhere between the frame and the central portion of the insert before the bat was under load:

> Because the movement occurs "across the gap," the "gap" necessarily features a width or distance along ***any*** latitudinal access of the bat. The gap therefore has three, not two, dimensions . . . .

July 26, 2004 Order, pp. 5-6 (emphasis added).

While the Federal Circuit agreed with this Court's construction of "gap" as a "separation" between the frame and insert,[7] it further construed "gap" -- when modified by the limitation "forming at least part of an annular shape" contained in claim 1 -- as not precluding "some contact" between the insert and frame:

> Thus, a claim without the "annular" requirement or with only a partial "annular" requirement could have a gap characterized by intersection of part of the cross-section between insert and frame. In other words, claims 1 and 18 do

---

[7] During the oral argument before the Federal Circuit in the *Wilson/Hillerich & Bradsby Co.* case, the Court observed: "Certainly the term gap means . . . that there has to be a space that is closed." Streater Second Supp. Decl., Ex. C, pp. 8-9.

> not require concentricity of the circular insert and frame. Moreover, those claims do not foreclose some contact between the insert and frame.
>
> * * *
>
> As a result of these considerations, this court defines "gap" for the purposes of claims 1 and 18 of the '398 patent as "a separation."

Federal Circuit Decision, pp. 9-11. *See also id.*, p. 9 (finding that "the modifiers to 'gap' [in the various claims], such as 'annular,' produce significant differences in the geometries in each defining claim. These modifiers inform the nature of the gap in each claim and define differently the cross-section of the claimed insert.").

### B. __The Federal Circuit Confirmed That The Insert and Frame In Claim 1 Must Have Perfectly Circular Cross-Sections__

The Federal Circuit concluded that claim 1 requires that both the frame and the insert "unequivocally have a 'circular cross-section.'" Federal Circuit Decision, p. 9. The Federal Circuit contrasted this perfect circularity requirement of claim 1 with claim 18, where the insert must only have "a substantially circular cross-section." *Id.*, p. 10. The Federal Circuit noted that the term "substantial" "implies 'approximate,' rather than 'perfect,'" and that "[t]herefore, in contrast to the insert of claim 1, the insert in this claim need not be ***perfectly*** circular." *Id.* (emphasis added).

### C. __Given Claim 1's Requirement That Both the Frame and the Insert Have Circular Cross-Sections, and That A "Gap" Exist Somewhere Between Them, Any Contact Between Them Is Limited To A Single Point In Any Given Cross-Section__

As demonstrated above, claim 1 requires that both the frame and the insert have a "circular cross-section," and that there be a "gap" or a "separation" between the insert and

the frame that forms "at least part of an annular shape." Federal Circuit Decision, pp. 9-11. Given these requirements, the outer diameter of the insert must necessarily be less than the inner diameter of the frame, or the frame and the insert would be in contact at all locations, precluding the "gap" or "separation" required by claim 1. Dennehy Second Decl., ¶¶ 1, 4. It is a mathematical fact that if circles of different diameters are positioned one within the other, with a "gap" or "separation" between them at any point, any contact between them can occur -- at most -- at a single, infinitesimally small point. *Id.*, ¶¶ 2, 3.c. Applying these principles to a tubular frame and a tubular insert, each having a circular cross section (as required by claim 1), any contact between the insert and the frame can exist at only one of two points, consistent with the requirement of a "gap":[8]

1. Contact between the insert and frame along a single, longitudinal line through the impact portion of the bat. Dennehy Second Decl., ¶ 3.c, Fig. 2.




[8] Of course, it is also possible that there is no contact between the frame and the insert. This is the only configuration that is illustrated in the '398 patent (Figures 1-3).

This configuration would occur if the insert in the '398 Patent embodiment was translated along the longitudinal axis to lay against the frame. The resulting contact is limited to a single point of contact along the line that runs the length of the impact portion -- and, critically, there can be no other contact between the members except at the single point of contact running along the length of the tube if any "gap" or "separation" exists between them, as required. Dennehy Second Decl., ¶¶ 3.b and 3.c.

