**In The Matter Of:**

*Miken Composites, LLC v.*
*Wilson Sporting Goods Co.*

---

*Douglas Guenther*
*May 12, 2004*

---

*McCorkle Court Reporters, Inc.*
*200 North LaSalle Street*
*Suite: 300*
*Chicago, IL U.S.A. 60601*
*(312) 263-0052 FAX: (312) 263-7494*

*Original File 051204AM.TXT, 166 Pages*
*Min-U-Script® File ID: 0368676192*

**Word Index included with this Min-U-Script®**

EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

MIKEN COMPOSITES, L.L.C., )
Plaintiff, )
vs. ) No. 02-CV-769
WILSON SPORTING GOODS COMPANY,)
Defendant. )

The deposition of DOUGLAS GUENTHER, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Elizabeth L. Vela, a Notary Public within and for the County of Cook, State of Illinois, at 8700 West Bryn Mawr, Chicago, Illinois, on the 12th day of May, 2004, at the hour of 10:00 o'clock a.m.

Reported by: Elizabeth L. Vela, CSR
License No.: 084-003650

Page 2

APPEARANCES:

BRIGGS & MORGAN, by
MR. MICHAEL H. STREATER,
2200 IDS Center
Minneapolis, MN 55402
(612) 977-8499
Representing the Plaintiff,

KEY & ASSOCIATES, by
MR. JEFFREY A. KEY,
150 North Michigan Avenue, Suite 1115
Chicago, IL 60601
(312) 560-2148
Representing the Defendant.

Page 3

INDEX


| WITNESS | EXAMINATION |
|---|---|
| DOUGLAS GUENTHER | |
| By MR. STREATER | 4 |


EXHIBITS


| NUMBER | MARKED FOR ID |
|---|---|
| Exhibit | |
| No. 65 | 14 |
| Nos. 47, 49, 66 | 25 |
| No. 67 | 37 |
| No. 68 | 66 |
| Nos. 46, 48, 50, 69, 70, 71 | 71 |


Page 4

(Witness sworn.)
DOUGLAS GUENTHER,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. STREATER:

**Q:** Good morning, Mr. Guenther.
**A:** Good morning.
**Q:** Would you state your full name for the record, please?
**A:** Douglas Gerard Guenther.
**Q:** And where do you reside, Mr. Guenther?
**A:** Wheaton, Illinois.
**Q:** Can you give me a residential address?
**A:** It's 2 South 400 Burning Trail, Wheaton, Illinois. And the Zip is 60187.
**Q:** You're currently employed by Wilson Sporting Goods Company, is that correct?
**A:** That's correct.
**Q:** And I will show you in a few minutes a report that you prepared that contains a resume of your past work history. Are you familiar with that document, your resume?
**A:** Yes, I am.

Page 105

has stated in this report.
Q: You told me a few minutes ago — I thought you said separation to you means no contact. Is that true?
A: It doesn't have to be continuous contact.
Q: So separation in the context of this patent can mean contact?
A: It can mean intermittent contact.
Q: What does intermittent contact mean?
A: It means between the surfaces, there are — there still exists — they can be minute, but there still exists annular gaps.
They could be small, large. They can be partial, all the way around the surface. So they're intermittent. There's intermittent annular ring-type gaps and there's areas where the parts are going to touch.
Q: Looking at these quarter-inch rings that you cut out of these bats, would you agree with me — for example, let's look at the one that's marked Figure 3, 5, and 6.
Would you agree that the outer surface of the insert and the inner surface of the bat frame are in contact with one another?

Page 106

A: No, not completely.
Q: You would agree that there is — that they're in contact with one another — can you quantify it? Over two-thirds of the ring?
A: Well, I know I can hold this ring up and look at the cross-section and I can see light shining through the two — between the insert and the frame.
Q: Okay. And —
A: So —
Q: How long is that area of light that you can see on that ring?
A: It's hard to — I would say it's at least — I can't give you an exact because it's so small, but I can say it's at least a third of the way around, the circumference.
Q: So on a rough view of that, it looks like about two-thirds of the outer surface of the insert and the inner surface of the bat frame are touching one another in contact, is that fair?
A: In the orientation that I'm setting it at, gravity is allowing the inner — the insert to sit against the frame.
Now, if I held this in a different

Page 107

orientation, like on the table, I'm not sure if I couldn't move the insert toward the gap to make a smaller gap that went all the way around between the two parts, because I can't — with the naked eye, it's hard — I can't tell you if I can do that or not.
Q: If the gap went all the way around, then the insert would fall out, wouldn't it?
A: Like this? I can push it out. So —
Q: But if you hold up that, it doesn't fall out, does it?
A: In this case, no, it doesn't.
Q: In none of the testing that you did, when you cut these quarter-inch sections, none of the inserts fell out, did they?
You could push them out with your fingers, but they didn't fall out, did they?
A: I didn't perform every test. So I don't know if that's the case, if some could fall out or not. I'm not sure.
Q: Let's talk about the ones you did. In the testing you did, none of the inserts fell out, did they?
A: That's correct.