2. Contact between the insert and frame at a single point on each of the opposite sides and ends of the frame. Dennehy Second Decl., ¶ 3.c, Fig. 3.




This configuration would occur if the insert shown in the '398 Patent embodiment was rotated around a transverse axis, causing the ends of the insert to each contact the frame at opposite points at the top and bottom of the frame. Dennehy Second Decl., ¶¶ 3.b and 3.c.

In each of these scenarios, "some contact" between the insert and frame occurs, as permitted by the Federal Circuit's Decision. And, because such contact can only occur in a single, limited point (given the requirements that the insert and frame have "circular cross-sections" and be "separated" by a "gap"), the resulting "gap" in these scenarios forms "at least part of an annular shape" – *i.e.*, part of an "area formed by two concentric circular or curved regions." This is demonstrated by the cross-sectional view of the impact regions of the bat in each of the permissible scenarios described above, reflected in the drawings in the upper right-hand corners of the above figures.

As demonstrated above, these are the <u>only</u> configurations that can exist where "some contact" occurs between a frame and an insert with "perfectly circular cross-sections" that are at least partially separated by a "gap."[9]

---

[9] The Federal Circuit made this very point when questioning Wilson's counsel during oral argument in the H & B Appeal:

> [S]peaking purely [in] mathematical terms here as the model of two circular – and they are described as circular, not substantially circular just in Claim I. If you have two circles, one of which is within the other, there are only three things that can happen, I take it. One is that they either don't touch or, two, that they touch at all points. The third is they touch on only one point. So you couldn't have two circles that touch on more than one point unless they touch on all points, correct? . . . ***When you say at least part of an annular shape, why should we then interpret that to mean something other than at most something that is annular except for one point of contact given that you've used the term circular to describe these two structures?*** Streater Second Supp. Decl., Ex. C, pp. 27-28 (emphasis added).

As discussed in the following section, none of the Miken bat models exhibit the limited point of contact permissible under claim 1, and thus none of the bats infringes the claim.

### D. <u>In Each of the Miken Bat Models, There is Intimate Contact Between the Frame and the "Insert" Throughout the Impact Portion, and Therefore Do Not Contain the "Gap" Or "Circular Cross-Sections" As Required By Claim 1</u>

1. *There Is No Evidence of <u>Any</u> "Gap" or "Separation" Between The Frames and Inserts In Three of The Accused Bats.*

There is absolutely no evidence that <u>any</u> "gap" or "separation" between the frame and insert exists in three of the accused bat models – the Intensit-E, Velocit-E and M-Pulse. Indeed, Miken's expert, Dr. Dennehy, was unable to detect any separation between the layers in these bats even when viewing samples at high levels of magnification.[10] Wilson has not – and cannot – offer any evidence that a "gap" exists in

---

In response, Wilson's counsel urged that manufacturing tolerances could result in an insert and frame with a cross-section that would be "circular within the range of what was capable of being manufactured at that time, but the tolerance might be such that there would be more than one contact point." *Id.* p. 29. The Federal Circuit plainly rejected Wilson's position when affirming that, under claim 1, the cross-sections for both the frame and insert must be "perfectly circular." Federal Circuit Decision, p. 10. This is consistent with the well-settled rule that manufacturing tolerances cannot be considered when construing patent claims, particularly not to expand their scope. *See, e.g., Middleton, Inc. v. Minnesota Mining & Mfg. Co.*, 311 F.3d 1384, 1389 (Fed. Cir. 2002); *Senmed, Inc. v. Richard-Allan Med. Indus., Inc.*, 888 F.2d 815, 821 n.10 (Fed. Cir. 1989).

[10] Dr. Dennehy also observed no separation between the "insert" and "frame" in the Velocit-E II bat when viewing a sample under an optical stereomicroscope, but because Wilson has proffered evidence that a .001" feeler gauge can be inserted between a 1/4" section of this bat, we address this "evidence" in Section III.D(2).

these bats. Thus, these accused bats cannot infringe claim 1 because they contain no "gap" at all.