Page 108

Q: So if they didn't fall out, there has to be some degree of contact between the outer surface of the insert and the inner surface of the bat frame, correct?
A: Yes.
Q: What does the word adjoin mean to you as an engineer in the context of the 398 patent?
A: Something that does not behave in a leaf spring fashion.
Q: Well, if you look on your claim chart on Page 16, about the middle of the page, it says one of the elements is the insert having first and second ends adjoining the tubular frame. Do you see that?
A: Correct.
Q: Does adjoining simply mean contacting the frame or does it mean contacting in such fashion that there cannot be any independent movement under load?
A: It means — in that context that that is written, it means that the insert outside of the impact area of the bat is — has a first and second end that do not behave in a leaf spring-like fashion.

Page 145

inch? Do you follow what I'm saying?
A: I follow what you're saying. That assumption would be based on perfectly concentric rings, which I believe is extremely difficult to do.
Q: Was the feeler gauge test attempted on any rings larger than a quarter-inch?
In other words, was — did Mr. Gaff try to do the feeler gauge test on a 10-inch section of any of these bats?
A: Not to my knowledge.
Q: Do you know why not?
A: We felt that we showed what we wanted to show by doing it on a quarter-inch section.
Q: We talked earlier about this light test that you did that I believe is reflected in Exhibit 49 in your initial report.
You talk about holding it up to a light, and then, I believe also in your — Exhibit 47, your reply to Dr. Dennehy's report.
Was that light test attempted on a 10-inch section of the Miken bats?
A: No, it was not.
Q: Why not?

Page 146

A: I didn't believe it was necessary.
Q: Do you have an opinion as to whether or not if you took a 10-inch section from any of these bats and held it up to the light box whether you would be able to see light coming through between the insert and the frame?
A: I think it could be done.
Q: So you believe that if you took a 10-inch section, the impact portion of any of these Miken bats and held it up to a light source, you would be able to see light coming through between the insert and the bat frame at some point along the circumference?
A: It would be difficult, but I think it could be done.
Q: What do you mean it would be difficult, but it could be — either you see it or you don't, right, or are you talking about manipulating the sample in some way?
A: No. It — with a part that long, just getting the orientation right, it's the whole set-up of the test.
It makes it much more difficult, because you've got such a long part and you're trying to

Page 147

shoot a beam of light through this.
That's the difficult part with the length. It's nothing to do with manipulating the test. It's just the set-up would be more difficult because the part is longer. That's all.
Q: We talked a little bit earlier and I want to follow up on it with respect to — let's take the Ultra for example.
If you look at that section — if you were to cut a section from the Ultra bat from the impact portion of that and looked at it circumferentially and longitudinally, isn't it true that there would be contact between the respective surfaces of the insert and the bat frame in most if not all areas?
A: There would be intermittent contact between the two. Whether that's — quantifiably, I'm not sure where that would be, but there would be areas of intermittent contact.
Q: Well, what do you — I keep dropping these out but — when you say intermittent contact, that suggests to me that it's — that there is contact not at very many places. Is that how you're using the term intermittent?
And I'm not talking about the degree of

Page 148

abutment between the respective layers. I'm simply talking about contact in the sense of touching.
A: I believe that there's these annular spatial separations mixed in with areas where the insert touches the frame.
Now, it's very difficult to say which one is greater or which one is less, but in the end, the combination of the two do not allow the support of interlaminar sheer during bending.
Q: Well, let's assume just for discussion here that the Court in this case construes Claim 1 of this patent as requiring before any impact with a ball no contact whatsoever between the outer surface of the insert and the inner surface of the bat frame except at the interference fits at the end of the insert. Are you following me so far?
A: Right.
Q: Let's assume that's what the Court says, okay?
A: Okay.
Q: That gap within the meaning of this patent means there can be no contact circumferentially or longitudinally except at the ends of the insert.
Are you with me so far?