2. *Because It Is Undisputed That The Frames and Inserts in The Remaining Bats Contain Numerous Points of Contact, These Bats Do Not Contain a "Gap" Forming "Part of an Annular Shape" or Possess "Circular Cross-Sections."*

In each of the remaining bat models – *i.e.*, the Ultra, Ultra II, Edge, Velocit-E II, hhd and Viper – Miken has offered unrefuted evidence that intimate contact between the insert and frame exists at numerous points both circumferentially and along the impact portion. Dr. Dennehy Reports of October 15, 2003 and January 15, 2004, p. 8 and pp. 6-7, respectively.[11] The Court can quickly confirm this contact by examining the samples of each bat impact portion submitted in connection with Miken's motion for summary judgment. Furthermore, as Dr. Dennehy's expert reports verify, only by viewing samples through a scanning electron microscope or an optical stereomicroscope can one even detect microscopic voids ranging *between the individual carbon fibers* (in the composite bats), and even then, these voids were intermittent and less than 0.0009 inches in size. *Id.*, p. 8 and pp. 6-7, respectively. Because this evidence confirms that the frame and insert in these bats are in contact at numerous points around the circumference and along the length of the frame (*i.e.*, everywhere that a microscopic void was not present), these

---

[11] Wilson's own engineering expert, Douglas Guenther, also admitted that in each of the Miken bat models, there are areas of contact between the frames and inserts longitudinally and circumferentially. Guenther Depo., pp. 147-48, 150.

bats do not contain a "gap" that "forms at least part of an annular shape" and also do not meet the circular cross-section requirement of claim 1.

Not surprisingly, in its initial response to Miken's summary judgment motion, Wilson failed to produce any evidence that these bats contain such a "gap," as it must to survive dismissal of its claims.[12] Instead, Wilson presented two, flawed pieces of evidence that it contends demonstrates that the Miken bats have "gaps," which relate solely to three of the accused bats: (1) a single light table test of an Ultra II bat showing what appears to be a crescent-shaped gap in a ¼ inch bat section (Guenther Report of October 24, 2003, p. 7, Figure 3); and (2) a feeler gauge test on an Ultra and a Velocit-E II bat where a .001" gauge was purportedly pushed through a ¼ inch bat section in each (Guenther Report of December 1, 2003, pp. 6-8, Figures 10-12).[13]

Wilson's flawed evidence fails as a matter of fact and law to demonstrate the existence of a frame and insert with a circular cross-section, and a gap between them, as required by claim 1 of the '398 Patent. Assuming that Wilson's light table test of a ¼ inch

12 In an effort to demonstrate the existence of a "gap," Wilson relied heavily on its so-called "load deflection" tests to demonstrate "independent movement" between the frames and inserts in the Miken models. Wilson Memo., pp. 11-13. Since the Federal Circuit has rejected Wilson's broad "independent movement" claim construction, these tests are completely immaterial to this Court's determination of the presence of a gap or separation in the Miken bats.

13 Wilson presented no evidence whatsoever as to whether the Intensit-E, Velocit-E, hhd, Viper, M-Pulse or Edge bats, relying solely on its load deflection and independent movement tests. *See generally* Wilson Memo.

sample was scientifically proper,[14] the small crescent-shaped light shown in the photograph extends only around approximately 60 degrees of the circumference of the circle. Guenther Report of October 24, 2003, p. 6.[15] As explained in Section III.C, if the insert and frame in fact have circular cross-sections, the light would be evident around virtually all of the 360 degree circle, with contact occurring at most at a single point. Wilson has thus established that either the frame and/or insert ***do not*** have circular cross-sections, or that its sampling technique was not scientifically valid. The same is true with Wilson's feeler gauge test.[16] The ability to push a feeler gauge through a ¼ inch sample at one point along the circumference, while the rest of the "insert" remains in contact with the frame, again establishes non-circular cross-sections. Thus, this "evidence" confirms that the two bat models subjected to the feeler gauge test cannot infringe claim 1.

Because all of the Miken bats have "inserts" in intimate contact with the frames throughout the impact portions, they cannot as a matter of law infringe claim 1. Wilson has not and cannot present evidence that any of the Miken bats have both an insert and frame with a circular cross-section and a gap between them.