Page 149

A: Uh-huh.
Q: Is that a yes?
A: Yes, it is. I'm sorry.
Q: If the Court were to rule that way, would you agree that none of the Miken bats would infringe the patent as construed by the Judge?
A: I think that's difficult for me to answer, because that's how they're construing the claim. It's not how I would construe the claim.
Q: I appreciate that.
MR. KEY: Just — could I just ask a question as a point of clarification? Are you only talking about Claims 1 and 15, the gap claims?
MR. STREATER: I'm just talking about Claim 1 in my hypothetical here.
MR. KEY: Okay.
BY MR. STREATER:
Q: If the Court were to conclude — were to construe Claim 1 as saying in order to infringe this claim, there has to be contact — strike that. Let me restate this.
If the Court were to construe Claim 1 of the patent as requiring, again, before impact that there be no contact whatsoever between the outer

Page 150

surface of the insert and the inner surface of the bat frame circumferentially around the insert and longitudinally down the insert except at the insert ends, if the Court were to construe the claim that way, you would agree that none of the Miken bats would infringe that claim as construed, true?
A: True.
Q: In other words, in each of the Miken bats that you looked at, there is, in fact, contact between the outer surface of the insert and the inner surface of the bat frame at some areas circumferentially and/or longitudinally, correct?
A: I can't prove that, but I would assume that to be the case.
Q: And you look —
MR. KEY: I'm getting a little bit worried about these feeler gauge samples going in and out, in and out. They're getting bent up.
MR. STREATER: I'm done with them.
MR. KEY: Are you sure?
MR. STREATER: I don't know.
MR. KEY: I was going to suggest, let's just leave them out.
MR. STREATER: That's fine. I don't know that

Page 151

they're going to be of evidentiary value anyway, but we'll see.
MR. KEY: Well, they're Wilson samples. And I know you don't mean to bend them up.
MR. STREATER: He was bending them. I wasn't bending them.
MR. KEY: Well —
MR. STREATER: I understand.
BY MR. STREATER:
Q: Dr. Dennehy in his report did some microscopic photography of the surfaces, the insert, the bat frame, and then also did some SEM views. And you've seen that, correct?
A: That's correct.
Q: And you would agree without going through each of those that there is, in fact, contact between the insert and the bat frame in the pictures that he's put together, correct?
A: I have — I can't agree with his pictures of what he did, because the way he cut the bats totally changed their configuration.
And I think the way they're sitting is not representative of how they sit in the full bat form.

Page 152

MR. STREATER: Could you just read his answer back?
(Whereupon, the record was read.)
BY MR. STREATER:
Q: The quarter-inch sections that you cut out of these bats in your view are representative, is that correct?
A: That's correct.
Q: But the way Dr. Dennehy has cut the bats, it distorts the bats in a way that the findings of the bases on those photographs are invalid in your view?
A: That's correct.
Q: And as I — I think that is dealt with in your Exhibit 66, which is your supplemental report, is that correct?
A: That's correct.
Q: It's also dealt with — you also deal with this in Exhibit 47.
You're talking about the release of the hoop stresses, is that correct?
A: That's right.
Q: Let's just focus on Exhibit 47 for a minute.

Page 157

hand in a number of these bats, would that suggest to you the degree of contact between the respective surfaces of the insert and the bat frame?
A: No.
Q: It wouldn't tell you anything about that?
A: Not really, no.
Q: If one wanted to make a determination as to how much of the surface area of the insert was actually in contact with the inside of the bat frame in each of these bat models, how would you do it?
A: You'd have to run different types of tests.
Q: I'm trying to get at a specific test that you think — you don't like the test that Dr. Dennehy did.
You think that distorted or disturbed the relationship of the bat frame and the insert, such that his conclusions are invalid, correct?
A: Right.
Q: So what test would you propose if you were going to try to measure the — again, just the amount of surface and contact?
A: I don't know — without — I don't have

Page 158

the ability to manufacture these bats.
So you know, I think it would have to fall on Miken to figure that — to understand that more. I don't have that ability so —
Q: With respect to the Velocit-E and Intensit-E bats, we talked earlier, if I can find it — I don't know if I've given it to you or not, but Exhibit 46 is Dr. Dennehy's initial report.
And at Page 4, the bottom of that page, it talks about the manufacturing of the Intensit-E and the Velocit-E bats.
And it indicates that with respect to both bats, the inserts are run through a grinder to achieve an outside diameter of 2.004 inches to 2.008 inches.
And then, he indicates that the — if you go to Page 5, that the inner diameter of the bat frame was specked at 2.000 inches, but he measured one and it came out to be 1.999 inches. Do you see that?
A: Let's see here.
Q: Now, assuming that to be the case, that the inserts for the Velocit-E and Intensit-E were, in fact, 2.004 inches to 2.008 inches and that the