---

14 Miken's engineering expert, Dr. Keith Dennehy, takes issue with Wilson's use of ¼ inch sections because of the effect of stresses and friction created by the cutting instruments on such a small cross-section. Dr. Dennehy concludes that "the conclusions drawn from testing the ¼ inch rings have to be questioned." Dr. Dennehy Report of December 1, 2003, pp. 3-4.

15 Indeed, Wilson's expert, Douglas Guenther, confirmed that two thirds of the outer surface of the "insert" and the inner surface of the “frame” were in contact in the sample used in the light box "test." Guenther Depo., p. 106.

16 Because the feeler gauge "test" was also done on a ¼ inch segment, it is also of questionable validity.

## IV. BECAUSE EACH OF THE MIKEN BATS HAS INTIMATE CONTACT BETWEEN THE FRAME AND INSERT THROUGHOUT THE IMPACT PORTION, NONE OF THE BATS INFRINGES CLAIM 18, WHICH PRECLUDES CONTACT BETWEEN THE FRAME AND INSERT, BEFORE IMPACT, AT THE POINT OF IMPACT

Although the term "gap" does not appear in claim 18, the Federal Circuit interpreted the claim as requiring a space between the frame and the insert before impact:

> Rather the claim requires only space between the frame and the insert to allow for contact when the impact portion is elastically deflected. Because the bat hits the ball at only a small point of impact, not extending over the entire circumference of the frame, ***claim 18 also not does foreclose the possibility that contact between the frame and the insert occurs, before impact, at some point other than that at which impact occurs.***

Federal Circuit Decision, p. 10 (emphasis added). Stated differently, claim 18 ***does*** foreclose the possibility of contact between the frame and the insert, before impact, at the point where impact will occur.

As discussed above, there is no evidence that any gap or separation between the frame and the insert exists in the Intensit-E, Velocit-E or M-Pulse. As such, none of these bats can infringe claim 18 because there is no possibility that there will be impact where a separation between the insert and frame exists. With respect to the remaining bat models (the Ultra, Ultra II, Edge, Velocit-E II, hhd, and Viper), Miken has demonstrated that there is intimate contact between the "inserts" and "frames" throughout the impact portion of each bat model, with only intermittent microscopic separations. Given this, none of these models are reasonably capable of use that infringes claim 18 because of the extreme unlikelihood that a ball would impact the frame ***precisely*** at a point where such a

random microscopic separation exists. *See Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) (device must be *reasonably capable* of a use that infringes the patent, and test of accused device under unusual conditions not relevant to infringement analysis). *See also High Tech Medical Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1555 (Fed. Cir. 1995) ("device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim"); *Hap Corp. v. Haeyman Mfg. Co.*, 311 F.2d 839, 843 (1st Cir. 1962) ("The question is not what [a device] might have been made to do, but what it was intended to do and did do . . . ."). Summary judgment of non-infringement of claim 18 is therefore mandated with respect to these bat models.

## V. BECAUSE EACH OF THE MIKEN BATS HAS AN INTERFERENCE FIT PRE-LOADING, NONE OF THE BATS INFRINGES CLAIM 18, WHICH REQUIRES THE ABSENCE OF AN INTERFERENCE FIT PRE-LOADING

Finally, as implicitly recognized by the Federal Circuit, claim 18 requires that the space between the insert and the frame at the point of impact must be "inwardly elastically deflectable such to ***establish*** a tight interference fit between the insert and the impact portion"[17] (emphasis added). *See* Federal Circuit Decision, p. 3 ("Although gap

[17] "Interference fit" is defined as "a fit wherein one of the mating parts of an assembly is forced into a space provided by the other part in such a way that the condition of maximum metal overlap is achieved." McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003). According to Douglas Guenther, one of Wilson's engineering experts, interference fit means "the two parts are put together in such a way that there are stresses applied to each part due to the fit of the joint." Guenther Depo., p. 160.