Page 159

inner diameter of the bat frame was 2.000 inches and that the inserts were hydraulically jacked or forced into the bat barrel, assuming all that to be true, would you expect there to be contact between the outer surface of the insert and the inner surface of the bat frame throughout most, if not all of the insert?
A: The one sentence that he states that the outside diameter of the mandrel would also be the inside diameter of the bat frames, I do not agree with that. So I really don't know what the inside diameter of the frame is.
Q: Why do you disagree with his comment?
A: Because I'm not sure what the material is of the mandrel.
I'm assuming it's steel. And once you mold over it and you take the part off, once it cools or changes temperature, it's going to change its dimension. It's not going to be the same. So I don't know what that's going to end up.
Q: Well, let's just assume per my question that it did, in fact, end up at 2.000 inches and that the insert ended up at 2.004 inches or something greater than that and that the insert was

Page 160

forced into the bat barrel.
Would you agree that there would be contact between the outer surface of the insert and the inner surface of the bat frame throughout most, if not all of the insert?
A: I would agree that there would be contact. What degree that contact would be of the overall surface area between the two parts would have to be determined.
Q: Does the term interference fit mean anything to you as an engineer?
A: Yes.
Q: What does interference fit mean?
A: It means that two parts are put together in such a way that there are stresses applied to each part due to the fit of the joint.
Q: The situation that I just described to you, assuming that that's what, in fact, happened during the manufacture of the Velocit-E and the Intensit-E, would that create an interference fit?
A: Theoretically, from the numbers, it would. What actually happens in reality may be different due to several factors, like the elasticity of the structure, the concentricity of the parts, and

**05-1103**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

WILSON SPORTING GOODS CO.,

*Plaintiff-Appellant*

v.

HILLERICH & BRADSBY CO.

*Defendant-Appellee*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS IN 00-CV-6517,
JUDGE RUBEN CASTILLO

---

# BRIEF OF PLAINTIFF-APPELLANT WILSON SPORTING GOODS CO.

Michael R. Levinson
Louis S. Chronowski
**SEYFARTH SHAW LLP**
55 E. Monroe Street, Suite 4200
Chicago, IL 60603

Jeffery A. Key
**KEY & ASSOCIATES**
150 N. Michigan Avenue
Chicago, IL 60601

Attorneys for Plaintiff-Appellant
WILSON SPORTING GOODS CO.

February 2, 2005

**EXHIBIT B**

A. The District Court Improperly Used Dictionary Definitions

The District Court used a dictionary to define "gap" as "a suspension of continuity." (A8). By itself, this definition makes sense. It is true to Eggiman's invention of separate frame and insert, which can move independently like a leaf-spring. But the District Court did not stop with this definition. It went on to define the word "void," which *appears nowhere in the patent*, as meaning "an open space or break in continuity." (A8). The District Court equated this latter definition with "a discontinuation of continuity," found it was "synonymous with 'gap,'" added the new words "single" and "continuous" to the limitation, and then concluded that "gap" means "a single continuous space or void." (A11). While this Court has recognized the assistance that dictionaries can offer "in determining the ordinary and customary meanings *of claim terms*," it has never suggested that dictionary definitions of words "synonymous" with claim terms should define those terms. *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002) (emphasis added).

But there is a more fundamental problem with what the District Court did. It ignored the essence of Eggiman's invention. This Court has made clear that what the patent "claims to be the invention" is critical. *C.R. Bard, Inc.*, 358 F.3d at 863. Even the "ordinary and customary meaning of a term does not govern if the

intrinsic record contains lexicography or disavowal of claim scope." *Texas Digital Systems*, 308 F.3d at 1204.

The essence of Eggiman's invention is a bat that has a leaf-spring-like structure. The frame and insert of Eggiman's invention can act like a leaf-spring, even if they are touching, so long as they can move independently upon impact with a ball. The specification makes that clear when it explains that there need be no lubricant between frame and insert:

> Moreover, insert and frame materials which are themselves slippery as to permit the independent movement of insert and frame may work equally as well. (A170, Col. 5, lines 19-22).