does not appear in claim 18, ***the claim term 'a tight interference fit' implies some sort of space between the frame and the insert***"); p. 10 (claim 18 "requires only space between the frame and the insert ***to allow for contact when the impact portion is elastically deflected***"). Thus, by its terms, claim 18 precludes the existence of a tight interference fit prior to the elastic deflection of the impact portion by the ball.[18]

With the possible exception of the Viper and the non-bonded hhd models, each of the other Miken bat models at issue are constructed so as to establish a tight interference fit between the "insert" and "frame" pre-loading. In the Intensit-E and Velocit-E bats, the outer diameter of the insert is actually larger than the inner diameter of the bat frame, and the inserts are hydraulically forced into the frames. Testing of these bats establishes that it takes an excess of 1,000 pounds of force to move the inserts within the bat frames. As such, a tight interference fit is necessarily created in each of these models. *See* Dr. Dennehy Report of October 15, 2003, p. 9 (stating that "... the design of these two bats results in an interference fit between the insert and the frame. The interference fit introduces tensile stresses in the frame and compressive stresses in the insert.").[19]

---

[18] Wilson's own expert acknowledges this. *See* Report of David M. Parks, pp. 25-26, stating that the interference fit of claim 18 is a "transient" or "temporary" fit that occurs only during impact between the bat and the ball.

[19] Douglas Guenther, Wilson's engineering expert, agreed that if the outer diameter of the insert in the Velocit-E or the Intensit-E was 2.004 inches or greater, and the insert was forced into a bat barrel with an inner diameter no greater than 2.000 inches, an interference fit would be created. Guenther Depo., pp. 159 - 160.

Although Miken's Ultra and Ultra II are manufactured differently than the Velocit-E and Intensit-E bats, even greater force is required to move the "insert" in the "frames" of these models.[20] Indeed, testing establishes that it takes in excess of 1,200 pounds of force to move the insert inside the frame of a 10-inch long section cut from an Ultra II bat. Dr. Dennehy's Report of December 1, 2003, p. 5. Given the similarities in design and manufacture between the M-Pulse, Velocit-E II and Edge bats, and the Ultra and Ultra II, a force comparable to that required for the Ultra II bat (1,200 pounds) would be necessary to move the "insert" within the "frame" in the M-Pulse, Velocit-E II and Edge bats. Dennehy Decl., ¶. 4.

Because each of these bats includes an interference fit between the "insert" and "frame" prior to impact with a ball, claim 18 is not infringed by any of these models.[21]

---

[20] As discussed above, given the manufacturing method of overlaying each successive carbon fiber layer on top of the mandrel and the previous layers, the "New Bats" (the Ultra, Ultra II, M-Pulse, Velocit-E II and Edge) do not have "inserts" because these layers are not "inserted" or "intended for insertion" into their "frames." For purposes of this section, however, the Court can consider the interior carbon rolled layers an "insert" and the outer woven carbon layers a "frame."

[21] The hhd bats that had their inserts bonded to the frames (85% of all of those manufactured) must also be deemed to have an interference fit pre-loading. According to one of Wilson's engineering experts, no independent movement of the insert and frame will occur if the frame and insert are bonded. David M. Parks's Report, p. 22. An interference fit, as defined by Dr. Parks (that is, the insert is locked in place and global relative motion of the insert and frame are restrained), is thus present in the bonded hhd bats. The remaining hhd bats, and all of the Viper bats, would need to be individually examined in order to determine whether, as a result of aluminum manufacturing tolerances, they had an "over-sized" insert and thus would have an interference fit, or whether they had an "under-sized" insert, in which case an interference fit may not be present.

## I. CONCLUSION

For the reasons stated herein, and in Miken's opening and reply memoranda, Miken respectfully requests that the Court grant its motion for summary judgment of non-infringement.

Dated: May 12, 2006

**BRIGGS AND MORGAN, P.A.**

By: *s/ Michael H. Streater*
Michael H. Streater
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2157
(612) 977-8400

FREDRIKSON & BYRON, P.A.
Kurt J. Niederluecke
200 South Sixth Street, Ste. 4000
Minneapolis, MN 55402
Phone: 612.492.7000
Facsimile: 612.492.7077