Indeed, the District Court in *Worth* recognized that "non-continuous gaps perform the patent's objective of increasing power transfer from the bat to the ball as long as there is a sufficient gap to allow a leaf-spring-like action between the frame and the insert." *Worth*, U.S.D.C., District of Oregon, Civil No. 97-1693-KI at 6. (A404).

B. <u>The District Court Misread the Prosecution History</u>

There is nothing in the prosecution history that disclaims as part of Eggiman's invention a double-walled bat in which the frame and insert touch. Eggiman did not ever distinguish the prior art on the ground that the prior art insert and frame simply touched but moved independently on impact, while his did not touch. On the contrary, when Eggiman prosecuted the patent, he repeatedly

distinguished the prior art on the ground that their inserts and frames were too far apart to "communicate" or "operably engage" or they simply did not teach or suggest such engagement, elastic deflection, or independent movement. (*See*, for example, April 26, 1994 Amendment: "None of the references of record discloses a bat frame and insert combination wherein the frame may elastically deflect across the gap to engage the insert")(A594-A595).

The District Court's construction of "gap," requiring "a single continuous space or void . . . *great enough to allow* for deflection of the frame across the gap," misses this important difference between Eggiman's invention and the prior art. (A11)(emphasis added). The prior art included a bat (Peng) in which the gap was *too great* to allow the frame to "operably engage" the insert. Eggiman stressed *narrowing* the distance between the frame and insert in order to allow a leaf-spring effect. The District Court erred by reading into the term "gap," a limitation that it had to have some minimum breadth in order to operably engage the insert. It did not.

According to the District Court, if impact with the ball causes the frame to engage the insert, then the "insert was *not* engaged by the frame prior to the inward deflection of the frame." (*Id.*) This presumably meant to the District Court that the frame and insert could not be touching before impact with the ball. The error in this is that "engaged" means much more than mere touching or contact. It

means, in the words of the Patent, "to load and inwardly deflect the underlying insert wall" itself. (A169, Col. 3, lines 20-22). The "insert deflects arcuately to cradle the arcuate deflection of the impact portion of the frame." (A169, Col. 3, lines 24-25). Indeed, Eggiman amended Claim 1 to replace the words "communicate with the insert" with the words, "operably engage the insert." (A593). He explained in the April 26 Amendment that this "frame engagement" is what provides "additional spring-like energy to the ball when the frame elastically rebounds back across the gap." (A594).

Thus, the frame and insert of Eggiman's bat could be in contact or touch *before* impact with the ball and still result in the frame "engaging" the insert -- as Eggiman defined it -- upon impact. In other words, there need not be a "single continuous space or void" between the frame and insert for the frame to operably engage the insert and create a leaf-spring effect. The District Court's observation that "the insert cannot be in tight abutment" with the frame because "that is what the Fuji patent teaches" does not mean no touching at some points. (A11). "The tightly-fitted Fuji insert simply acts to thicken the wall of the impact portion of the bat." (A168, Col. 1, lines 67-68). The '398 Patent distinguishes Fuji because Fuji teaches "tight abutment as causing the insert to be 'fixed relative to the frame.'" (A168, Col. 1, lines 61-64). The Fuji bat prevents the frame and insert from moving independently as a leaf-spring. Eggiman's insert is *not* fixed relative to the

frame and it can touch the frame at some points without being in "tight abutment" and still move independently.

C. The District Court Failed to Differentiate Claim 1 From Claims 2 and 15

Claim 1 refers to the "insert being separated from the tubular frame by a gap forming *at least part of an annular shape. . . .*" (A170, Col. 5, lines 59-61). Claim 15 refers to "an internal structural insert *defining an annular gap* with an inside wall of the impact portion . . . ." (A170, Col. 6, lines 39-41)(emphasis added). This difference suggests that the shape of the "gap" formed by the insert and frame in Claim 1 need not be completely ring-like, but only form *part of* a ring-like shape, while the "gap" defined in Claim 15 must be annular or ring-like. Under the doctrine of claim differentiation, the Court must recognize that there is a difference in the language of Claim 1 and Claim 15 and must not re-write the "part of an annular shape" limitation of Claim 1 into the "annular gap" limitation of Claim 15. *Versa Corp. v. AG-BAG Int'l*, 392 F.3d 1325, 1330 (Fed. Cir. 2004). As this Court has explained:

> The difference in meaning and scope between claims is presumed to be significant "[t]o the extent that the absence of such difference in meaning and scope would make a claim superfluous." (*Id.*)

Without differentiating between the specific language Eggiman used in Claims 1 and 15, the District Court simply construed the "part of an annular shape"